Case Number: CACE-15-002802 Division: 12

Filing # 23890789 E-Filed 02/18/2015 10:45:37 AM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, FLORIDA

CASE NO.

GARY DEAR,
as Class Representative of those similarly
Situated,

        Plaintiff,

vs.

Q CLUB HOTEL, LLC, a Delaware Limited
Liability Company,

        Defendant.

_____/

## SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

    YOU ARE COMMANDED to serve this Summons, and a copy of the complaint or petition in this action on defendant:

**Q CLUB HOTEL, LLC, a Delaware Limited Liability Company**
**By Serving:  Michelle Santoro, as Registered Agent**
**505 N. Fort Lauderdale Beach Blvd.**
**Fort Lauderdale, FL 33304**

    Each defendant is required to serve written defenses to the complaint or petition on **STEVEN R. JAFFE, FARMER, JAFFE, WEISSING, et. al.,** Plaintiff's attorney, whose address is 425 N. Andrews Avenue, Suite 2, Fort Lauderdale, Florida 33301, Tel: (954) 524-2820, within twenty (20) days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

    DATED on _____FEB 18 2015_____, 2015.

HOWARD C. FORMAN
As Clerk of the Court

BY: _____

Filing # 23890789 E-Filed 02/18/2015 10:45:37 AM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, FLORIDA

CASE NO:

GARY DEAR,
as Class Representative of those similarly
Situated,                                                    **CLASS REPRESENTATION**


       Plaintiff,

v.

Q CLUB HOTEL, LLC, a Delaware
Limited Liability Company,

       Defendant.
_____/

## CLASS ACTION COMPLAINT

Plaintiff, GARY DEAR, ("Plaintiff") individually and on behalf those similarly situated, by and through his undersigned counsel, hereby sue Defendant, Q CLUB HOTEL, LLC ("Defendant" or "Q CLUB"), a Delaware Limited Liability Company, and allege:

1.    Plaintiff brings this class action under Rule 1.220, Fla. R. Civ. P., and Chapter 86, Fla. Stat., for damages, and for declaratory, injunctive, and supplemental relief.

2.    Plaintiff and Class Members are condominium owners of units in Defendant's Q Club Resort and Residence Condominium, part of which is dedicated to a hotel operating under the Hilton brand known as the "Hilton Fort Lauderdale Beach Resort."

3.    The condominium is governed by a uniform declaration of condominium whose terms apply to each Plaintiff and Class Member similarly and to Q CLUB whose duties under it apply to Plaintiff and Class Members uniformly.

4.     Under the declaration, each Plaintiff and each Class Member is assessed a percentage of specifically defined "Shared Costs" in order to pay for the maintenance and operation of specifically defined "Shared Components" of the condominium and the amenities within the hotel.

5.     Q CLUB is in turn required to maintain financial records accounting for the elements making up the Shared Costs and roster indicating unit owners and their applicable charges. Q CLUB is also obligated to receive and accept reimbursement from unit owners for Shared Costs, but only as specifically identified and defined in the declaration of condominium.

6.     However, this has regularly not been the case. At all times material to this action, Q CLUB has systematically failed to maintain the records it is obligated to maintain, and Q CLUB has routinely and systematically collected payments from Plaintiff and Class Members for items that either are not Shared Costs, or are artificially inflated by Q CLUB.

7.     Accordingly, on behalf of themselves and others similarly situated, as a matter of common concern to the condominium's unit owners, Plaintiff now seeks a declaration of the Parties' rights and obligations under the declaration; an injunction; and damages from Q CLUB attributable to the unlawful charges Q CLUB has imposed in material breach of the condominium declaration (attached as **Exhibit A**) governing the Q Club Resort and Residence Condominium.

## PARTIES, JURISDICTION AND VENUE

8.     This action is brought under Florida law and Florida Rule of Civil Procedure 1.220. Plaintiff sues Q CLUB for damages in excess of fifteen thousand dollars ($15,000.00), excluding interest, costs, and attorney's fees, and for declaratory and injunctive relief.

2

9.   Plaintiff understands and believes that neither any individual Class Member nor any Plaintiff has a claim that exceeds $75,000.00 including pro rata attorney's fees. Plaintiff is not in a position to assert whether the total amount in controversy exceeds $5,000,000.00 in aggregate damage.

10.   Plaintiff, GARY DEAR ("DEAR) is an individual Florida Citizen residing in Palm Beach County, Florida, and is otherwise *sui juris*. DEAR owns Unit 1402 at Q Club Resort. DEAR is a Class Member who has paid Q Club for Shared Costs as defined in this action.

11.   Defendant, Q CLUB HOTEL, LLC ("Q CLUB") is a Delaware Limited Liability Company; maintains a principal address in Miami-Dade County, Florida; and has registered with the Florida Secretary of State, Division of Corporations, to conduct business in Florida. Q CLUB is a Florida and Delaware citizen. Since at least February 2011, Q CLUB has engaged in substantial, continuous, systematic, and non-isolated business activity within the state of Florida, including Broward County, Florida.

12.   Venue is proper in Broward County pursuant to § 47.011, Fla. Stat., because the acts complained of and giving rise to this action have occurred in Broward County, Florida, and the condominium at issue is located here.

13.   All conditions precedent and necessary to bring this action have either been performed, have occurred, have been waived, or have otherwise been excused.

### FACTS APPLICABLE TO ALL COUNTS

14.   The Q Club Resort and Residence Condominium ("CONDOMINIUM") is located on Ft. Lauderdale beach in Broward County, Florida. It was established on or about February 2007. The CONDOMINIUM part of a condo/hotel arrangement consisting of three hundred thirty-three

(333) residential units ("Residential Units"), six (6) commercial units, and one (1) hotel unit ("Hotel Unit").

15.    Defendant, Q CLUB, is the owner of the Hotel Unit.  Q CLUB markets, manages, and operates the Hotel Unit as the "Hilton Fort Lauderdale Beach Resort" under an exclusive licensing agreement with the Hilton Hotels Corporation.

16.    Plaintiff and Class Members own Residential Units in the CONDOMINIUM.

17.    The CONDOMINIUM is governed by a uniform declaration of condominium including several exhibits ("Declaration" attached as **Exhibit "A"**) whose standardized terms apply to each Plaintiff and Class Member similarly. Q CLUB is also bound to follow the terms of the Declaration, and under its standardized terms, Q CLUB's duties apply to Residential Unit Owners, including Plaintiff and Class Members, similarly.

18.    Unlike a traditional hotel with central ownership and management, the 333 Residential Units connected with the Hotel Unit are actually each individually owned condominium units subject to rental by guests enjoying the amenities of the Hotel Unit.

19.    The Declaration is a standard form used in making sales of Residential Units in Q CLUB.  A potential CONDOMINIUM owner's reasonable incentive for purchasing and owning a Residential Unit in this condo/hotel arrangement is the unit owner's opportunity to generate income from the rental of his or her Residential Unit. According to one news report, "[a]s a condo/hotel, the Hilton Fort Lauderdale has unique dual-functioning concept and is designed for both the investor and part-time resident who want to take advantage of the revenue-generating benefits of putting their unit into the hospitality inventory to be rented out as a luxurious hotel suite when not in use."[1]

---

[1] http://www.hotelnewsresource.com/article11799.html.

4

20.   As part of this condo/hotel arrangement, Q Club runs the Hotel Unit as a traditional resort hotel.  Like other hotels on Fort Lauderdale beach, no guest, including any Residential Unit owner, may occupy a Residential Unit for more than 120 days in any calendar year, and none may occupy them for more than 60 days between November 15 and April 15 and between April 16 and November 14 of each year.  These restrictions are to ensure the transient nature of the use of the Residential Units.  *See* Declaration, §16.1.

21.   Each Residential Unit owner may participate in Q CLUB's rental management program (the "RMP") owned and operated by Q CLUB. Alternatively, each Residential Unit owner has the right to rent and manage his or her Residential Unit(s) individually or through a separate management company.

22.   Because the Residential Units are to be used for transient and/or hotel rentals, the rental of Residential Units is not subject to the approval of the CONDOMINIUM's association or of Q CLUB, and is not subject to any other limitations unless set forth in the Declaration.  *See* Declaration §16.7.

### The "Shared Components"

23.   The CONDOMINIUM was established in a manner that enables guests to enjoy both common elements of the CONDOMINIUM and the amenities within the Hotel Unit described as "Shared Components."  The Shared Components are owned and controlled by Q CLUB.  *See* Declaration § 2.13(d).

24.   The Shared Components include specified structural components and improvements, excluding the individual residential and commercial units.  The Shared Components include the main hotel lobby and front desk, elevators, pool, recreation deck, fitness center, parking garage, and the balconies affixed to each Residential Unit.  *See* Declaration § 2.34.

5

25.    The rights of Residential Unit owners to use the Shared Components are subject to the limitations set forth in § 3.5(e) of the Declaration and the obligations for payment of the assessments and charges set forth in § 12 of the Declaration.  However, "in no event shall an owner be denied access to and from the Owner's Unit." *See* Declaration §16.1.

26.    Because Residential Unit owners cannot access their units without using some Shared Components (such as traversing the lobby and using the elevator), each unit owner is granted an easement of support and of necessity by the Declaration.  Stated differently, the Shared Components owned by Q CLUB are subject to an easement of support and of necessity in favor of the 333 Residential Unit owners and six Commercial Unit owners. *See* Declaration § 3.5(a).

27.    Additionally, each Residential Unit owner, and his or her guests, tenants and invitees, has an easement for ingress and egress and for the use and enjoyment of the Shared Components. See Declaration § 3.5(e).

**The "Shared Costs"**

28.    The Hotel Unit includes some Shared Components with the Residential Unit Owners, and the Declaration obligates Residential Unit Owners to reimburse Q CLUB for "Shared Costs" relating to those Shared Components as those costs are defined in the Declaration.

29.    The Declaration sets forth the obligation of each Residential Unit owner and each commercial unit owner to reimburse Q CLUB as the Hotel Unit for certain costs—"Shared Costs"—"incurred by the Hotel Unit Owner in (or reasonably allocated to) the repair, replacement, improvement, maintenance, management, operation, ad valorem tax obligations, and insurance of the Shared Components." *See* Declaration, § 12.1.

30.    The Shared Costs are in addition to fees assessed by the CONDOMINIUM's association. *See* Declaration, §§ 2.35, 12.1.

6

31.   Under the Declaration, the Shared Costs are assessed against each of the 333 Residential Units on a percentage basis annually according to each Residential Unit's "proportionate share" of Q CLUB's Shared Costs according to the terms of the Declaration and its exhibits. To this end, § 12.3 (a) of the Declaration sets forth that each owner of a Residential Unit, including Plaintiff and Class Members, "shall be deemed to covenant and agree to pay the Hotel Unit Owner annual charges for the operation and insurance of, and for payment of 40.4967% of the Shared Costs (the "Non-Hotel Units Allocated Share")." Also, "each Residential and Commercial Unit Owner shall be charged a 'proportionate share' of the Hotel Shared Costs.

32.   The proportionate share for each Residential and Commercial Unit is set forth more specifically on Exhibit "7" to the Declaration." *See* Declaration, §12.3. Exhibit 7 to the Declaration contains a table specifying, among other things, the "Unit Number" and that Unit's "Allocated Share of Shared Costs." *Id*.

33.   Under §12.3(b) of the Declaration, the Hotel Unit Owner is required to "prepare a roster of the Residential Units and Commercial Units and charges applicable thereto which shall be kept in the office of the Hotel Unit Owner and shall be open to inspection by any Owner."

34.   Section12.7 of the Declaration, states that the "Hotel Unit Owner shall maintain financial books and records showing its actual receipts and expenditures with respect to the maintenance, operation, repair, replacement, alteration and insurance of the Shared Components, including the then current budget and any then proposed budget (the "Shared Component Records")." The Shared Component Records shall at all times, during reasonable business hours, be subject to the inspection of any Member of the Association."

7

**Facts Relating to Named Plaintiff**

***Dear***

35.    DEAR purchased Residential Unit 1402 in the CONDOMINIUM on or about December 18, 2006.

36.    Since that time, DEAR has regularly paid fees assessed by the CONDOMINIUM's association and otherwise complied with his or her obligations under the Declaration.

37.    Since that time, Q CLUB routinely requested payments from DEAR for purported Shared Costs.

38.    Since becoming the owner of the Residential Unit, DEAR has also regularly paid requests for reimbursement or payment from Q CLUB for purported Shared Costs as set forth in the Declaration. At no time did Q CLUB indicate that it was requesting Shared Costs payments from DEAR that were not covered under the Declaration.

**Plaintiff and Class Members have Suffered Common Injuries**

39.    The Declaration contains preprinted, uniform, and standardized terms and conditions that have applied to each Class Member, including each Plaintiff.

40.    The Declaration is essentially a contract and covenant that runs with the land that binds Q CLUB, Plaintiff, and Class Members.

41.    Q CLUB has entered into the same covenant and agreements stated in the Declaration with all of the Residential Unit Owners at the Q Club Resort.

42.    At all times material to this action, Q CLUB was obligated to comply with the terms and conditions of the Declaration, which are material to and would be material to any person owning a Residential Unit. Some of these terms include, but are not limited to, Q CLUB's duty to:

8

a. Prepare a roster of Residential Units and Commercial Units and the charges applicable thereto and keep it in the office of the Hotel Unit Owner, which is open to inspection by any Residential Unit Owner;

b. Maintain financial records showing the actual receipts and expenditures of the costs of maintaining and operating the Shared Components; and,

c. Request payment for and collect from Plaintiff and Class Members annual charges for their allocated shares of Shared Costs as defined in the Declaration.

43. At all times material to this action, based on requests for those payments from Q CLUB, Plaintiff and Class Members as Residential Unit owners have regularly paid their percentages of purported Shared Costs to Q CLUB.

44. Nevertheless, on information and belief, Q CLUB has routinely failed to maintain the foregoing financial records relating to costs and operations of the Shared Components; and failed to main a roster of Residential Unit Owners and their expenditures.

45. Further, on information and belief, Q CLUB has regularly and systematically inflated annual charges relating to purported Shared Costs and billed and collected those overcharged amounts from Residential Unit Owners, including Plaintiff and Class Members; and Q CLUB annually charged Residential Unit Owners, including Plaintiff and Class Members, and collected from them monies to cover items and expenses that went well beyond the Shared Costs defined in the Declaration.

46. Upon information and belief, Q CLUB has in fact charged Residential Unit Owners for costs incurred that bear no relationship to the Shared Components. By way of example, Q CLUB has charged and collected from Residential Unit Owners, including Plaintiff and Class Members, management fees, payroll expenses, workman's compensation insurance premiums

9

and other employment costs that relate to employees of Q CLUB who do not service the Shared Components. Q CLUB has also paid employees, such as managers, who do perform management for the Shared Components unreasonable salaries and bonuses.

47.    Also, by way of example, unwarranted charges have included charges relating to the interior of the Residential Units and the Commercial Units. Q CLUB, upon information and belief, has billed and collected from Residential Unit Owners, including Plaintiff and Class Members, monies for expenses that included cleaning supplies, laundry, maid services, maintenance, security and other services, and expenses actually provided to areas other than the Shared Components.

48.    Moreover, by way of example, upon information and belief, Q CLUB has charged and collected from Residential Unit Owners, including Plaintiff and Class Members, management fees for managing the entire hotel and characterized such management fees as management fees for the Shared Components.

49.    The Addendum to the Declaration includes a projected Shared Component budget for January 1, 2006 through December 31, 2006. It projects management fees for the Shared Components of $45,768.00 annually. Just nine years later, these fees have increased dramatically and are typically in excess of two and even three million dollars per year. The Addendum's projected shared cost component budget lists the specific labor that is to be treated as a Shared Cost as follows: Maintenance Engineer, Assistant Engineer, Painter, Janitorial Staff, Groundskeepers, Receiving, Front Desk, Concierge, Housekeeping, Pool & Fitness, General Administrative, Sales & Marketing and Property Operations. Q CLUB has however charged Plaintiff and Class Members for labor for maids, cooks, bartenders and other laborers that are not Shared Costs as set forth in the budget.

50.   By engaging in the foregoing course of conduct, Q CLUB has caused Residential Unit Owners, including Plaintiff and Class Members, to be aggrieved and suffer ascertainable losses and damage.

51.   Q CLUB's course of conduct set out above is on going and adverse to the public interest. Unless enjoined and restrained by an order of this Court, Q CLUB will continue to engage in the unlawful acts and practices set out herein. Such acts and conduct by Q CLUB has caused ascertainable loss and actual damage to Residential Unit Owners, including Plaintiff and Class Members, and unless enjoined by the Court, Q CLUB will continue to aggrieve and cause monetary loss to Plaintiff, Class Members, and future Residential Unit Owners.

**CLASS REPRESETATION ALLEGATIONS**

52.   Plaintiff brings this action as a class action pursuant to Rule 1.220(a) and 1.220(b)(2) and/or 1.220(b)(3) and/or 1.220(d)(4) of the Florida Rules of Civil Procedure on behalf of the following "Classes" and "Class Members:"

Rule 1.220(b)(3) Class: Residential Unit Owners who, during the five-year period preceding the filing of this action (the "Class Period"), paid Q CLUB or persons acting on its behalf costs, expenses and charges which were billed as a Residential Unit Owner's allocated share identified in Exhibit 7 to the Declaration.

Rule 1.220 (b)(2) Class: All current owners of Residential Units in the Q Club Resort and Residence Condominium.

53.   **Numerosity:** The proposed Classes consist of at least 333 owners of Residential Units at the Q Club Resort and Residence Condominium. Plaintiff believe that this Class is so numerous such that joinder of all Class Members is impracticable and the disposition of their claims in a class action rather in individual actions will benefit the Parties and the Court.  Class

11

Members can be notified of this class action via notice publication and U.S. mail, at addresses that Defendant has in its business records.

54.   **Commonality and Predominance**: Common questions of law *or* fact exist as to Class Members and predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law or fact common to Class Members are:

    a.   Whether Defendant participated in and pursued the common course of conduct complained of herein;

    b.   The proper scope and definition of "Shared Components," "Shared Costs," and Parties' associated obligations and duties set forth in the Declaration;

    c.   Whether Defendant has billed and collected from Class Members annual charges for items included within the Declaration's definition of Shared Costs, but which it artificially inflated beyond that which it reasonably and actually incurred or allocated;

    d.   Whether Defendant has billed and collected from Class Members annual allocated shares of Shared Costs that included costs or charges for items not reimbursable as Shared Costs as those costs are defined in the Declaration;

    e.   Whether Class Members have sustained damages and, if so, the proper measure thereof; and

    f.   Whether Plaintiff and Class Members are entitled to injunctive and declaratory relief.

55.   **Typicality**: Plaintiff's claim is typical of those of the other Class Members because Plaintiff has no interest that is adverse to the interests of other Class Members; and Plaintiff, like all other Class Members, are or have been Residential Unit Owners; and were affected by the

same ongoing and illegal conduct by Defendant through its systematically failing to maintain the records it is obligated to maintain under the Declaration and charging and collecting payments for items that either are not Shared Costs, or are artificially inflated by Defendant.

56.     **Adequacy of Representation**: Plaintiff will fairly and adequately protect the interests of Class Members because it is in his best interests to prosecute the claims alleged herein to obtain full redress due them for the illegal conduct of which he complains. Plaintiff has retained counsel experienced in litigating complex class actions. Plaintiff has no interests that conflict with Class Members because questions of law or fact regarding Defendant's liability are common to all Class Members, to the extent that by prevailing on his own claims, Plaintiff necessarily will establish Defendant's liability to all Class Members. Plaintiff's counsel has the necessary resources to adequately and vigorously litigate this class action, and Plaintiff and his counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class Members.

57.  **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. The prosecution of individual remedies by Class Members will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. Many individual Class Members have little ability to prosecute an individual action due to their age, the complexity of the issues involved in this litigation, the enormity of Defendant's business, the significant costs attendant to litigation on this scale, and the amount of money damages suffered by or owed Class Members. Class action treatment will permit a large number of similarly

situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

58.  **Rule 1.220(b)(2):** Defendant's actions are generally applicable to the class as a whole thereby making declaratory and injunctive relief to the entire Rule 1.220(b)(2) Class particularly appropriate under Fla. R. Civ. P. Rule 1.220(b)(2).   Because Plaintiff seeks injunctive and declaratory relief under Rule 1.220(b)(2), the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the Defendant. Further, adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interests of other Class Members who are not parties to the adjudication and may impair and impede their ability to protect their interests.

59.  **Rule 1.220(d)(4) Issue Certification:** This action has been brought and may properly be maintained as a class action against Defendant pursuant to the Rule 1.220 of the Florida Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class Members are easily ascertainable.   In the alternative, even if the Court decides class certification of the entire action is not warranted, Rule 1.220(d)(4) authorizes this Court to isolate the common issues and proceed with class treatment of these particular issues, especially those issues relating to Q Club's liability and interpretation of the Declaration at issue.

60.  Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I - BREACH OF CONTRACT

61.    Plaintiff reasserts and re-alleges the allegations contained in paragraphs 1 through 65 above as though fully stated herein.

62.    Count I is brought on behalf of Plaintiff individually and on behalf of the Rule 1.220(b)(3) Class Members set forth above.

63.    As set forth above, the Declaration is a contract whose terms and conditions bind Q CLUB, Plaintiff, and Class Members, and define the Parties' duties, rights, and obligations, relating, among other things, to Shared Components, Shared Costs, and financial records that Q CLUB must maintain.

64.    As set forth above, Q CLUB has neither prepared a roster of Residential Units and Commercial Units and the charges applicable thereto, nor kept a roster in the office of the Hotel Unit Owner, which is open to inspection by any Residential Unit Owner. This conduct is a material breach of §12.3 of the Declaration, including §12.3(b).

65.    In addition, Q CLUB has breached §12.7 of the Declaration by failing to maintain for all times material the financial books and records showing its actual receipts and expenditures with respect to the maintenance, operation, repair, replacement, alteration and insurance of the Shared Components, including the then current budget and any then proposed budget.

66.    Q CLUB has further failed to maintain such records available for inspection by any Member of the Association at all times during reasonable business hours.

67.    Q CLUB has further breached the Declaration by over-charging and collecting from Residential Unit Owners, including Plaintiff and Rule 1.220(b)(3) Class Members, for Shared Costs as defined by the Declaration. In addition, Q CLUB has charged and collected from them

for costs incurred by the Q CLUB as the Hotel Unit Owner that are not Shared Costs or defined by the Declaration.

68.    As a direct and proximate result of the breach set forth herein, Plaintiff and all other similarly situated Class Members have suffered damages in an amount that will be proven at trial.

69.    WHEREFORE, Plaintiff demands the following relief:

    a.  An order certifying the Rule 1.220(b)(3) Class under Rule 1.220(b)(3) and/or 1.220(d)(4) the appropriate provisions of, and appointing Plaintiff and his legal counsel to represent the Class;

    b.  For the named Plaintiff and the Rule 1.220(b)(3) Class, monetary relief against Q CLUB in the amount of their actual and consequential damages;

    c.  Pre and post judgment interest to the Rule 1.220(b)(3) Class, as allowed by law;

    d.  Reasonable attorneys' fees and costs to counsel for the Rule 1.220(b)(3) Class for conferring pecuniary and non-pecuniary benefits to the Class and/or on any basis that is fair and reasonable; and

    e.  Such other and further relief as is just and proper.

## COUNT II
## (DECLARATORY AND INJUNCTIVE RELIEF)

70.    Plaintiff readopts and re-alleges the allegations set forth in Paragraphs 1-65 as if fully stated herein, and further state:

71.    Count II is brought on behalf of Plaintiff individually and on behalf of the Rule 1.220(b)(2) Class Members set forth above under Chapter 86, Fla. Stat.

72.    Plaintiff and Rule 1.220(b)(2) Class Members own Residential Units in the CONDOMINIUM, which is governed by a uniform Declaration whose standardized terms apply

to each Plaintiff and Class Member similarly. Q CLUB is also bound to follow the terms of the Declaration, and under its standardized terms, Q CLUB's duties apply to Residential Unit Owners, including Plaintiff and Class Members, similarly.

73.    Plaintiff and Class Members as Residential Unit Owners have a legal right under the Declaration to have accurate financial records showing the actual receipts and expenditures of the costs of maintaining and operating the Shared Components kept and available for review and have accurate records kept showing a roster of Residential Unit Owners and their payments and expenditures.

74.    Plaintiff and Class Members as Residential Unit Owners also have a legal right under the Declaration to be charged and pay annual charges for items included within the Declaration's definition of Shared Costs, that are not artificially inflated beyond that which it reasonably and actually incurred or allocated by Q CLUB; and a legal right to not be charged and pay annual allocated shares of Shared Costs that include costs or charges for items not reimbursable as Shared Costs as those costs are defined in the Declaration.

75.    Nonetheless, this has regularly not been the case. At all times material to this action, Q CLUB has systematically failed to maintain the records it is obligated to maintain, and Q CLUB has routinely and systematically collected payments from Plaintiff and Class Members for items that either are not Shared Costs, or are artificially inflated by Q CLUB.

76.    Plaintiff and Class Members are interested parties who seek a declaration of their rights and legal relations *vis-à-vis* Q CLUB with regard to the foregoing provisions of the Declaration, to which they are all parties.

17

77. Plaintiff, individually, and on behalf of all those similarly situated, are in doubt as to his rights under the Declaration relating to Shared Costs, Shared Components, and record-keeping, which the Parties currently dispute.

78. There is a genuine dispute and current controversy between the parties that requires a judicial declaration of rights under the Declaration.

79. Moreover, Defendant continues to retain monies due and owing Plaintiff and Class Members that they paid for overcharges or paid for items not allowed as Shared Costs, and Defendant continues to not maintain the financial records it must under the Declaration.

80. Any potential injury to Defendant attributable to an injunction of this course of conduct is outweighed by the injury that Plaintiff and Class Members and the public will suffer if such injunction is not issued, and such injunction would not be adverse to the public interest.

81. WHEREFORE, Plaintiff, individually and on behalf of the Rule 1.220(b)(2) Class of persons similarly situated, and pursuant to Florida Statutes 86.011 and 86.021, requests a declaratory judgment interpreting the Declaration identified herein, and prays for an order as follows:

     a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fla. R. Civ. P. 1.220(b)(2) and/or 1.220(d)(4);

     b. Designating Plaintiff as representative of the Class and its counsel as Class counsel;

     c. Entering declaratory judgment and corollary injunction in favor of Plaintiff and the Rule 1.220(b)(2) Class and against Defendant:

1. Finding and declaring Defendant failed to maintain the records it is obligated to maintain under Declaration and ordering it to do so on a going-forward basis;

2. Finding and declaring that Q CLUB has billed and collected from Class Members annual allocated shares of Shared Costs that included costs or charges for items not reimbursable as Shared Costs as those costs are defined in the Declaration and entering an injunction prohibiting it from doing so; and,

3. Finding and declaring that Q CLUB has billed and collected from Class Members annual charges for items included within the Declaration's definition of Shared Costs, but which it artificially inflated beyond that which it reasonably and actually incurred or allocated and entering an injunction prohibiting it from doing so.

d. Awarding reasonable attorney's fees and costs to Plaintiff and against Defendant for conferring pecuniary and non-pecuniary benefits to the Rule 1.220(b)(2) Class and/or on any basis that is fair and reasonable; and,

e. Granting any further relief this Honorable Court may deem just and proper.

## JURY DEMAND

Plaintiff and class members, demand trial by jury on all issues triable by a jury.

## CERTIFICATE RE: E-FILING

I HEREBY CERTIFY that this Complaint was filed electronically in compliance with Florida Rules of Judicial Administration 2.515 and 2.516(e).

I FURTHER CERTIFY for purposes of service of any documents after initial process that staff.efile@pathtojustice.com is primary.

Dated: February 18, 2015.

Respectfully submitted,

SWEETAPPLE, BROEKER & VARKAS, PL
*Counsel for Plaintiff(s)*
20 SE 3rd Street
Boca Raton, Florida 33432
Telephone: (561) 392-1230
E-Mail:pleadings@sweetapplelaw.com

By:  */s/ Robert a. Sweetapple*
        ROBERT A. SWEETAPPLE
        Florida Bar No. 0296988

*And*

FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
*Co-Counsel for Plaintiff(s)*
425 North Andrews Avenue, Suite 2
FORT LAUDERDALE, FL 33301
(954)524-2820 TELEPHONE
(954)524-2822 Fax
E-Mail: staff.efile@pathtojustice.com

By: */s/ Steven R. Jaffe*
        Steven R. Jaffe, Esq.
        Florida Bar No.: 0390770
        Mark S. Fistos
        Florida Bar No. 909191
        Matthew D. Weissing
        Florida Bar No.: 559792

20

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, FLORIDA

CASE NO.  CACE-15-002802

GARY DEAR,
as Class Representative of those similarly
Situated,

       Plaintiff,

vs.

Q CLUB HOTEL, LLC, a Delaware
Limited Liability Company,

       Defendant.

_____/

<u>**PLAINTIFF'S NOTICE OF FILING**</u>

    The Plaintiff, GARY DEAR, by and through his undersigned counsel files Exhibit A to

the Class Action Complaint filed on February 18, 2015.

<u>**CERTIFICATE RE: E-FILING AND E-SERVICE**</u>

    I HEREBY CERTIFY that this Notice of Filing Answers to Interrogatories was filed
electronically in compliance with Florida Rules of Judicial Administration 2.515 and 2.516(e).

    I FURTHER CERTIFY for purposes of service of any documents after initial process that
staff.efile@pathtojustice.com is primary.

Dated:  February 20, 2015.

                          Respectfully submitted,
                          SWEETAPPLE, BROEKER & VARKAS, PL
                          *Counsel for Plaintiff(s)*
                          20 SE 3rd Street
                          Boca Raton, Florida 33432
                          Telephone:  (561) 392-1230
                          E-Mail:pleadings@sweetapplelaw.com

                          By: _ */s/ Robert a. Sweetapple*
                              ROBERT A. SWEETAPPLE
                              Florida Bar No. 0296988

1

*And*

FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
*Co-Counsel for Plaintiff(s)*
425 North Andrews Avenue, Suite 2
FORT LAUDERDALE, FL 33301
(954)524-2820 TELEPHONE
(954)524-2822 Fax
E-Mail: staff.efile@pathtojustice.com

By: */s/ Steven R. Jaffe*
      Steven R. Jaffe, Esq.
      Florida Bar No.: 0390770
      Mark S. Fistos
      Florida Bar No. 909191
      Matthew D. Weissing
      Florida Bar No.: 559792

# EXHIBIT A

CFN # 106679130, OR ___ 43282   Page 1943, Page  1 of 94, Reco___'ed 12/15/2006 at
02:50 PM, Broward Co___   ___ Commission,  Deputy Clerk 3110

This instrument prepared by, or under the supervision of (and
after recording, return to):

Gary A. Saul, Esq.
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131

(Reserved for Clerk of Court)




**DECLARATION**
**OF**
**Q CLUB RESORT AND RESIDENCES CONDOMINIUM**

COSTA DORADA ASSOCIATES, LTD., a Florida limited partnership, hereby declares:

1.   **Introduction and Submission.**

   1.1   **The Realty.**  The Developer owns fee title to certain real property located in Broward County, Florida, as more particularly described in Exhibit "1" annexed hereto (the "Realty").

   1.2   **Submission Statement.**  The Developer hereby submits the Realty and all improvements erected or to be erected thereon and all other property, real, personal or mixed, now or hereafter situated on or within the Realty - but excluding all public or private (e.g. cable television) utility installations and all leased property therein or thereon - to the condominium form of ownership and use in the manner provided for in the Florida Condominium Act as it exists on the date hereof and as it may be hereafter renumbered.  Without limiting any of the foregoing, no property, real, personal or mixed, not located within or upon the Realty, shall for any purposes be deemed part of the Condominium or be subject to the jurisdiction of the Association, the operation and effect of the Florida Condominium Act or any rules or regulations promulgated pursuant thereto, unless expressly provided.

   1.3   **Name.**  The name by which this condominium is to be identified is Q CLUB RESORT AND RESIDENCES CONDOMINIUM (hereinafter called the "Condominium").

2.   **Definitions.**  The following terms when used in this Declaration and in its exhibits, and as it and they may hereafter be amended, shall have the respective meanings ascribed to them in this Section, except where the context clearly indicates a different meaning:

   2.1   "Act" means the Florida Condominium Act (Chapter 718 of the Florida Statutes) as it exists on the date hereof and as it may be hereafter renumbered.

   2.2   "Allocated Interests" shall have the meaning ascribed to it in Section 5.1 below.

   2.3   "Articles" or "Articles of Incorporation" mean the Articles of Incorporation of the Association, as amended from time to time.

   2.4   "Assessment" means a share of the funds required for the payment of Common Expenses which from time to time is assessed against the Unit Owner.

   2.5   "Association" or "Condominium Association" means Q CLUB RESORT AND RESIDENCES CONDOMINIUM ASSOCIATION, INC., a Florida corporation not for profit, the sole entity responsible for the operation of the Common Elements of the Condominium.

   2.6   "Association Property" means that property, real and personal, which is owned or leased by, or is dedicated by a recorded plat to, the Association for the use and benefit of its members.

   2.7   "Board" or "Board of Directors" means the board of directors, from time to time, of the Association.  Directors must be natural persons who are 18 years of age or older.  Any person who has been convicted of any felony by any court of record in the United States and who has not had his or her right to vote restored pursuant to law in the jurisdiction of his or her residence is not eligible for Board membership.

   2.8   "Building" means the structure(s) in which the Units and the Common Elements are located, regardless of the number of such structures, which are located on the Condominium Property.

---

**Exhibit 1**

CFN # 106678130, OR   43282   PG   1944,   Page   2 of 94

2.9    "By-Laws" mean the By-Laws of the Association, as amended from time to time.

2.10   "Cabanas" means those portions of the Hotel Unit, as defined below, described as "cabanas" on Exhibit "2" attached hereto.

2.11   "Commercial Unit" or "Commercial Units" means and refers to the Units designated by the prefix CU- as identified on Exhibit "2" attached hereto. References herein to "Units" or "Parcels" shall include the Commercial Units unless the context would prohibit or it is otherwise expressly provided.

2.12   "Committee" means a group of Board Members, Unit Owners or Board Members and Unit Owners appointed by the Board or a member of the Board to make recommendations to the Board regarding the Association budget or to take action on behalf of the Board.

2.13   "Common Elements" mean and include:

    (a)   The portions of the Condominium Property which are not included within the Units.

    (b)   An easement of support in every portion of a Unit which contributes to the support of the Building.

    (c)   The property and installations required for the furnishing of utilities and other services to more than one Unit or to the Common Elements; it any of being the intent, however, that all such property and installations shall be deemed Shared Components which are part of the Hotel Unit rather than part of the Common Elements.

    (d)   Any other parts of the Condominium Property designated as Common Elements in this Declaration. The Condominium has been established in such a manner to minimize the Common Elements. Most components which are typical "common elements" of a condominium, have instead been designated herein as part of the Shared Components of the Hotel Unit.

2.14   "Common Expenses" mean all expenses incurred by the Association for the operation, maintenance, repair, replacement or protection of the Common Elements and Association Property, the costs of carrying out the powers and duties of the Association, and any other expense, whether or not included in the foregoing, designated as a "Common Expense" by the Act, the Declaration, the Articles or the Bylaws. For all purposes of this Declaration, "Common Expenses" shall also include, without limitation: (a) all reserves required by the Act or otherwise established by the Association, regardless of when reserve funds are expended; (b) if applicable, insurance for directors and officers; (c) the real property taxes, Assessments and other maintenance expenses attributable to any Units acquired by the Association or any Association Property and/or rental or other expenses owed in connection with any Units leased by the Association; (d) the costs and expenses of maintaining, repairing and/or replacing as necessary any landscaping located along or upon the medians adjacent to (even if beyond the legal boundaries of) the Condominium Property; and (e) any unpaid share of Common Expenses or Assessments extinguished by foreclosure of a superior lien or by deed in lieu of foreclosure. Common Expenses shall not include any separate obligations of individual Unit Owners, including, without limitation, any sums payable to the Hotel Unit Owner (as hereinafter defined).

2.15   "Common Surplus" means the excess of all receipts of the Association collected on behalf of the Association, including, but not limited to, Assessments, rents, profits and revenues on account of the Common Elements, over the amount of Common Expenses.

2.16   "Condominium Parcel" means a Unit together with the undivided share in the Common Elements which is appurtenant to said Unit; and when the context permits, the term includes all other appurtenances to the Unit.

2.17   "Condominium Property" means the Realty, Improvements and other property described in Section 1.2 hereof, subject to the limitations thereof and exclusions therefrom.

2.18   "County" means the County of Broward, State of Florida.

2.19   "Declaration" or "Declaration of Condominium" means this instrument and all exhibits attached hereto, as same may be amended from time to time.

2.20   "Developer" means COSTA DORADA ASSOCIATES, LTD., a Florida limited partnership, its successors and such of its assigns as to which the rights of Developer hereunder are specifically assigned. Developer may assign all or a portion of its rights hereunder, or all or a portion of such rights in connection with specific portions of the Condominium. In the event of any partial assignment, the assignee shall not be deemed the Developer, but may exercise such rights of Developer as are specifically assigned to it. Any such assignment may be made on a nonexclusive basis. The rights of Developer under this Declaration are independent of the Developer's rights to control the Board of Directors of the Association, and, accordingly, shall not be deemed waived, transferred or assigned to the Unit Owners, the Board or the Association upon the transfer of control of the Association.

2.21   "Dispute", for purposes of Section 18.1, means any disagreement between two or more parties that involves: (a) the authority of the Board, under any law or under this Declaration, the Articles or By-Laws to: (i) require any Owner to take any action, or not to take any action, involving that Owner's Unit; or (ii) alter or add to a Common Element; or (b) the failure of the Association, when required by law or this Declaration, the Articles

or By-Laws to: (i) properly conduct elections; (ii) give adequate notice of meetings or other actions; (iii) properly conduct meetings; or (iv) allow inspection of books and records. "Dispute" shall not include any disagreement that primarily involves title to any Unit or Common Element; the interpretation or enforcement of any warranty; or the levy of a fee or Assessment or the collection of an Assessment levied against a party.

2.22    "Division" means the Division of Florida Land Sales, Condominiums and Mobile Homes of the Department of Business and Professional Regulation, State of Florida, or its successor.

2.23    "First Mortgagee" means any person or entity holding a first mortgage on a Unit or Units.

2.24    "Hotel Unit" means and refers to Unit "CU-1" and/or "HU", as identified on Exhibit "2" attached hereto, which includes the Shared Components (as hereinafter defined). References herein to "Units" or "Parcels" shall include the Hotel Unit unless the context would prohibit or it is otherwise expressly provided.

2.25    "Hotel Unit Owner" means and refers to the owner(s) from time to time of the Hotel Unit.

2.26    "Improvements" mean all structures and artificial changes to the natural environment (exclusive of landscaping) located on the Condominium Property including, but not limited to, the Building.

2.27    "Institutional First Mortgagee" means a bank, savings and loan association, insurance company, real estate or mortgage investment trust, pension fund, an agency of the United States Government, mortgage banker, the Federal National Mortgage Association ("FNMA"), the Federal Home Loan Mortgage Corporation ("FHLMC") or any other lender generally recognized as an institutional lender, or the Developer, holding a first mortgage on a Unit or Units.

2.28    "Life Safety Systems" mean and refer to any and all emergency lighting, audio and visual signals, safety systems, sprinklers and smoke detection systems, which are now or hereafter installed in the building, whether or not within the Units. All such Life Safety Systems, together with all conduits, wiring, electrical connections and systems related thereto, regardless of where located, when the context shall so allow, the Components hereunder. Without limiting the generality of the foregoing, when the context shall so allow, the Life Safety Systems shall also be deemed to include all means of emergency ingress and egress, which shall include all stairways and stair landings.

2.29    "Majority of Institutional First Mortgagees" shall mean and refer to Institutional First Mortgagees of Units to which at least fifty-one percent (51%) of the voting interests of Units subject to mortgages held by Institutional First Mortgagees are appurtenant.

2.30    "Primary Institutional First Mortgagee" means the Institutional First Mortgagee which owns, at the relevant time, Unit mortgages securing a greater aggregate indebtedness than is owed to any other Institutional First Mortgagee.

2.31    "Realty" shall have the meaning given in Section 1.1 below.

2.32    "Residential Unit" means and refers to each of the Units other than the Hotel Unit and Commercial Units. References herein to "Units" or "Parcels" shall include Residential Units unless the context prohibits or it is otherwise expressly provided.

2.33    "Resolution" shall mean and refer to Resolution No. 00-79 of the City Commission of the City of Fort Lauderdale, Florida dated June 20, 2000.

2.34    "Shared Components". Together, the improvements constituting the Common Elements, Residential Units, Commercial Units and the Hotel Unit have been, or shall be, constructed as a single structure and operated as an integrated project. Given the integration of the structure of these improvements, and notwithstanding anything to the contrary depicted on the survey/plot plan attached hereto as Exhibit "2", the following components of the improvements (the "Shared Components") shall be deemed part of the Hotel Unit, whether or not graphically depicted as such on said survey/plot plan: any and all structural components of the Improvements, including, without limitation, all exterior block walls and all finishes (glass, paint, stucco etc) and balconies, terraces and/or facades attached or affixed thereto; the roof; all roof trusses, roof support elements and roofing insulation; all utility, mechanical, electrical, telephonic, telecommunications, plumbing Life Safety Systems and other systems, including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility, mechanical, telephonic, telecommunications, electrical, plumbing Life Safety Systems and/or other systems; all heating, ventilating and air conditioning systems, including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services; all elevator shafts, elevator cabs, elevator cables and/or systems and/or equipment used in the operation of the elevators transversing the Condominium Property; and all trash rooms, trash chutes and any and all trash collection and/or disposal systems. In addition, the Shared Components include the following areas and/or facilities (together with a license for reasonable pedestrian access thereto, as determined by the Hotel Unit Owner): the main hotel lobby; the pools and pool deck; the fitness center, if any, which may be located from time to time within the improvements constructed upon the Hotel Unit and any and all parking areas and/or parking garages located within the Condominium Property. Notwithstanding anything herein, or in any of the exhibits hereto, contained to the contrary, the Shared Components shall be deemed part of the Hotel Unit. The Hotel Unit Owner shall have the right (but not the obligation), by Supplemental Declaration executed by the Hotel Unit Owner alone, to designate additional portions of the Hotel Unit as Shared Components hereunder. The

CFN # 106678130, OR F  43282 PG 1946, Page 4 of 94

Hotel Unit Owner shall have the right, from time to time, to expand, alter, relocate and or eliminate the portions of the Hotel Unit deemed Shared Components, without requiring the consent or approval of the Association or any Owner, provided that any portions withdrawn are not, in the reasonable opinion of the Hotel Unit Owner essential to the structural integrity of the Residential Units and/or the Commercial Units, the provision of utilities and utility services to the Residential Units and/or the Commercial Units, the provision of valet parking service to and from the Residential Unit Owners and/or the Commercial Units and/or the provision of pedestrian access to and from the Residential Unit Owners and/or the Commercial Units and the adjoining public street. In furtherance of the foregoing, the Hotel Unit Owner also reserves the absolute right at any time, and from time to time, to construct additional facilities within the Hotel Unit and to determine whether same shall be deemed Shared Components. Without limiting the generality of the foregoing, any and all food and beverage operations, retail areas not contained within the Commercial Units, meeting rooms, conference rooms, business center(s) and/or ballrooms, whether now or hereafter located within the Hotel Unit, shall expressly be excluded from the Shared Components and shall be deemed the exclusive property, and for the exclusive use, of the owner from time to time of the Hotel Unit. It is expressly contemplated that persons other than Unit Owners shall be granted use rights in and to certain of the facilities of the Hotel Unit (such determination to be made in the sole and absolute discretion of the Hotel Unit Owner).

2.35    "Shared Costs" shall have the meaning given in Section 12.1 below.  The Shared Costs are not Common Expenses.

2.36    "Unit" means a part of the Condominium Property which is subject to exclusive ownership and except where specifically excluded, or the context otherwise requires, shall be deemed to include the Residential Units the Commercial Units and the Hotel Unit.

2.37    "Unit Owner" or "Owner of a Unit" or "Owner" means a record owner of legal title to a Condominium Parcel.

3.    **Description of Condominium**

3.1    **Identification of Units.**  The Realty has constructed thereon one building containing Three Hundred Forty (340) Units consisting of Three Hundred Thirty Three (333) Residential Units, six (6) Commercial Units and one (1) Hotel Unit. Each such Unit is identified by a separate numerical or alpha-numerical designation. The designation of each of such Units is set forth on Exhibit "2" attached hereto. Exhibit "2" consists of a survey of the Realty, a graphic description of the improvements located thereon, including, but not limited to, the Building in which the Units are located, and a plot plan thereof. Said Exhibit "2", together with this Declaration, is sufficient in detail to identify the Common Elements and each Unit and their relative locations and dimensions. There shall pass with a Unit as appurtenances thereto: (a) an undivided share in the Common Elements and Common Surplus; (b) the exclusive right to use such portion of the Common Elements as may be provided in this Declaration; (c) an exclusive easement for the use of the airspace occupied by the Unit as it exists at any particular time and as the Unit may lawfully be altered or reconstructed from time to time, provided that an easement in airspace which is vacated shall be terminated automatically; (d) membership in the Association with the full voting rights appurtenant thereto; and (e) other appurtenances as may be provided by this Declaration.

3.2    **Unit Boundaries.**  Each Unit shall include that part of the Building containing the Unit that lies within the following boundaries:

(a)    **Boundaries of Residential Units and Commercial Units.**  The upper and lower boundaries of each Residential Unit and Commercial Units shall be the following boundaries extended to their planar intersections with the perimetrical boundaries:

(i)    **Upper Boundaries.**  The horizontal plane of the unfinished lower surface of the ceiling (which will be deemed to be the ceiling of the upper story if the Unit is a multi-story Unit, provided that in multi-story Units where the lower boundary extends beyond the upper boundary, the upper boundary shall include that portion of the ceiling of the lower floor for which there is no corresponding ceiling on the upper floor directly above such bottom floor ceiling).

(ii)    **Lower Boundaries.**  The horizontal plane of the unfinished upper surface of the floor of the Unit (which will be deemed to be the floor of the first story if the Unit is a multi-story Unit, provided that in multi-story Units where the upper boundary extends beyond the lower boundary, the lower boundary shall include that portion of the floor of the upper floor for which there is no corresponding floor on the bottom floor directly below the floor of such top floor).

(iii)    **Interior Divisions.**  Except as provided in subsections 3.2(a)(i) and 3.2(a)(ii) above, no part of the floor of the top floor, ceiling of the bottom floor, stairwell adjoining the multi-floors, in all cases of a multi-story Unit, if any, or nonstructural interior walls shall be considered a boundary of the Residential or Commercial Unit, as applicable.

(iv)    **Perimetrical Boundaries.**  The perimetrical boundaries of the Unit shall be the vertical planes of the unfinished interior surfaces of the walls bounding the Unit extended to their planar intersections with each other and with the upper and lower boundaries. Notwithstanding the foregoing, as to walls shared by a Residential or Commercial Unit

and the Hotel Unit, the perimetrical boundary of the Hotel Unit at such shared wall shall be coextensive to the perimetrical boundary of the adjoining Residential or Commercial Unit (so that the shared wall and all installations therein which are deemed part of the Shared Components - shall be part of the Hotel Unit and the Hotel Unit shall extend to the unfinished and therefore the perimetrical boundary of the Hotel Unit shall extend to the unfinished interior surface of any walls bounding a Residential or Commercial Unit).

(b)  Boundaries of the Hotel Unit.  The Hotel Unit shall consist of all of the Condominium Property, including, without limitation, any and all improvements now or hereafter constructed thereon, less and except only the following: (i) the Residential Units and the Commercial Units and (ii) the portion of the Condominium Property below elevation minus seventy feet (-70') N.G.V.D. Said portion of the Condominium Property lying below elevation minus seventy feet (-70') N.G.V.D. shall be deemed Common Elements hereunder.

(c)  Apertures.  Where there are apertures in any boundary, including, but not limited to, windows, doors, bay windows and skylights, all of same shall be deemed part of the Shared Components, and as such, part of the Hotel Unit.

(d)  Exceptions.  In cases not specifically covered above, and/or in any case of conflict or ambiguity, the survey of the Units set forth as Exhibit "4" hereto shall control in determining the boundaries of a Unit, except that the provisions of Section (b) above shall control unless specifically depicted and labeled otherwise on such survey.

3.3  Cabanas.  All of the Cabanas shall be deemed to be included within the Hotel Unit and the private property of the Hotel Unit Owner.  Notwithstanding anything herein contained to the contrary, Unit Owners shall only have such rights to use the Cabanas as may be granted from time to time, if at all, by the Hotel Unit Owner.  The Hotel Unit Owner may impose a charge for the use of the Cabanas if such use is made available.

3.4  Parking.  All of the parking areas for the use of the Units are located within the Hotel Unit and shall be subject to the procedures and regulations adopted for same from time to time by the Hotel Unit Owner.  Notwithstanding anything herein contained to the contrary, Unit Owners shall only have such rights of parking as may be made available from time to time by the Hotel Unit Owner.  Developer, as the initial Hotel Unit Owner (and thereafter the Owner of the Hotel Unit, if different from Developer), shall have, and hereby reserves unto the Hotel Unit Owner, the exclusive right, but not the obligation, at any time, and from time to time, to grant to specific Units the exclusive right to use one or more of the parking spaces located in the parking areas, with or without consideration (with any consideration to be the sole property of the Hotel Unit Owner), whereupon the parking space so assigned shall be deemed an appurtenance of the Unit(s) to which it is assigned (and shall automatically pass with title to the Unit, unless first transferred by the Owner of the applicable Unit to another Unit, which transfers shall be permitted hereunder).  A grant with respect to parking spaces shall be made by the Hotel Unit Owner by written assignment (which shall not be recorded).  Notwithstanding an assignment, such parking spaces may be relocated at any time, and from time to time, by the Owner of the Hotel Unit to comply with applicable Federal, State and local laws and regulations regarding or affecting handicap accessibility.  All fees collected by the Owner of the Hotel Unit for assigning parking spaces, if any, shall be retained by the Owner of the Hotel Unit Owner and shall not constitute income or revenue of the Association.  The costs associated with the use, operation, maintenance and upkeep of any parking space shall be deemed the responsibility of the Owner of the Unit to which such parking space is an appurtenance.  Parking for the Owners of Units located in the Condominium and their guests, tenants and invitees, may be either by self-parking, or by valet, at the sole discretion of, and in accordance with the procedures and regulations adopted for same from time to time by, the Hotel Unit Owner.  The Hotel Unit Owner may impose a charge for valet services if same is made available.  Any such charge shall be retained by the Hotel Unit Owner and shall not constitute income or revenue of the Association.

3.5  Easements.  The following easements are hereby created (in addition to any easements created under the Act and any easements affecting the Condominium Property and recorded in the Public Records of the County):

(a)  Support.  Each Unit and any structure and/or improvement now or hereafter constructed shall have an easement of support and of necessity and shall be subject to an easement of support and necessity in favor of all other Units, the Common Elements and such other improvements constructed upon the Condominium Property.

(b)  Utility and Other Services; Drainage.  Easements are reserved under, through and over the Condominium Property as may be required from time to time for utility, cable television, communications and monitoring systems, Life Safety Systems, digital and/or satellite systems, broadband communications and other services and drainage in order to serve the Condominium and/or members of the Association.  A Unit Owner shall do nothing within or outside his Unit that interferes with or impairs, or may interfere with or impair, the provision of such utility, cable television, communications monitoring systems, Life Safety Systems, digital and/or satellite systems, broadband communications or other service or drainage facilities or the use of these easements.  The Association and Hotel Unit Owner shall have a right of access to each Unit to maintain, repair or replace any Common Element or Shared Component pipes, wires, ducts, vents or cables, conduits and other utility, cable television, communications, Life Safety Systems, digital and/or satellite systems, broadband communications and similar systems, hot water heaters, service and drainage facilities, and Common Elements and/or Shared Components contained in

CFN # 106678130, OR I  43282  PG  1948,  Page  6 of 94

the Unit or elsewhere in or around the Condominium Property, and to remove any improvements interfering with or impeding such facilities or easements herein reserved; provided such right of access, except in the event of an emergency, shall not unreasonably interfere with the Unit Owner's permitted use of the Unit, and except in the event of an emergency, entry shall be made on not less than one (1) days' notice (which notice shall not, however, be required if the Unit Owner is absent when the giving of notice is attempted).

(c)    **Commercial Units.** A non-exclusive easement in favor of each Commercial Unit Owner, and its and their guests, tenants, and invitees, shall exist over and upon the Shared Components to afford customers, employees, delivery personnel and other persons designated by the applicable Commercial Unit Owner, access to the applicable Commercial Unit for its intended purposes. Any such easement, however, shall be subject to regulation from time to time by the Hotel Unit Owner.

(d)    **Encroachments.**  If (i) any portion of the Common Elements and/or Shared Components encroaches upon any Unit; (ii) any Unit encroaches upon any other Unit or upon any portion of the Common Elements and/or Shared Components; or (iii) any encroachment shall hereafter occur as a result of (1) construction of the improvements; (2) settling or shifting of the improvements; (3) any alteration or repair to the Common Elements (or the Shared Components) made by or with the consent of the Association or Developer or the Hotel Unit Owner, as appropriate; or (4) any repair or restoration of the improvements (or any portion thereof) or any Unit after damage by fire or other casualty or any third by Condemnation of eminent domain proceedings of all or any portion of any Unit or the Common Elements (or the Shared Components), then, in any such event, a valid easement shall exist for such encroachment and for the maintenance of same so long as the improvements shall stand.

(e)    **Ingress and Egress.**  A non-exclusive easement in favor of each Unit Owner and resident, their guests and invitees, (for such member of the Association (and its) and their guests, tenants and invitees) shall exist for(a) pedestrian traffic over, through and across such portions of the Hotel Unit as are designated by the Hotel Unit Owner and intended to provide direct pedestrian access to and from the applicable Residential Unit and/or Commercial Unit and the public right-of-way adjacent to the Condominium Property, and (ii) use and enjoyment of the Shared Components, subject to regulation as may be established from time to time by the Hotel Unit Owner and subject to the other provisions of this Declaration, specifically Section 3.3 and Section 3.4 above. Notwithstanding the foregoing, the aforesaid easement over the Hotel Unit is limited and solely for use of the named beneficiaries' obtaining access to and from their Unit and shall not be used for the provision of any services, including, without limitation, any hotel related services including, but not limited to, solicitation and/or provision of housekeeping, personal services (i.e., massage, personal training, dry cleaning, etc.) and/or food and beverage service, it being understood and agreed by all Unit Owners that any such services may only be provided by the Owner(s) of the Hotel Unit. The provisions of this section 3.5(e) may not be amended without an affirmative vote of not less than 4/5ths of all voting interests of all Unit Owners.

(f)    **Construction; Maintenance.**  The Developer (including its designees, contractors, successors and assigns) and the Hotel Unit Owner shall have the right, in its (and their) sole discretion from time to time, to enter the Condominium Property and take all other action necessary or convenient for the purpose of completing the construction of any and all improvements for repair, replacement and maintenance or Condominium Property, or any part thereof and for repair, replacement and maintenance or warranty purposes or where the Developer and/or Hotel Unit Owner, in its or their sole discretion, determines that it is required or desires to do so.

(g)    **Sales Activity.**  For as long as there are any Units owned by the Developer and/or the Developer has any ownership interest in the Hotel Unit, the Developer, its designees, successors and assigns, shall have the right to use any such Units and parts of the Common Elements or Association Property for guest accommodations, model apartments and sales, leasing and construction offices relating to the Condominium, to show model Units and the Common Elements to prospective purchasers and tenants of Units, and to erect on the Condominium Property and/or Association Property signs and other promotional material to advertise or otherwise market the Units, and/or any facilities built or to be constructed upon any portion of the Condominium Property for sale, lease or occupancy.

(h)    **Roof and Window Washing Easement.**  An easement is hereby reserved over and across each Unit and any appurtenances thereto for the Hotel Unit Owner (and the personnel, employees and/or contractors of the Hotel Unit Owner) to stage and perform exterior window washing, exterior painting of the Building, maintenance, repair, replacement or alteration of any mechanical equipment located or accessible from the roof of the Building and/or other exterior repairs, replacements, alterations and/or maintenance (preventative or otherwise).

(i)    **Support of Adjacent Structures.**  In the event that any structure(s) is constructed so as to be connected in any manner to the Buildings and/or any improvements constructed upon the Condominium Property, then there shall be (and there is hereby declared) an easement of support for such structure(s) as well as for the installation, maintenance, repair and replacement of all utility lines and equipment serving the adjoining structures which are necessarily or conveniently located within the Condominium Property and/or the Association Property.

CFN # 106678130, OR B  43282  PG  1949,  Page  7 of 94

(j)    **Warranty.** For as long as Developer remains liable under any warranty, whether statutory, express or implied, for act or omission of Developer in the development, construction, sale and marketing of the Condominium, then Developer and its contractors, agents and designees shall have the right, in Developer's sole discretion and from time to time, to enter the Common Elements for the purpose of making any necessary inspections, tests, repairs, improvements and/or replacements required for the Developer to fulfill any of its warranty obligations. Failure of the Association or any Unit Owner to grant access may result in the appropriate warranty being nullified and of no further force or effect. Nothing herein shall be deemed or construed as the Developer making or offering any warranty, all of which are disclaimed (except to the extent same may not be) as set forth in Section 22 below.

(k)    **Additional Easements.** The Association, through its Board, on the Association's behalf and on behalf of all Unit Owners (each of whom hereby appoints the Association as its attorney-in-fact for this purpose), shall have the right to grant such additional general ("blanket") and specific electric, gas or other utility, cable television, security systems, communications or service easements (and appropriate bills of sale for equipment, conduits, pipes, lines and similar installations pertaining thereto), or modify or relocate any such existing easements or drainage facilities, in any portion of the Condominium and/or Association Property, and to grant access easements or relocate any existing access easements in any portion of the Condominium and/or Association Property, as the Board shall deem necessary or desirable for the proper operation and maintenance of the improvements (or any portion thereof or for the general health or welfare of the Unit Owners and/or members of the Association) or for the purpose of carrying out any provisions of this Declaration, provided that such easements or the relocation of existing easements will not prevent or unreasonably interfere with the reasonable use of the Units for their intended purposes and provided further that if any such easement is to traverse the Hotel Unit, the joinder of the Hotel Unit Owner must be obtained.

4.    **Restraint Upon Separation and Partition of Common Elements.** The undivided share in the Common Elements and Common Surplus which is appurtenant to a Unit, shall not be separated therefrom and shall pass with the title to the Unit, whether or not separately described. The appurtenant share in the Common Elements and Common Surplus, except as elsewhere herein provided to the contrary, cannot be conveyed or encumbered except together with the Unit. The respective shares in the Common Elements appurtenant to Units shall remain undivided, and no action for partition of the Common Elements, the Condominium Property, or any part thereof, shall lie, except as provided herein with respect to termination of the Condominium.

5.    **Ownership of Common Elements and Common Surplus and Share of Common Expenses; Voting Rights**

5.1    **Percentage Ownership and Shares.** The undivided percentage interest in the Common Elements and Common Surplus, and the percentage share of the Common Expenses, appurtenant to each Unit, is as set forth on Exhibit "3" attached hereto (the "Allocated Interests").

5.2    **Voting.** Each Residential Unit shall be entitled to one (1) vote to be cast by its Owner in accordance with the provisions of the By-Laws and Articles of Incorporation of the Association. The Hotel Unit shall be entitled to fifty (50) votes to be cast by its Owner, each Commercial Unit shall be entitled to three (3) votes, to be cast by each Commercial Unit Owner, all in accordance with the provisions of the By-Laws and Articles of Incorporation of the Association. Each Unit Owner shall be a member of the Association.

6.    **Amendments.** Except as elsewhere provided herein, amendments may be effected as follows:

6.1    **By The Association.** Notice of the subject matter of a proposed amendment shall be included in the notice of any meeting at which a proposed amendment is to be considered. A resolution for the adoption of a proposed amendment may be proposed either by a majority of the Board of Directors of the Association or by not less than one-third (1/3) of the Unit Owners. Except as elsewhere provided, approvals must be by an affirmative vote representing in excess of 80% of the voting interests of all Unit Owners. Directors and members not present in person or by proxy at the meeting considering the amendment may express their approval in writing, provided that such approval is delivered to the secretary at or prior to the meeting.

6.2    **Material Amendments.** Unless otherwise provided specifically to the contrary in this Declaration, no amendment shall change the configuration or size of any Unit in any material fashion, materially alter or modify the appurtenances to any Unit, permit timeshare estates, or change the percentage by which the Owner of a Unit shares the Common Expenses and owns the Common Elements and Common Surplus (any such change or alteration being a "Material Amendment"), unless the record Owner(s) thereof, and all record owners of mortgages or other liens thereon, shall join in the execution of the amendment and the amendment is otherwise approved by in excess of 80% of the voting interests of Unit Owners. The acquisition of property by the Association, material alterations or substantial additions to such property or the Common Elements by the Association and installation, replacement and maintenance of approved hurricane shutters, if in accordance with the provisions of this Declaration, shall not be deemed to constitute a material alteration or modification of the appurtenances of the Units, and accordingly, shall not constitute a Material Amendment.

6.3   Mortgagee's Consent.  No amendment may be adopted which would eliminate, modify, prejudice, abridge or otherwise adversely affect any rights, benefits, privileges or priorities granted or reserved to mortgagees of Units without the consent of said mortgagees in each instance; nor shall an amendment make any change in the sections hereof entitled "Insurance", "Reconstruction or Repair after Casualty", or "Condemnation" unless the Primary Institutional First Mortgagee shall join in the amendment.  Except as specifically provided herein or if required by FNMA or FHLMC, the consent and/or joinder of any lien or mortgage holder on a Unit shall not be required for the adoption of an amendment to this Declaration and, whenever the consent or joinder of a lien or mortgage holder is required, such consent or joinder shall not be unreasonably withheld.

6.4   By or Affecting The Developer.  Notwithstanding anything herein contained to the contrary, during the time the Developer has the right to elect a majority of the Board of Directors of the Association, the Declaration, the Articles of Incorporation or the By-Laws of the Association may be amended by the Developer alone, without requiring the consent of any other party, to effect any change whatsoever, except for an amendment: (a) to permit time-share estates (which must be approved, if at all, in the manner provided in Section 6.2 above); or (b) to effect a "Material Amendment", which must be approved, if at all, in the manner set forth in Section 6.2 above.  The unilateral amendment right set forth herein shall include, without limitation, the right to correct scrivener's errors.  No amendment may be adopted which would eliminate, modify, prejudice, abridge or otherwise adversely affect any rights, benefits, privileges or priorities granted or reserved to the Developer, without the consent of the Developer in each instance.

6.5   South Florida Water Management District.  No amendment may be adopted which would affect the surface water management system, including environmental conservation areas, without the consent of the South Florida Water Management District (the "District").  The District shall determine whether the amendment necessitates a modification of the current surface water management permit.  If a modification is necessary, the District will advise the Association.

6.6   Execution and Recording.  An amendment, other than amendments made by the Developer alone pursuant to the Act or this Declaration, shall be evidenced by a certificate of the Association, executed either by the President of the Association or a majority of the members of the Board of Directors which shall include recording data identifying the Declaration and shall be executed with the same formalities required for the execution of a deed.  An amendment of the Declaration is effective when the applicable certificate is properly recorded in the public records of the County.  No provision of this Declaration shall be revised or amended by reference to its title or number only.  Proposals to amend existing provisions of this Declaration shall contain the full text of the provision to be amended; new words shall be inserted in the text underlined; and words to be deleted shall be lined through with hyphens.  However, if the proposed change is so extensive that this procedure would hinder, rather than assist, the understanding of the proposed amendment, it is not necessary to use underlining and hyphens as indicators of words added or deleted, but, instead, a notation must be inserted immediately preceding the proposed amendment in substantially the following language: "Substantial rewording of Declaration.  See provision . . . for present text."  Nonmaterial errors or omissions in the amendment process shall not invalidate an otherwise properly adopted amendment.

7.   Maintenance and Repairs.

7.1   Units.  All maintenance, repairs and replacements of, in or to any Unit, whether structural or nonstructural, ordinary or extraordinary, foreseen or unforeseen, including, without limitation, maintenance, repair and replacement of window coverings, interior nonstructural walls, the interior side of the entrance door and all other doors within or affording access to a Unit, and the electrical (including wiring), plumbing (including fixtures and connections), heating and air-conditioning equipment, fixtures and outlets, appliances, carpets and other floor coverings, all interior surfaces and the entire interior of the Unit lying within the boundaries of the Unit or other property belonging to the Unit Owner, shall be performed by the Owner of such Unit at the Unit Owner's sole cost and expense, except as otherwise expressly provided to the contrary herein.

7.2   Common Elements and Association Property.  Except to the extent (i) expressly provided to the contrary herein, or (ii) proceeds of insurance are made available therefor, all maintenance, repairs and replacements in or to the Common Elements and Association Property shall be performed by the Association and the cost and expense thereof shall be charged to all Unit Owners as a Common Expense, except to the extent arising from or necessitated by the negligence, misuse or neglect of specific Unit Owners, in which case such cost and expense shall be paid solely by such Unit Owners.

7.3   The Hotel Unit.  The Hotel Unit Owner(s), from time to time, shall be responsible for the repair, replacement, improvement, maintenance, management, operation, and insurance of the Hotel Unit, which shall be performed in a commercially reasonable manner in the determination of the Owner(s) of the Hotel Unit (which determination shall be binding).  In consideration of the reservation and grant of easement over the Hotel Unit, as provided in Section 3.5(e) above, each Residential Unit Owner and each Commercial Unit Owner shall be obligated for payment of the expenses incurred by the Hotel Unit Owner(s) in connection with such maintenance, repair, replacement, improvement, management, operation, and insurance, all as more particularly provided in Section 12 below.

7.4   Specific Unit Owner Responsibility.  The obligation to maintain and repair any air conditioning equipment, plumbing or electrical fixtures or other items of property which service a particular Unit and not any other Unit shall, to the extent not part of the Shared Components and otherwise part of the Condominium, be the responsibility of the applicable Unit Owner, individually, without regard to whether such items are included within the boundaries of the Units.

CFN # 106678130, OR I    43282  PG  1951,  Page  9 of 94

8.    Additions, Alterations or Improvements by Unit Owner.

8.1    Consent of the Hotel Unit Owner   No Residential Unit Owner or Commercial Unit Owner (other than the Developer) shall make any addition, alteration or improvement in or to the Common Elements, the Association Property, or his or her Unit, or install any signage in or on the Unit, or upon the Common Elements, Association Property or the Shared Components without the prior written consent of the Hotel Unit Owner. The Hotel Unit Owner shall have the obligation to answer, in writing, any written request by a Residential and/or Commercial Unit Owner for approval of such an addition, alteration or improvement within thirty (30) days after such request and all additional information requested is received, and the failure to do so within the stipulated time shall constitute the Hotel Unit Owner's consent. The Hotel Unit Owner may condition the approval in any manner, including, without limitation, retaining approval rights of the contractor to perform the work.   The proposed additions, alterations and improvements by the Unit Owners shall be made in compliance with all laws, rules, ordinances and regulations of all governmental authorities having jurisdiction, and with any conditions imposed by the Association with respect to design, structural integrity, aesthetic appeal, construction details, lien protection or otherwise.   Further, no alteration, addition or modification may in any manner affect the Hotel Unit or any portion of the Shared Components, without the prior written consent of the Hotel Unit Owner (which consent may be withheld in its sole discretion).   Once approved by the Hotel Unit Owner, such approval may not be revoked.   A Residential or Commercial Unit Owner making or causing to be made any such additions, alterations or improvements agrees, and shall be deemed to have agreed, for such Owner, and such Owner's heirs, personal representatives, successors and assigns (it is appropriate to hold the Association, the Developer, the Hotel Unit Owner and all other Unit Owners harmless from and to indemnify them for any liability or damage to the Condominium Property, the Association Property, the Hotel Unit and/or the Shared Components and expenses linked therefrom, and shall be solely responsible for the maintenance, repair and insurance thereof from and after that date of installation or construction thereof. The Hotel Unit Owner's rights of review and approval of plans and other submissions under this Declaration are intended solely for the benefit of the Hotel Unit Owner.  Neither the Developer and the Association, the Hotel Unit Owner, nor any of its officers, directors, employees, agents, contractors, consultants or attorneys shall be liable to any Owner or any other person by reason of mistake in judgment, failure to point out or correct deficiencies in any plans or other submissions, negligence, or any other misfeasance, malfeasance or non-feasance arising out of or in connection with the approval or disapproval of any plans or submissions. Anyone submitting plans hereunder, by the submission of same, and any Owner, by acquiring title to same, agrees not to seek damages from the Developer, the Association and/or the Hotel Unit Owner arising out of the Hotel Unit Owner's review of any plans hereunder. Without limiting the generality of the foregoing, the Association nor the Hotel Unit Owner shall be responsible for reviewing, nor shall its review of any plans be deemed approval of, any plans from the standpoint of structural safety, soundness, workmanship, materials, usefulness, conformity with building or other codes or industry standards, or compliance with governmental requirements.  Further, each Owner (including the Owner harmless from and against any and all costs, claims (whether rightfully or wrongfully asserted), successors and assigns) agrees to indemnify and hold the Developer, the Association and the Hotel Unit damages, expenses or liabilities whatsoever (including, without limitation, reasonable attorneys' fees and court costs at all trial and appellate levels), arising out of any review of plans hereunder.  The foregoing provisions requiring approval shall not be applicable to the Hotel Unit and/or to any Unit owned by the Developer.  The provisions of this Section 8.1 shall not be amended without an affirmative vote of 4/5ths of the total voting interests in the Condominium.

8.2    Life Safety Systems.  No Unit Owner shall make any additions, alterations or improvements to the Life Safety Systems, and/or to any other portion of the Condominium Property which may impair the Life Safety Systems or access to the Life Safety Systems, without first receiving the prior written approval of the Board and/or the Hotel Unit Owner.  In that regard, no lock, chain or other device or combination thereof shall be installed or maintained at any time on or in connection with any door on which panic hardware or fire exit hardware is required.  Stairwell identification and emergency signage shall not be altered or removed by any Unit Owner whatsoever.  No barrier including, but not limited to personally, shall impede the free movement of ingress and egress to and from all emergency ingress and egress passageways.

8.3    Improvements, Additions or Alterations by Developer or to the Hotel Unit.  Anything to the contrary notwithstanding, the foregoing restrictions of this Section 8 shall not apply to Developer-owned Units, nor to the Hotel Unit.  The Developer shall have the additional right, without the consent or approval of the Board of Directors or other Unit Owners, but without obligation, to (a) make alterations, additions or improvements, structural and non-structural, interior and exterior, ordinary and extraordinary, in, to and upon any Unit owned by it (including, without limitation, the removal of walls, floors, ceilings and other structural portions of the Improvements), and (b) expand, alter or add to all or any part of the recreational facilities.  Similarly, the Hotel Unit Owner shall have the additional right, without the consent or approval of the Board of Directors or other Unit Owners, but without obligation, to make alterations, additions or improvements, structural and non-structural, interior and exterior, ordinary and extraordinary, in, to and upon the Hotel Unit (including, without limitation, the removal of walls, floors, ceilings and other structural portions of the Improvements), and to expand, alter or add to all or any part of the recreational facilities contained within the Hotel Unit.  Any amendment to this Declaration required by a change made pursuant to this Section 8.3 shall be adopted in accordance with Section 6, provided, however, that the exercise of any right by Developer pursuant to clause 8.3(b) above shall not be deemed a Material Amendment.  Notwithstanding anything to the contrary contained in this Declaration, each Unit Owner recognizes and agrees that the Hotel Unit Owner shall be permitted to make to make the following alterations to each unit (and shall be permitted access to each Unit for purposes of making the following described alterations): (i) installation of unit location/exiting maps on the interior portion of each Residential Unit's entry door and (ii) replacement of manually operated doors with doors containing automatic closing devices (i.e., spring hinges or door closers). To the extent that the unit owner has installed unit location/exit maps and/or automatic doors, no Unit Owner shall be permitted to make

CFN # 106678130, OR I   43282  PG 1952,  Page  10 of 94

any additions, alterations or improvements to such unit location/exit maps and/or automatic doors, and/or to any other portion of the Condominium Property which may impair such unit location/exit maps and/or automatic doors, without first receiving the prior written approval of the Board and/or the Hotel Unit Owner.

9.  **Operation of the Condominium by the Association; Powers and Duties.**

9.1   **Powers and Duties.**  The Association shall be the entity responsible for the operation of the Common Elements and the Association Property, but not the Shared Components, as same are part of the Hotel Unit. The powers and duties of the Association shall include those set forth in the By-Laws and Articles of Incorporation of the Association (which By-Laws and Articles are attached hereto as Exhibits "4" and "5", respectively) as amended from time to time. In addition, the Association shall have all the powers and duties set forth in the Act, as well as all powers and duties granted to or imposed upon it by this Declaration, including, without limitation:

(a)   The irrevocable right to have access to each Unit from time to time during reasonable hours as may be necessary for pest control purposes and for the maintenance, repair or replacement of any Common Elements or any portion of a Unit, if any, to be maintained by the Association, or at any time and by force, if necessary, to prevent damage to the Common Elements, the Association Property or to a Unit or Units.

(b)   The power to make and collect Assessments and other charges against Unit Owners and to lease, maintain, repair and replace the Common Elements and Association Property.

(c)   The duty to maintain accounting records of the Association according to good accounting practices, which shall be open to inspection by Unit Owners or their authorized representatives at reasonable times upon prior request.

(d)   The power to borrow money, execute promissory notes and other evidences of indebtedness and to give as security therefor mortgages and security interests in property owned by the Association, if any, provided that such actions are approved by a majority of the entire membership of the Board of Directors and two-thirds of the voting interests of the Units represented at a meeting at which a quorum has been attained, or by such greater percentage of the Board or Unit Owners as may be specified in the By-Laws with respect to certain borrowing.  The foregoing restriction shall not apply if such indebtedness is entered into for the purpose of financing insurance premiums, which action may be undertaken solely by the Board of Directors, without requiring a vote of the Unit Owners.

(e)   The power to adopt and amend rules and regulations concerning the details of the operation and use of the Common Elements and Association Property.

(f)   The power to acquire, convey, lease and encumber real and personal property.  Personal property shall be acquired, conveyed, leased or encumbered upon a majority vote of the Board of Directors, unless the cost thereof exceeds $25,000.00 in which event the acquisition shall require an affirmative vote of not less than 2/3rds of the voting interests.  Real property shall be acquired, conveyed, leased or encumbered upon a majority vote of the Board of Directors alone and an affirmative vote of not less than 2/3rds of the voting interests; provided, however, that the acquisition of any Unit as a result of a foreclosure of the lien for Assessments (or by deed in lieu of foreclosure) shall be made upon the majority vote of the Board, regardless of the price for same and the Association, through its Board, has the power to hold, lease, mortgage or convey the acquired Unit(s) without requiring the consent of Unit Owners.  The expenses of ownership (including the expense of making and carrying any mortgage related to such ownership), rental, membership fees, taxes, Assessments, operation, replacements and other expenses and undertakings in connection therewith shall be Common Expenses.

(g)   The power to execute all documents or consents, on behalf of all Residential Unit Owners (and their mortgagees), required by all governmental and/or quasi-governmental agencies in connection with land use and development matters (including, without limitation, plats, waivers of plat, unities of title, covenants in lieu thereof, etc.), and in that regard, each Owner of a Residential Unit, by acceptance of the deed to such Owner's Residential Unit, and each mortgagee of a Residential Unit, by acceptance of a lien on said Owner's Residential Unit, appoints and designates the President of the Association, as such Owner's agent and attorney-in-fact to execute any and all such documents or consents.

(h)   The obligation to (i) operate and maintain the surface water management system in accordance with the permit issued by the District, (ii) carry out, maintain, and monitor any required wetland mitigation tasks and (iii) maintain copies of all permitting actions with regard to the District.

(i)   All of the powers which a corporation not for profit in the State of Florida may exercise pursuant to this Declaration, the Articles of Incorporation, the Bylaws, Chapters 607 and 617, Florida Statutes and the Act, in all cases except as expressly limited or restricted in the Act.

In the event of conflict among the powers and duties of the Association or the terms and provisions of this Declaration, exhibits attached hereto or otherwise, this Declaration shall take precedence over the Articles of Incorporation, By-Laws and applicable rules and regulations; the Articles of Incorporation shall take




CFN # 106678130, OR F   43282   PG 1953,   Page 11 of 94

precedence over the By-Laws and applicable rules and regulations; and the By-Laws shall take precedence over applicable rules and regulations, all as amended from time to time. Notwithstanding anything in this Declaration or its exhibits to the contrary, the Association shall at all times be the entity having ultimate control over the Condominium, consistent with the Act.

9.2    Limitation Upon Liability of Association.   Notwithstanding the duty of the Association to maintain and repair parts of the Condominium Property, the Association shall not be liable to Unit Owners for injury or damage, other than for the cost of maintenance and repair, caused by any latent condition of the Condominium Property.  Further, the Association shall not be liable for any such injury or damage caused by defects in design or workmanship or any other reason connected with any additions, alterations or improvements or other activities done by or on behalf of any Unit Owners regardless of whether or not same shall have been approved by the Association pursuant to Section 8.1 hereof.  The Association also shall not be liable to any Unit Owner or lessee or to any other person or entity for any property damage, personal injury, death or other liability on the grounds that the Association did not obtain or maintain insurance (or carried insurance with any particular deductible amount) for any particular matter where: (i) such insurance is not required hereby; or (ii) the Association could not obtain such insurance at reasonable costs or upon reasonable terms.  Nothing herein shall be deemed to relieve the Association of its duty to exercise ordinary care in the carrying out of its responsibilities nor to deprive the Unit Owners of their right to sue the Association if it negligently or willfully causes damage to the Unit Owners' property during the performance of the Association's duties.

9.3    Restriction Upon Assignment of Shares in Assets.   The share of a Unit Owner in the funds and assets of the Association cannot be assigned, hypothecated or transferred in any manner except as an appurtenance to his Unit.



9.4    Approval or Disapproval of Matters.   Whenever the decision of a Unit Owner is required upon any matter, whether or not the subject of an Association meeting, that decision shall be expressed by the same person who would cast the vote for that Unit at an Association meeting, unless the joinder of all record Owners of the Unit is specifically required by this Declaration or by law.



9.5    Acts of the Association.   Unless the approval or action of Unit Owners, and/or a certain specific percentage of the Board of Directors of the Association, is specifically required in this Declaration, the Articles of Incorporation or By-Laws of the Association, applicable rules and regulations or applicable law, all approvals or actions required or permitted to be given or taken by the Association shall be given or taken by the Board of Directors, without the consent of Unit Owners, and the Board may so approve and act through the proper officers of the Association without a specific resolution.  When an approval or action of the Association is permitted to be given or taken hereunder or thereunder, such action or approval may be conditioned in any manner the Association deems appropriate or the Association may refuse to take or give such action or approval without the necessity of establishing the reasonableness of such conditions or refusal.

9.6    Effect on Developer.   If the Developer holds a Unit for sale in the ordinary course of business, none of the following actions may be taken without the prior written approval of the Developer:

    (a)    Assessment of the Developer as a Unit Owner for capital improvements;

    (b)    Any action by the Association that would be detrimental to the sales of Units by the Developer; provided, however, that an increase in Assessments for Common Expenses without discrimination against the Developer shall not be deemed to be detrimental to the sales of Units.

10.    Determination of Common Expenses and Fixing of Assessments Therefor.   The Board of Directors shall from time to time, and at least annually, prepare a budget for the Condominium and the Association, determine the amount of Assessments payable by the Unit Owners to meet the Common Expenses of the Condominium and the By-Laws, and allocate and assess such expenses among the Unit Owners in accordance with the provisions of this Declaration and the By-Laws.  The Board of Directors shall advise all Unit Owners promptly in writing of the amount of the Assessments payable by each of them as determined by the Board of Directors as aforesaid and shall furnish copies of the budget, on which such Assessments are based, to all Unit Owners and (if requested in writing) to their respective mortgagees.  The Common Expenses shall include the expenses of and reserves for (if required by, and not waived in accordance with applicable law) the operation, maintenance, repair and replacement of the Common Elements and Association Property, costs of carrying out the powers and duties of the Association, the cost of fire and other casualty and liability insurance as herein provided, and any other expenses designated as Common Expenses by the Act, this Declaration, the Articles or By-Laws of the Association, applicable rules and regulations or by the Association.  Incidental income to the Association, if any, may be used to pay regular or extraordinary Association expenses and liabilities, to fund reserve accounts, or otherwise as the Board shall determine from time to time, and need not be restricted or accumulated.  Any budget adopted shall be subject to change to cover actual expenses at any time.  Any such change shall be adopted consistent with the provisions of this Declaration and the By-Laws.

11.    Collection of Assessments.

11.1    Liability for Assessments.   A Unit Owner, regardless of how title is acquired, including by purchase at a foreclosure sale or by deed in lieu of foreclosure shall be liable for all Assessments coming due while he is the Unit Owner.  Additionally, a Unit Owner shall be jointly and severally liable with the previous Owner for all unpaid Assessments that came due up to the time of the conveyance, without prejudice to any right the Owner may have to recover from the previous Owner the amounts paid by the grantee Owner.  The liability

for Assessments may not be avoided by waiver of the use or enjoyment of any Common Elements or by the abandonment of the Unit for which the Assessments are made or otherwise.

11.2   Special and Capital Improvement Assessments.  In addition to Assessments levied by the Association to meet the Common Expenses of the Condominium and the Association, the Board of Directors may levy "Special Assessments" and "Capital Improvement Assessments" upon the following terms and conditions:

(a)   "Special Assessments" shall mean and refer to a charge against each Owner and his Unit, representing a portion of the costs incurred by the Association for specific purposes of a nonrecurring nature which are not in the nature of capital improvements.

(b)   "Capital Improvement Assessments" shall mean and refer to a charge against each Owner and his Unit, representing a portion of the costs incurred by the Association for the acquisition, installation, construction or replacement (as distinguished from repairs and maintenance) of any capital improvements located or to be located within the Common Elements or Association Property.

(c)   Special Assessments and Capital Improvement Assessments may be levied by the Board and shall be payable in lump sums or installments, in the discretion of the Board; provided that, if such Special Assessments or Capital Improvement Assessments, in the aggregate in any year, exceed $125,000.00 or cause the total Assessments levied to exceed 115% of Assessments for the preceding calendar year, the Board must obtain approval of a majority of the Units represented at a meeting at which a quorum is attained.

11.3   Default in Payment of Assessments for Common Expenses.  Assessments and installments thereof not paid within ten (10) days from the date when they are due shall bear interest at fifteen percent (15%) per annum from the date due (but not part thereof) or at an administratively tolerable if lower amount (not to exceed the greater of $25.00 or five percent (5%)) of each delinquent installment.  This Association has a lien on each Condominium Parcel to secure the payment of Assessments.  Except as set forth below, the lien is effective from, and shall relate back to, the date of the recording of this Declaration.  However, as to first mortgages of record, the lien is effective from and after recording of a claim of lien.  The lien shall be evidenced by the recording of a claim of lien in the Public Records of the County.  To be valid, the claim of lien must state the description of the Condominium Parcel, the name of the record Owner, the name and address of the Association, the amount due and the due dates, and the claim of lien must be executed and acknowledged by an officer or authorized officer of the Association.  The claim of lien shall agree by way of settlement) have been secured by it (or such other amount as to which the Association shall agree by way of settlement) have been fully paid or until it is barred by law.  No such lien shall be effective longer than one (1) year after the claim of lien has been recorded unless, within that one (1) year period, an action to enforce the lien is commenced.  The one (1) year period shall automatically be extended for any length of time during which the Association is prevented from filing a foreclosure action by an automatic stay resulting from a bankruptcy petition filed by the Owner or any other person claiming an interest in the Unit.  The claim of lien shall secure (whether or not stated therein) all unpaid Assessments, which are due and which may accrue subsequent to the recording of the claim of lien and prior to the entry of a certificate of title, as well as interest and all reasonable costs and attorneys' fees incurred by the Association incident to the collection process.  Upon payment in full, the person making the payment is entitled to a satisfaction of the lien in recordable form.  The Association may bring an action in its name to foreclose a lien for unpaid Assessments in the manner a mortgage of real property is foreclosed and may also bring an action at law to recover a money judgment for the unpaid Assessments without waiving any claim of lien.  The Association is entitled to recover its reasonable attorneys' fees incurred either in a lien foreclosure action or an action to recover a money judgment for unpaid Assessments.

Additionally, each Owner of any Unit by acceptance of a deed therefor or other conveyance thereof, whether or not it shall be so expressed in any such deed or other conveyance, shall be deemed to have assigned all rents, issues and profits (the "Collateral Assignment of Rents") on each such Unit to the Association, which Collateral Assignment of Rents shall become absolute upon default of such Unit Owner hereunder.  As an additional right and remedy of the Association, upon default in the payment of Assessments as aforesaid and after thirty (30) days' prior written notice to the applicable Unit Owner and the recording of a claim of lien, the Association may declare the Assessment Installments for the remainder of the budget year to be accelerated and immediately due and payable.  In the event that the amount of such installments changes during the remainder of the budget year, the Unit Owner or the Association, as appropriate, shall be obligated to pay or reimburse to the other the amount of increase or decrease within ten (10) days of same taking effect.

11.4   Notice of Intention to Foreclose Lien.  No foreclosure judgment may be entered until at least thirty (30) days after the Association gives written notice to the Unit Owner of its intention to foreclose its lien to collect the unpaid Assessments.  If this notice is not given at least thirty (30) days before the foreclosure action is filed, and if the unpaid Assessments, including those coming due after the claim of lien is recorded, are paid before the entry of a final judgment of foreclosure, the Association shall not recover attorney's fees or costs.  The notice must be given by delivery of a copy of it to the Unit Owner or by certified or registered mail, return receipt requested, addressed to the Unit Owner at the last known address, and upon such mailing, the notice shall be deemed to have been given.  If after diligent search and inquiry the Association cannot find the Unit Owner or a mailing address at which the Unit Owner will receive the notice, the court may proceed with the foreclosure action and may award attorney's fees and costs as permitted by law.  The notice requirements of this subsection are satisfied if the Unit Owner records a Notice of Contest of Lien as provided in the Act.

11.5    Appointment of Receiver to Collect Rental.  If the Unit Owner remains in possession of the Unit after a foreclosure judgment has been entered, the court in its discretion may require the Unit Owner to pay a reasonable rental for the Unit.  If the Unit is rented or leased during the pendency of the foreclosure action, the Association is entitled to the appointment of a receiver to collect the rent.  The expenses of such receiver shall be paid by the party which does not prevail in the foreclosure action.

11.6    First Mortgages.  The liability of a First Mortgagee, or its successor or assignee, who acquire title to a Unit by foreclosure or by deed in lieu of foreclosure for the unpaid Assessments (or installments thereof) that became due prior to the First Mortgagee's acquisition of title is limited to the lesser of:

(a)     The Unit's unpaid Common Expenses and regular periodic Assessments which accrued or came due during the six (6) months immediately preceding the acquisition of title and for which payment in full has not been received by the Association; or

(b)     One percent (1%) of the original mortgage debt.

As to a Unit acquired by foreclosure, the limitations set forth in clauses (a) and (b) above shall not apply unless the First Mortgagee joined the Association as a defendant in the foreclosure action.  Joinder of the Association, however, is not required if, on the date the complaint is filed, the Association was dissolved or Association did not maintain an office or agent for service of process at a location which was known or reasonably discoverable by the mortgagee.

A First Mortgagee acquiring title to a Unit as a result of foreclosure or deed in lieu thereof may not, during the period of its ownership of such Unit, whether or not such Unit is unoccupied, be excused from the payment of some or all of the Common Expenses coming due during the period of such ownership.

11.7    Developer's Liability for Assessments.  During the period from the date of the recording of this Declaration until the earlier of the following dates (the "Guarantee Expiration Date"):  (a) the last day of the sixth (6th) complete calendar month after the applicable recording date, or (b) the date that control of the Association is transferred to Unit Owners other than the Developer as provided in the By-Laws and the Act, the Developer shall not be obligated to pay the share of Common Expenses and Assessments attributable to the Units owned by the Developer, provided:  (i) that the regular Assessments for Common Expenses shall not increase during such period over the amount set forth in Exhibit "6" attached hereto, subject only to the occurrence of an Extraordinary Financial Event, as set forth below; and (ii) that the Developer shall be obligated to pay any amount of Common Expenses actually incurred during such period and not produced by the Assessments at the guaranteed levels receivable from other Unit Owners and/or from income of the Association.  After the Guarantee Expiration Date, the Developer shall have the option of extending the guarantee for four (4) additional six (6) month periods, or paying the share of Common Expenses and Assessments attributable to Units it then owns.  Notwithstanding the above and as provided in Section 718.116(9)(a)(2) of the Act, in the event of an Extraordinary Financial Event (as hereinafter defined), the costs necessary to effect restoration shall be assessed against all Unit Owners owning units on the date of such Extraordinary Financial Event, and their successors and assigns, including the Developer (with respect to Units owned by the Developer).  As used in this subsection, an "Extraordinary Financial Event" shall mean a casualty loss affecting a Condominium resulting from a natural disaster or Act of God, which is not covered by insurance proceeds from the insurance maintained by the Association as required by Section 718.111(11)(a) of the Act.

11.8    Certificate of Unpaid Assessments.  Within fifteen (15) days after written request by a Unit Owner or mortgagee of a Unit, the Association shall provide a certificate stating all Assessments and other moneys owed to the Association by the Unit Owner with respect to his Unit.  Any person other than the Unit Owner who relies upon such certificate shall be protected thereby.  The Association or its authorized agent may charge a reasonable fee for the preparation of such certificate.

11.9    Installments.  Regular Assessments shall be collected monthly or quarterly, in advance, at the option of the Association.  Initially, assessments will be collected monthly.

11.10   Application of Payments.  Any payments received by the Association from a delinquent Unit Owner shall be applied first to any interest accrued on the delinquent installment(s) as aforesaid, then to any administrative late fees, then to any costs and reasonable attorneys' fees incurred in collection and then to the delinquent and any accelerated Assessments.  The foregoing shall be applicable notwithstanding any restrictive endorsement, designation or instruction placed on or accompanying a payment.

12.     Obligation for Expenses Relating to the Hotel Unit.

12.1    Maintenance.  As provided in Sections 3.5(e) and 7.3 above, the Hotel Unit Owner has granted easements with respect to certain portions of the Hotel Unit and agreed to repair, replace, improve, maintain, manage, operate, and insure the Hotel Unit, all to be done as determined and ordered by the Hotel Unit Owner, and otherwise as provided in Section 7.3.  In consideration of the foregoing each Residential Unit Owner, and each Commercial Unit Owner, by acceptance of a deed or other conveyance of the applicable Unit, and whether or not expressly stated, shall be deemed to agree that the costs incurred by the Hotel Unit Owner in (or reasonably allocated to) the repair, replacement, improvement, maintenance, management, operation, ad valorem tax obligations and insurance of the Shared Components (including reasonable reserves if established by the Hotel Unit Owner and any assessments payable by the Hotel Unit Owner to the

CFN # 106678130, OR B. 43282 PG 1956, Page 14 of 94

Association, the "Shared Costs") shall be paid for in part through charges (either general or special) imposed against the Residential Units and the Commercial Units in accordance with the terms hereof. No Owner may waive or otherwise escape liability for charges for the Shared Costs by non-use (whether voluntary or involuntary) of the Hotel Unit or abandonment of the right to use same. Notwithstanding anything herein contained to the contrary, the Hotel Unit Owner shall be excused and relieved from any and all maintenance, repair and/or replacement obligations with respect to the Hotel Unit to the extent that the funds necessary to perform same, to the extent the obligation of the Residential Unit Owners and/or the Commercial Unit Owners, are not available through the charges imposed and actually collected. The Hotel Unit Owner shall have no obligation to fund and/or advance any deficit or shortfall in funds which were the obligation of the Residential Unit Owners and/or the Commercial Unit Owners in order to properly perform the maintenance, repair and/or replacement obligations described herein.

12.2    Easement. An easement is hereby reserved and created in favor of the Hotel Unit Owner, and its designees over the Condominium Property for the purpose of entering onto the Condominium Property for the performance of the maintenance, repair and replacement obligations herein described.

12.3    Charges to Unit Owners: Lien.

(a)      Developer, for all Units now or hereafter located within the Condominium Property, hereby covenants and agrees, and each Owner of any Residential Unit and/or Commercial Unit, by acceptance of a Deed therefor or other conveyance thereof, whether or not it shall be so expressed in such Deed or other conveyance, shall be deemed to covenant and agree to pay to the Hotel Unit Owner annual charges for the operation and maintenance of, and for payment of 40.4857% of the Shared Costs (the "Non-Hotel Units Allocated Share"), the establishment of reasonable reserves for the replacement of the Shared Components and the furnishings and finishings thereof, capital improvement charges, special charges and all other charges herein referred to or lawfully imposed by the Hotel Unit Owner in connection with the repair, replacement, improvement, maintenance, management, operation, and insurance of the Shared Components, all such charges to be fixed, established and collected from time to time as herein provided. The annual charge, capital improvement charge and special charge, together with such interest thereon and costs of collection thereof as hereinafter provided, shall be a charge on the Residential Units and Commercial Units and shall be a continuing lien upon the Residential Units and Commercial Units against which each such charge is made and upon all improvements thereon, from time to time existing. Each such charge, together with such interest thereon and costs of collection thereof as hereinafter provided, shall also be the personal obligation of the person who is the Owner of such Residential Units and/or Commercial Units at the time when the charge fell due and all subsequent Owners of that Unit until paid, except as provided in Section 12.5 below. Reference herein to charges shall be understood to include reference to any and all of said charges whether or not specifically mentioned. Each Residential and Commercial Unit shall be charged a "proportionate share" of the Hotel Shared Costs. The proportionate share for each Residential and Commercial Unit is set forth on Exhibit "7" attached hereto (with the aggregate of the proportionate shares attributable to the Residential and Commercial Units equal to the Non-Hotel Units Allocated Share).

(b)      In addition to the regular and capital improvement charges which are or may be levied hereunder, the Hotel Unit Owner shall have the right to collect reasonable reserves for the replacement of the Shared Components and the furnishings and finishings thereof and to levy special charges against an Owner(s) to the exclusion of other Owners for the repair or replacement of damage to any portion of the Hotel Unit (including, without limitation, improvements, furnishings and finishings therein) caused by the misuse, negligence or other action or inaction of an Owner or his guests, tenants or invitees. Any such special charge shall be subject to all of the applicable provisions of this Section including, without limitation, lien filing and foreclosure procedures and late charges and interest. Any special charge levied hereunder shall be due within the time specified by the Hotel Unit Owner in the action imposing such charge. The annual regular charges provided for in this Declaration and shall be applicable through December 31 of such year. Each subsequent annual Section shall commence on the first day of the month next following the recordation of this charge shall be imposed for the year beginning January 1 and ending December 31. The annual charges shall be payable in advance in monthly installments, or in annual, semi- or quarter-annual installments if so determined by the Hotel Unit Owner (absent which determination they shall be payable monthly). The charge amount (and applicable installments) may be changed at any time by the Hotel Unit Owner from that originally stipulated or from any other charge that is in the future adopted by the Hotel Unit Owner. The original charge for any year shall be levied for the calendar year (to be reconsidered and amended, if necessary, at any appropriate time during the year), but the amount of any revised charge to be levied during any period shorter than a full calendar year shall be in proportion to the number of months (or other appropriate installments) remaining in such calendar year. The Hotel Unit Owner shall fix the date of commencement and the amount of the charge against the Residential Units and/or Commercial Units, as applicable, for each charge period, to the extent practicable, at least thirty (30) days in advance of such date or period, and shall, at that time, prepare a roster of the Residential Units, and Commercial Units and charges applicable thereto which shall be kept in the office of the Hotel Unit Owner and shall be open to inspection by any Owner. Written notice of the charge shall thereupon be sent to every Unit Owner subject thereto twenty (20) days prior to payment of the first installment thereof, except as to special charges. In the event no such notice of the charges for a new charge period is given, the amount payable shall continue to be the same as the amount payable for the previous period, until changed in the manner provided for herein.

CFN # 106678130, OR B 43282 PG 1957, Page 15 of 94

12.4 Effect of Non-Payment of Charge; the Personal Obligation; the Lien; Remedies of the Hotel Unit Owners. If the charges (or installments) provided for herein are not paid on the date(s) when due (being the date(s) specified herein or pursuant hereto), then such charges (or installments) shall become delinquent and shall, together with late charges, interest and the cost of collection thereof as hereinafter provided, thereupon become a continuing lien on the Unit and all improvements thereon which shall bind such Unit in the hands of the then Owner, and such Owner's heirs, personal representatives, successors and assigns. Except as provided in Section 12.5 to the contrary, the personal obligation of an Owner to pay such charge shall pass to such Owner's successors in title and recourse may be had against either or both. If any installment of a charge is not paid within fifteen (15) days after the due date, at the option of the Hotel Unit Owner, a late charge not greater than the amount of such unpaid installment may be imposed (provided that only one late charge may be imposed on any one unpaid installment and if such installment is not paid thereafter, if, and the late charge shall accrue interest as provided herein but shall not be subject to additional late charges; provided further, however, that each other installment thereafter coming due shall be subject to one late charge each as aforesaid) and the Hotel Unit Owner may bring an action at law against the Owner(s) personally obligated to pay the same, may record a claim of lien (as evidence of its lien rights as hereinabove provided) against the Unit on which the charges and late charges are unpaid and all improvements thereon, may foreclose the lien against the applicable Unit and all improvements thereon on which the charges and late charges are unpaid, or may pursue one or more of such remedies at the same time or successively, and attorneys' fees and costs actually incurred in preparing and filing the claim of lien and the complaint, if any, and prosecuting same, in such action shall be added to the amount of such charges, late charges and interest secured by the lien, and in the event judgment is obtained, such judgment shall include all such sums as above provided and attorneys' fees actually incurred together with the costs of the action, through all appellate appellate levels. Failure of the Hotel Unit Owner to any collecting entity) to send or deliver bills or notices of charges shall not relieve Owners from their obligations hereunder. The Hotel Unit Owner shall have such other remedies for collection and enforcement of charges as may be permitted by applicable law. All remedies are intended to be, and shall be, cumulative.

12.5 Subordination of the Hotel Unit Owner's Lien. The lien for the charges provided for in this Article shall be subordinate to real property tax liens and the lien of any first mortgage; provided, however, that any such mortgage lender when in possession, and in the event of a foreclosure, any purchaser at a foreclosure sale, and any such mortgage lender acquiring a deed in lieu of foreclosure, and all persons claiming by, through or under such purchaser or mortgage lender, shall hold title subject to the liability and lien of any charge coming due after such foreclosure (or conveyance in lieu of foreclosure). Any unpaid charge which cannot be collected as a lien against any Unit by reason of the provisions of this Section shall be deemed to be a charge divided equally among, payable by and a lien against all Units, including the Units as to which the foreclosure (or conveyance in lieu of foreclosure) took place.

12.6 Curative Right. In the event (and only in the event) that the Hotel Unit Owner fails to maintain the Shared Components as required under this Declaration for any reason other than failure to receive sufficient funds therefor from Unit Owners, the Association shall have the right to perform such duties; provided, however, that same may only occur after thirty (30) days' prior written notice to the Hotel Unit Owner and provided that such curative action cannot be effected curative action within said thirty (30) day period (or if the curative Owner has not remedied the completed within said thirty (30) day period and thereafter diligently pursued same to completion). To the extent that the Association must undertake maintenance responsibilities as a result of the Hotel Unit Owners' failure to perform same, then in such event, but only for such remedial actions as may be necessary, the Association shall be deemed vested with the Charge rights of the Hotel Unit Owner hereunder for the limited purpose of obtaining reimbursement from the Hotel Unit Owner for the costs of performing such remedial work.

12.7 Financial Records. The Hotel Unit Owner shall maintain financial books and records showing its actual receipts and expenditures with respect to the maintenance, operation, repair, replacement, alteration and insurance of the Shared Components, including the then current budget and any then proposed budget (the "Shared Components Records"). The Shared Components Records need not be audited or reviewed by a Certified Public Accountant. The Shared Components Records shall at all times, during reasonable business hours, be subject to the inspection of any Member of the Association.

12.8 Limitation Upon Liability of Hotel Unit Owner. Notwithstanding the duty of the Hotel Unit Owner to maintain and repair the Shared Components, the Hotel Unit Owner shall not be liable to any other Unit Owners (nor their guests, tenants or invitees) for injury or damage, either then for the cost of maintenance and repair, caused by any latent condition of the Shared Components. Further, the Hotel Unit Owner shall not be liable for any such injury or damage caused by defects in design or workmanship or any other reason connected with any additions, alterations or improvements or other activities done by or on behalf of any Unit Owners regardless of whether or not same shall have been approved by the Hotel Unit Owner pursuant to Section 8.1 hereof. The Hotel Unit Owner also shall not be liable to any Unit Owner or lessee or to any other person or entity for any property damage, personal injury, death or other liability on the grounds that the Hotel Unit Owner did not obtain or maintain insurance (or carried insurance with any particular deductible amount) for any particular matter where: (i) such insurance is not required hereby; or (ii) the Hotel Unit Owner could not obtain such insurance at reasonable costs or upon reasonable terms.

12.9 Hotel Unit Owners Consent; Conflict. The provisions of this Section 12 shall not be amended, modified or in any manner impaired and/or diminished, directly or indirectly, without the prior written consent of 4/5% of the Residential Unit Owners, the Commercial Unit Owners and the prior written consent of the Hotel Unit Owner. In the event of any conflict between the provisions of this Section 12, and the provisions of any other Section of this Declaration, the provisions of this Section 12 shall prevail and govern.

T[...] OFFICIAL COPY

13. **Insurance.** Insurance obtained by the Hotel Unit Owner pursuant to the requirements of this Section 13 shall be governed by the following provisions:

13.1 **Purchase, Custody and Payment.**

(a) **Purchase.** All insurance policies required to be obtained by the Hotel Unit Owner hereunder shall be issued by an insurance company authorized to do business in Florida or by surplus lines carriers offering policies for properties in Florida.

(b) **Named Insured.** The named insured shall be the Hotel Unit Owner, individually, or such designee as may be designated by the Hotel Unit Owner, and as agent for the Association and the Owners of Units covered by the policy, without naming them, and as agent for the holders of any mortgage on a Unit (or any leasehold interest therein), without naming them. The Association, Unit Owners and the holders of any mortgage on a Unit (or any leasehold interest therein) shall be deemed additional insureds.

(c) **Custody of Policies and Payment of Proceeds.** All policies shall provide that payments for losses made by the insurer shall be paid to the Hotel Unit Owner and the holders of any mortgage on the Hotel Unit, as their interests may appear.

(d) **Copies to Mortgagees.** One copy of each insurance policy, or a certificate evidencing such policy, and all endorsements thereto, shall be furnished by the Hotel Unit Owner upon request to the holders of any mortgage on a Unit. Copies of certificates shall be furnished not less than ten (10) days prior to the beginning of the term of the policy, or not less than ten (10) days prior to the expiration of each preceding policy that is being renewed or replaced, as appropriate.

(e) **Personal Property and Liability.** Except as specifically provided herein, the Hotel Unit Owner shall not be responsible to other Unit Owners to obtain insurance coverage upon the property lying within the boundaries of their Units, including, but not limited to, the Improvements, Owners' personal property, nor insurance for the Owners' personal liability and living expenses, nor for any other risks not otherwise insured in accordance herewith.

13.2 **Coverage.** The Hotel Unit Owner shall maintain insurance covering the following:

(a) **Casualty.** The Shared Components, together with all fixtures, building service equipment, personal property and supplies constituting the Shared Components (collectively the "Insured Property"), shall be insured in such commercially reasonable amounts as may be determined from time to time by the Hotel Unit Owner. Notwithstanding the foregoing, the Insured Property shall not include, and shall specifically exclude, the Residential Units and the Commercial Units, the portions of the Hotel Unit which are not part of the Shared Components, and all furniture, furnishings, Unit floor coverings, wall coverings and ceiling coverings, other personal property owned, supplied or installed by Residential Unit Owners or the Commercial Unit Owner (or tenants of same), and all electrical fixtures, appliances, air conditioner and/or heating equipment, water heaters, water filters, built-in cabinets and countertops, and window treatments, including curtains, drapes, blinds, hardware and similar window treatment components, or replacements or any of the foregoing which are located within the boundaries of a Unit and serve only one Unit and all air conditioning compressors that service only an individual Unit, if any and to the extent not part of the Shared Components. Such policies may contain reasonable deductible provisions as determined by the Hotel Unit Owner. Such coverage shall afford protection against loss or damage by fire and other hazards covered by a standard extended coverage endorsement, and such other risks as from time to time are customarily covered with respect to buildings and improvements similar to the Insured Property in construction, location and use, including, but not limited to; vandalism and malicious mischief.

(b) **Liability.** Comprehensive general public liability and automobile liability insurance covering loss or damage resulting from accidents or occurrences on or about or in connection with the Insured Property or adjoining driveways and walkways, or any work, matters or things related to the Insured Property, with such coverage as shall be required by the Hotel Unit Owner, and with a cross liability endorsement to cover liabilities of the Unit Owners as a group to any Unit Owner, and vice versa.

(c) **Worker's Compensation** and other mandatory insurance, when applicable, to the extent applicable to the maintenance, operation, repair or replacement of the Shared Components.

(d) **Flood Insurance** covering the Insured Property, if so determined by the Hotel Unit Owner.

(e) **Such Other Insurance** as the Hotel Unit Owner shall determine from time to time be desirable in connection with the Shared Components.

When appropriate and obtainable, each of the foregoing policies shall waive the insurer's right to: (i) as to property insurance policies, subrogation against the Association and against the Unit Owners individually and as a group, (ii) to pay only a fraction of any loss in the event of coinsurance or if other insurance carriers have issued coverage upon the same risk, and (iii) avoid liability for a loss that is caused by an act of the Hotel Unit Owner (or any of its employees, contractors and/or agents), one or more Unit Owners or as a

CFN # 106678130, OR B' 43282  PG  1959,  Page  17 of 94

result of contractual undertakings. Additionally, and each policy shall provide that the insurance provided shall not be prejudiced by any act or omissions of individual Unit Owners that are not under the control of the Hotel Unit Owner.

13.3 **Additional Provisions.** All policies of insurance shall provide that such policies may not be canceled or substantially modified without at least thirty (30) days' prior written notice to all of the named insureds, including all mortgagees. Prior to obtaining any policy of casualty insurance or any renewal thereof, the Hotel Unit Owner may obtain an appraisal from a fire insurance company, or other competent appraiser, of the full insurable replacement value of the Insured Property (exclusive of foundations), without deduction for depreciation, for the purpose of determining the amount of insurance to be effected pursuant to this Section.

13.4 **Premiums.** Premiums upon insurance policies purchased by the Hotel Unit Owner pursuant to this Section 13 shall be among the costs assessed against the Unit Owners in accordance with the provisions of Section 12. Premiums may be financed in such manner as the Hotel Unit Owner deems appropriate.

13.5 **Share of Proceeds.** All insurance policies obtained by or on behalf of the Hotel Unit Owner pursuant to this Section 13 shall be for the benefit of the Hotel Unit Owner, the Association, the Unit Owners and the holders of any mortgages on a Unit (or any leasehold interest therein), as their respective interests may appear. The duty of the Hotel Unit Owner shall be to receive such proceeds as are paid and to hold the same in trust for the purposes elsewhere stated herein, and for the benefit of the Unit Owners and the holders of any mortgages on the subject Unit(s) (or any leasehold interest therein) in accordance with their Allocated Interest attributable thereto.

13.6 **Distribution of Proceeds.** Proceeds of insurance policies required to be maintained by the Hotel Unit Owner pursuant to this Section 13 shall be distributed to or for the benefit of the beneficial owners thereof in the following manner:

(a) **Reconstruction or Repair.** If the damaged property for which the proceeds are paid is to be repaired or reconstructed, the proceeds shall be paid to defray the cost thereof as elsewhere provided herein. Any proceeds remaining after defraying such costs shall be distributed to the Owners, remittances to Unit Owners and their mortgagees being payable jointly to them.

13.7 **Hotel Unit Owner as Agent.** The Hotel Unit Owner is hereby irrevocably appointed as agent and attorney-in-fact for the Association and each Unit Owner and for each owner of a mortgage or other lien upon a Unit and for each owner of any other interest in the Condominium Property to adjust all claims arising under insurance policies purchased by the Hotel Unit Owner and to execute and deliver releases upon the payment of claims.

13.8 **Unit Owners' Personal Coverage.** The insurance required to be purchased by the Hotel Unit Owner pursuant to this Section 13 shall not cover claims against an Owner due to accidents occurring within his Unit, nor casualty or theft loss to the contents of an Owner's Unit. It shall be the obligation of the individual Unit Owner, if such Owner so desires, to purchase and pay for insurance as to all such and other risks not covered by insurance required to be carried by the Hotel Unit Owner hereunder.

13.9 **Effect on Association.** The Association shall only maintain such insurance as is expressly required to be maintained by the Association pursuant to the Act, it being the express intent of the Developer, as the Owner of each and every of the Units upon the recordation hereof, for itself and its successors and assigns, that the Association not be required to maintain insurance hereunder. To the extent that the Association is required to maintain insurance pursuant to the express requirements of the Act, then (a) as to any insurance required to be maintained by the Association, the Hotel Unit Owner shall be relieved and released of its obligation hereunder to maintain same, and (b) all of the provisions hereof regarding said insurance, any claims thereunder and the distribution and application of proceeds thereunder shall be governed in accordance with the terms of this Declaration governing the insurance required to be maintained by the Hotel Unit Owner as if the references herein to the Hotel Unit Owner were references to the Association.

13.10 **Benefit of Mortgagees.** Certain provisions in this Section 13 entitled "Insurance" are for the benefit of mortgagees of Units and may be enforced by such mortgagees.

14. **Reconstruction or Repair After Fire or Other Casualty.**

14.1 **Determination to Reconstruct or Repair.** Subject to the immediately following paragraph, in the event of damage to or destruction of the Insured Property as a result of fire or other casualty, the Hotel Unit Owner shall determine whether or not to repair and/or restore the Insured Property, and if a determination is made to effect restoration, the Hotel Unit Owner shall disburse the proceeds of all insurance policies required to be maintained by it under Section 13 to the contractors engaged in such repair and restoration in appropriate progress payments.

In the event the Hotel Unit Owner determines not to effect restoration to the Shared Components, the net proceeds of insurance resulting from such damage or destruction shall be divided among all the Unit Owners in proportion to their Allocated Interests; provided, however, that no payment shall be made to a Unit Owner until there has first been paid off out of his share of such fund all mortgages and liens on his Unit in the order of priority of such mortgages and liens.

CFN # 106678130, OR F  43282  PG  1960,  Page  18 of 94

14.2   Plans and Specifications. Any reconstruction or repair must be made substantially in accordance with the plans and specifications for the original Improvements and then applicable building and other codes; or if not, then in accordance with the plans and specifications approved by the Hotel Unit Owner, provided, however, that if any reconstruction is undertaken, same shall be undertaken in such a manner to restore the Residential Units to substantially the same condition they were in prior to the occurrence of the casualty..

14.3   Assessments. If the proceeds of the insurance are not sufficient to defray the estimated costs of reconstruction and repair to be effected by the Hotel Unit Owner, or if at any time during reconstruction and repair, or upon completion of reconstruction and repair, the funds for the payment of the costs of reconstruction and repair are insufficient, Assessments shall be made against the Unit Owners by the Hotel Unit Owner (which shall be deemed to be assessments made in accordance with, and secured by the lien rights contained in, Section 12 above) in sufficient amounts to provide funds for the payment of such costs. Such Assessments on account of damage to the Insured Property shall be in proportion to all of the Owners' respective Allocated Interests.

14.4   Benefit of Mortgagees. Certain provisions in this Section 14 are for the benefit of mortgagees of Units and may be enforced by any of them.

15.   Condemnation.

15.1   Deposit of Awards. The taking or portions of the Shared Components by the exercise of the power of eminent domain shall be deemed to be a casualty, and the awards for that taking shall be deemed to be proceeds from insurance on account of the casualty and shall be deposited with the Hotel Unit Owner. Even though the awards may be payable to Unit Owners, the Unit Owners shall deposit the awards with the Hotel Unit Owner, and/or if the event of failing to do so, in the discretion of the Hotel Unit Owner, a charge shall be made against a defaulting Unit Owner in the amount of his award, or the amount of that award shall be set off against the sums hereafter made payable to that Owner.

15.2   Determination Whether to Continue Condominium. Whether the Condominium will be continued after condemnation will be determined in the manner provided for determining whether damaged property will be reconstructed and repaired after casualty. For this purpose, the taking by eminent domain also shall be deemed to be a casualty.

15.3   Disbursement of Funds. If the Condominium is terminated after condemnation, the proceeds of the awards and special Assessments will be deemed to be insurance proceeds and shall be owned and distributed in the manner provided with respect to the ownership and distribution of insurance proceeds if the Condominium is terminated after a casualty.

15.4   Taking of Shared Components. Awards for the taking of Shared Components shall be used to render the remaining portion of the Shared Components usable in the manner approved by the Hotel Unit Owner, provided, that if the cost of such work shall exceed the balance of the funds from the awards for the taking, the work shall be approved in the manner elsewhere required for capital improvements to the Shared Components. The balance of the awards for the taking of Shared Components, if any, shall be distributed to the Unit Owners in accordance with their Allocated Interests. Notwithstanding the foregoing, in the event that the costs of restoration resulting from any taking exceed $1,000,000.00, then the Hotel Unit Owner shall have the sole right to determine whether or not to repair and/or restore in the same manner as is provided in Section 14 above with respect to a casualty loss. If there is a mortgage on a Unit, the distribution shall be paid jointly to the Owner and the said mortgagees.

16.   Occupancy and Use Restrictions. In order to provide for congenial occupancy of the Condominium and Association Property and for the protection of the values of the Units, the use of the Condominium Property shall be restricted to and shall be in accordance with the following provisions:

16.1   Occupancy. Each Residential Unit shall be used as a residence only, whether for permanent, temporary or transient, use, except as otherwise herein expressly provided, all in accordance with the Resolution and all other applicable county and state codes, ordinances and regulations.

In accordance the terms of the Resolution and Section 47-12 of the ULDR of the City of Fort Lauderdale, Florida referred to in Section 2 of the Resolution, occupancy of each Unit shall be restricted as follows:

"No guest (including unit owners) of the hotel shall be provided lodging for more than sixty (60) days during November 15 to April 15 of each year, and no more than a total of one hundred and twenty (120) days in any calendar year".

In that regard, each Owner recognizes and agrees that the Hotel Unit and the Commercial Units may be used for any lawful purpose, and may be used by the Owner(s) thereof and its/their guests, tenants and invitees. The provisions of this subsection 16.1 shall not be applicable to Units used by the Developer for model apartments, sales or resales offices or management or administrative services. The rights of Residential Unit Owners to use the Shared Components shall be limited to the extent granted in, and subject to the restrictions of, Section 3.5(e), and the obligation for payment of the assessments and charges set forth in Section 12 (provided, however, that in no event shall an Owner be denied access to and from the Owner's Unit). The provisions of this subsection 16.1 shall not be amended without the affirmative vote of not less

then four-fifths (4/5ths) of the total voting interests of all Unit Owners. Each Owner, by acceptance of title to a Unit, shall be deemed to have understood and agreed that, pursuant to Resolution, certain restrictions have been imposed on continuous occupancy of the Units and to assure the transient nature of the use of the Units. Accordingly, each Unit shall be bound by all such restrictions.

16.2   Pet Restrictions.  Not more than one (1) domesticated dog or cat may be maintained in a Unit provided such pet: (a) is not more than fifteen (15) lbs, (b) is permitted to be so kept by applicable laws and regulations, (c) is not left unattended on balconies or in lanai areas, (d) generally, is not a nuisance to residents of other Units or of neighboring buildings and (e) is not a pit bull, rottweiler or other breed considered to be dangerous by the Hotel Unit Owner, in its sole discretion; provided that the Hotel Unit Owner shall not be liable for any personal injury, death or property damage resulting from a violation of the foregoing and any occupant of a Unit committing such a violation shall fully indemnify and hold harmless the Board of Directors, the Developer, each Unit Owner and the Association in such regard. Any landscaping damage or other damage to the Common Elements or any other portion of the Q Club Project caused by a Unit Owner's pet must be promptly repaired by the Unit Owner. The Hotel Unit Owner retains the right to effect said repairs and charge the Unit Owner therefor. Unit Owners must pick up all solid wastes of their pets and dispose of such wastes appropriately. All pets (including cats) must be kept on a leash of a length that efforts reasonable control over the pet at all times when outside the Unit or enclosed patio. Pets shall only be walked or taken upon those portions of the Hotel Lot and/or Hotel Unit designated by the Hotel Lot and/or Hotel Unit, as applicable, if any, from time to time for such purposes.

16.3   Hotel Related Service.  The Company from time to time of this Hotel Unit shall have the exclusive right (but not the obligation) to provide hotel and/or transient rental services, including, but not limited to, jubilation and/or provision of housekeeping, personal services (i.e., massage, personal training, dry cleaning, etc.) and/or food and beverage service, to the Condominium and the Unit Owners.  No amendment to this Declaration or rule of the Association shall be adopted to impair or abridge the rights herein granted without an affirmative vote in not less than 80% of the total voting interests.

16.4   Alterations.  Without limiting the generality of Section 8.1 hereof, but subject to Section 9 hereof, no Residential Unit Owner shall cause or allow improvements or changes to any Residential Unit, Common Elements or Association Property, including, but not limited to, painting or other decorating of any nature, installing any electrical wiring, television antenna, machinery, or air-conditioning units, which in any manner change the appearance of any portion of the Building or the exterior of said Unit, without obtaining the prior written consent of the Association and/or Hotel Unit Owner, as applicable, in the manner specified in section 8.1 hereof. Additionally, curtains or drapes (or linings thereof) which face the exterior windows or glass doors of Units shall be white or off-white in color and shall be subject to disapproval by the Hotel Unit Owner, in which case they shall be removed and replaced with acceptable items. Notwithstanding the provisions of Section 8.1 above, any Unit Owner may display one portable, removable United States flag in a respectful way, and, on Armed Forces Day, Memorial Day, Flag Day, Independence Day and Veterans day, may display in a respectful way portable, removable official flags, not larger than 4½ feet by 6 feet, that represent the United States Army, Navy, Air Force, Marine Corps or Coast Guard.

16.5   Nuisances.  No nuisances (as defined by the Association) shall be allowed on the Condominium or Association Property, nor shall any use or practice be allowed which is a source of annoyance to occupants of Units or which interferes with the peaceful possession or proper use of the Condominium and/or Association Property by its residents, occupants or members.  No activity specifically permitted by this Declaration, including, without limitation, activities or businesses conducted from the Hotel Unit, shall be deemed a nuisance.

16.6   No Improper Uses.  No improper, offensive, hazardous or unlawful use shall be made of the Condominium or Association Property or any part thereof, and all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction thereover shall be observed.  Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereover, relating to any portion of the Condominium and/or Association Property, shall be corrected by, and at the sole expense of, the party obligated to maintain or repair such portion of the Condominium Property, as elsewhere herein set forth. Notwithstanding the foregoing and any provisions of this Declaration, the Articles of Incorporation or By-Laws, the Association shall not be liable to any person(s) for its failure to enforce the provisions of this Section 16.6.  No activity specifically permitted by this Declaration shall be deemed to be a violation of this Section.

16.7   Leases.  It is intended that the Units may be used for transient and/or hotel rentals. As such, leasing of Units or portions thereof shall not be subject to the approval of the Association and/or any other limitations, other than as expressly provided herein. However, all leasing of Units or portions thereof shall be made in accordance with the Resolution and all other applicable zoning ordinances and other limitations imposed by the City of Fort Lauderdale. Each tenant or occupant shall comply with the covenants, terms, conditions and restrictions of this Declaration (and all Exhibits hereto) and with any and all rules and regulations adopted by the Hotel Unit Owner and/or Association from time to time, including, without limitation, any and all regulations and/or procedures adopted by the Hotel Unit Owner regarding mandatory check-in for Owners and residents, coordination of charging privileges and other matters reasonably necessary to allow Owners and hotel guests to be well integrated into a unified structure and operation. The Unit Owner will be jointly and severally liable with the tenant to the Association for any amount which is required by the Association and/or the Hotel Unit Owner to repair any damage to the Common Elements, the Hotel Unit and/or the Shared Components resulting from acts or omissions of tenants (as determined in the sole discretion of the Association) and to pay any claim for injury or damage to property caused by the negligence of the tenant and special charges may be levied against the Unit therefor. All tenancies are hereby made subordinate to

any lien filed by the Condominium Association or the Hotel Unit Owner, whether prior or subsequent to such lease. Notwithstanding the foregoing, there shall be no minimum lease term for the rental of Units, nor shall there be a maximum number of times that a Unit may be leased. There shall be no amendment to this Section 16.7, or to any other provision of this Declaration which shall impair the rights established in this Section 16.7, without the prior approval of eighty percent (80%) of the entire voting interests of all Unit Owners.

16.8   **Weight and Sound Restriction.**  Hard and/or heavy surface floor coverings, such as tile, marble, wood, and the like will be permitted only in foyers and bathrooms, unless same meets or exceeds the sound insulation parameters established from time to time by the Hotel Unit Owner. Also, the installation of any improvement or heavy object must be submitted to and approved by the Hotel Unit Owner, and be compatible with the overall structural design of the building. The Hotel Unit Owner may require a structural engineer to review certain of the proposed improvements, with such review to be at the Owner's sole expense. The Hotel Unit Owner will have the right to specify the exact material to be used on balconies. Any use guidelines set forth by the Hotel Unit Owner shall be consistent with good design practices for the waterproofing and overall structural design of the Building. Owners will be held strictly liable for violations of these restrictions and for all damages resulting therefrom and the Hotel Unit Owner has the right to require immediate removal of violations. Each Owner, by acceptance of a deed or other conveyance of their Unit, hereby acknowledges and agrees that sound transmission in a high-rise building such as the Condominium is very difficult to control, and that noises from adjoining or nearby Units and or mechanical equipment can often be heard in another Unit. The Developer does not make any representation or warranty as to the level of sound transmission between and among Units and the other portions of the Condominium Property, and each Unit Owner hereby waives and expressly releases any such warranty and claim for loss or damages resulting from sound transmission.

16.9   **Exterior Improvements.**  Without limiting the generality of Sections 6.7 nor 16.8 hereof, nor subject to any provision of this Declaration specifically permitting same, no Unit Owner shall cause anything to be affixed or attached to, hung, displayed or placed on, the exterior walls, doors, balconies or windows of the Building (including, but not limited to, awnings, signs, storm shutters, screens, window tinting, furniture, fixtures and equipment), without the prior written consent of the Hotel Unit Owner. Notwithstanding the foregoing, any Unit Owner may display one portable removable United States flag in a respectful way.

16.10  **Access to Units.**  In order to facilitate access to Units by the Association for the purposes enumerated in Section 9.1 hereof, it shall be the responsibility of all Unit Owners to deliver a set of keys (or access card or code, as may be applicable) to their respective Units to the Association and the Hotel Unit Owner to use in the performance of its functions.  No Owner shall change the locks to his Unit without so notifying the Association and Hotel Unit Owner and delivering to the Association and the Hotel Unit Owner a new set of keys (or access card or code, as may be applicable) to such Unit. The Hotel Unit Owner shall have the right to adopt reasonable regulations from time to time regarding access control and check-in, check-out procedures which shall be applicable to both hotel guests and Unit Owners.

16.11  **Mitigation of Dampness and Humidity.**  No Unit Owner shall install, within his or her Unit, or upon the Common Elements or Association Property, non-breathable wall-coverings or low-permeance paints. Additionally, any and all built-in casework, furniture, and or shelving in a Unit must be installed over floor coverings to allow air space and air movement and shall not be installed with backboards flush against any gypsum board wall. Additionally, all Unit Owners, whether or not occupying the Unit, shall periodically run the air conditioning system to maintain the Unit temperature, whether or not occupied, at 78°F, to minimize humidity in the Unit. While the foregoing are intended to minimize the potential development of molds, fungi, mildew and other mycotoxins, each Owner understands and agrees that there is no method for completely eliminating the development of molds or mycotoxins. The Developer does not make any representations or warranties regarding the existence or development of molds or mycotoxins and each Owner shall be deemed to waive and expressly release any such warranty and claim for loss or damages resulting from the existence and/or development of same. In furtherance of the rights of the Association as set forth in Section 9.1(a) above, in the event that the Association reasonably believes that the provisions of this Section 16.11 are not being complied with, then, the Association shall have the right (but not the obligation) to enter the Unit (without requiring the consent of the Owner or any other party) to turn on the air conditioning in an effort to cause the temperature of the Unit to be maintained as required hereby (with all utility consumption costs to be paid and assumed by the Unit Owner). To the extent that electric service is not then available to the Unit, the Association shall have the further right, but not the obligation (without requiring the consent of the Owner or any other party) to connect electric service to the Unit (with the costs thereof to be borne by the Unit Owner, or if advanced by the Association, to be promptly reimbursed by the Owner to the Association, with all such costs to be deemed Charges hereunder).

16.12  **Antennas, Satellite Dishes.**  To the extent permitted by applicable law, no Owner may install any antenna, satellite dish or other transmitting or receiving apparatus in or upon his or her Unit (and/or areas appurtenant thereto), without the prior written consent of the Hotel Unit Owner.

16.13  **Storage on Balconies/Terraces.**  No equipment, materials or other items shall be kept or stored on any balcony or terrace area of the Condominium, including but not limited to towels, clothing, bicycles, BBQ's and/or any other open flame cooking device.  The foregoing shall not prevent, however, placing and using patio-type furniture, planters and other items in such areas if same are normally used or customarily used for a residential balcony or terrace area, but all such patio furniture, planters and others must be reasonably acceptable to the Hotel Unit Owner.  In the event of any doubt or dispute as to whether a particular item is permitted hereunder, the decision of the Hotel Unit Owner shall be final and dispositive..

CFN # 106678130, OR E   43282   PG   1963,   Page   21 of 94

16.14    **Effect on Developer.**  Subject to the following exceptions, the restrictions and limitations set forth in this Section 16 shall not apply to the Developer nor to Units owned by the Developer. The Developer shall not be exempt from the restrictions, if any, relating to requirements that leases or lessees by approved by the Association, pet restrictions, occupancy of Units based on age and vehicular restrictions, except as such vehicular restrictions relate to the Developer's construction, maintenance and marketing activities.

17.    **Selling and Mortgaging of Units.**  No Residential Unit Owner other than the Developer may sell his or her Residential Unit except by complying with the following provisions:

17.1    **Right of First Refusal.**  Any Residential Unit Owner who receives a bona fide offer to purchase his or her Residential Unit (such offer to purchase a Residential Unit is called an "Outside Offer," the party making any such Outside Offer is called an "Outside Offeror," and the Unit Owner to whom the Outside Offer is made is called an "Offeree Unit Owner"), which the Offeree Unit Owner intends to accept shall give notice by registered mail to the Hotel Unit Owner of the receipt of such Outside Offer. Said notice shall also state the name and address of the Outside Offeror, the terms of the proposed transaction and such other information as the Hotel Unit Owner may reasonably require.  The giving of such notice to the Hotel Unit Owner shall constitute an offer by the Offeree Unit Owner to sell his or her Residential Unit to the Hotel Unit Owner and shall also constitute a warranty and representation by the Offeree Unit Owner to the Hotel Unit Owner that such Offeree Unit Owner or its designee upon the same terms and conditions as contained in such Outside Offer and shall also constitute a warranty and representation by the Offeree Unit Owner to the Hotel Unit Owner that such Offeree Unit Owner or its designee upon the same terms and conditions as contained in such Outside Offer and shall also constitute a warranty and representation by the Offeree Unit Owner to the Hotel Unit Owner that such Offeree Unit Owner or its designee contains the Outside Offer is a bona fide in all respects.  The Offeree Unit Owner may elect, by sending written notice to such Offeree Unit Owner before the expiration of said thirty (30) day period, by certified mail, to purchase such Unit upon the same terms and conditions as contained in the Outside Offer and as stated in the notice from the Offeree Unit Owner.

In the event the Hotel Unit Owner shall timely elect to purchase such Residential Unit, or to cause the same to be purchased by its designee, title shall close at the office of the attorneys for the Hotel Unit Owner, in accordance with the terms of the Outside Offer, within forty five (45) days after the giving of notice by the Hotel Unit Owner of its election to accept such offer. If, pursuant to such Outside Offer to purchase said Residential Unit, the Outside Offeror was to assume or take title to the Residential Unit subject to the Offeree Unit Owner's existing mortgage or mortgages, the Hotel Unit Owner may purchase the Residential Unit and assume or take title to the Residential Unit subject to said existing mortgage or mortgages, as the case may be.  At the closing, the Offeree Unit Owner shall convey the same to the Hotel Unit Owner, or to its designee, by statutory warranty deed, with all tax and/or documentary stamps affixed at the expense of the Offeree Unit Owner, who shall also pay all other taxes arising out of such sale.  Title shall be good and marketable and insurable and the Offeree Unit Owner shall deliver an abstract or provide a title binder (and subsequently, title insurance) at its expense at least thirty (30) days prior to such closing.  Real estate taxes, mortgage interest if any and Common Expenses shall be apportioned between the Offeree Unit Owner and the Hotel Unit Owner, or its designee, as of the closing date.

In the event the Hotel Unit Owner or its designee shall fail to accept such offer within thirty (30) days after receipt of notice and all additional information requested, as aforesaid, the Offeree Unit Owner shall be free to accept the Outside Offer within sixty (60) days after (i) notice of refusal is given by the Hotel Unit Owner, or (ii) the expiration of the period in which the Hotel Unit Owner or its designee might have accepted such offer, as the case may be.  In the event the Offeree Unit Owner shall accept the Outside Offer within such sixty (60) day period but such sale shall not be consummated in accordance with the terms of such Outside Offer or within a reasonable time after the date set for closing thereunder, then, should such Offeree Unit Owner thereafter elect to sell such Unit, the Offeree Unit Owner shall be required to again comply with all of the terms and provisions of this Section.

Any deed to an Outside Offeror shall automatically be deemed to provide that the acceptance thereof by the grantee or tenant shall constitute an assumption of the provisions of the Declaration, the By-Laws, the Articles of Incorporation, applicable rules and regulations and all other agreements, documents or instruments affecting the Condominium Property or administered by the Hotel Unit Owner, as the same may be amended from time to time.

Any purported sale of a Unit in violation of this Section shall be voidable at any time at the election of the Hotel Unit Owner and if the Hotel Unit Owner shall so elect, the Unit Owner shall be deemed to have authorized and empowered the Hotel Unit Owner to institute legal proceedings to void the conveyance. Said Unit Owner shall reimburse the Hotel Unit Owner for all expenses (including attorneys' fees and disbursements) incurred in connection with such proceedings.

The foregoing restrictions regarding sales of Units shall not apply to the Hotel Unit, Commercial Units, Units owned by the Developer, its designees, assignees or affiliates or by or to any Institutional First Mortgages acquiring title by foreclosure or by a deed in lieu of foreclosure.  Commercial Unit Owners, the Developer, its/their designees, assignees or affiliates and such Institutional First Mortgagees shall have the right to sell Units without having to first offer the same for sale to the Hotel Unit Owner.

17.2    **No Severance of Ownership.**  No part of the Common Elements may be sold, conveyed or otherwise disposed of, except as an appurtenance to the Unit in connection with a sale, conveyance or other

disposition of the Unit to which such interest is appurtenant, and any sale, conveyance or other disposition of a Unit shall be deemed to include that Unit's appurtenant interest in the Common Elements.

17.3   Release by the Hotel Unit Owner of the Right of First Refusal. The right of first refusal contained in Section 17.1 may be released or waived by the Hotel Unit Owner only in the manner provided in Section 17.4. In the event the Hotel Unit Owner shall release or waive its right of first refusal as to any Unit, such Unit may be sold or conveyed free and clear of the provisions of said Section 17.1.

17.4   Certificate of Termination of Right of First Refusal. A certificate executed and acknowledged by the Hotel Unit Owner stating that the provisions of Section 17.1 have been satisfied by a Unit Owner, or stating that the right of first refusal contained therein has been duly released or waived by the Hotel Unit Owner and that, as a result thereof, the rights of the Hotel Unit Owner thereunder have terminated, shall be conclusive with respect to all persons who rely on such certificate in good faith. The Hotel Unit Owner shall furnish such certificate upon request to any Unit Owner in respect to whom the provisions of such Section have, in fact, terminated or been waived. No fee shall be charged by the Hotel Unit Owner in connection with the furnishing of such certificate in excess of the charges reasonably required for same.

17.5   Exceptions. The provisions of Section 17.1 shall not apply with respect to any sale or conveyance of any Unit by (a) the Unit Owner thereof to his or her spouse, adult children, parents, parents-in-law, adult siblings or a trustee, corporation or other entity where the Unit Owner or the aforementioned related persons are and continue to be the sole beneficiary or equity owner of such trustee, corporation or other entity, or to any one or more of the above, (b) by the Developer (if not to, by the Hotel Unit Owner (c) the Association, (e) any proper officer conducting the sale of a Unit in connection with the foreclosure of a mortgage or other lien covering such Unit or delivering a deed in lieu of foreclosure, or (f) a First Mortgagee (or its designee) obtaining title by virtue of foreclosure of its mortgage or acceptance of a deed in lieu of foreclosure; provided, however, that each succeeding Unit Owner shall be bound by, and his Unit subject to, the provisions of this Section 17. that each succeeding Unit Owner shall be bound by, and his Unit subject to, the provisions of this Section 17.

17.6   Gifts and Devises, etc. Any Unit Owner shall be free to convey or transfer his Unit by gift, to devise his Unit by will, or to have his Unit pass by intestacy, without restriction; provided, however, that each succeeding Unit Owner shall be bound by, and his Unit subject to, the provisions of this Section 17.

17.7   Mortgage of Units. Each Unit Owner shall have the right to mortgage his Unit without restriction.

18.   Compliance and Default. The Association, each Unit Owner, occupant of a Unit, tenant and other invitee of a Unit Owner shall be governed by and shall comply with the terms of this Declaration and all exhibits annexed hereto and the rules and regulations adopted pursuant to those documents, as the same may be amended from time to time and the provisions of all of such documents shall be deemed incorporated into any lease of a Unit whether or not expressly stated in such lease. The Association (and Unit Owners, if appropriate) shall be entitled to the following relief in addition to the remedies provided by the Act:

18.1   Mandatory Nonbinding Arbitration of Disputes. Prior to the institution of court litigation, the parties to a Dispute shall petition the Division for nonbinding arbitration. The arbitration shall be conducted according to rules promulgated by the Division and before arbitrators employed by the Division. The filing of a petition for arbitration shall toll the applicable statute of limitation for the applicable Dispute, until the arbitration proceedings are completed. Any arbitration decision shall be presented to the parties in writing, and shall be deemed final if a complaint for trial de novo is not filed in a court of competent jurisdiction in which the Condominium is located within thirty (30) days following the issuance of the arbitration decision. The prevailing party in the arbitration proceeding shall be awarded the costs of the arbitration, and attorneys' fees and costs incurred in connection with the proceedings. The party who files a complaint for a trial de novo shall be assessed the other party's arbitration costs, court costs and other reasonable costs, including, without limitation, attorneys' fees, investigation expenses and expenses for expert or other testimony or evidence incurred after the arbitration decision, if the judgment upon the trial de novo is not more favorable than the arbitration decision. If the judgment is more favorable, the party who filed a complaint for trial de novo shall be awarded reasonable court costs and attorneys' fees. Any party to an arbitration proceeding may enforce an arbitration award by filing a petition in a court of competent jurisdiction in which the Condominium is located. A petition may not be granted unless the time for appeal by the filing of a complaint for a trial de novo has expired. If a complaint for a trial de novo has been filed, a petition may not be granted with respect to an arbitration award that has been stayed. If the petition is granted, the petitioner may recover reasonable attorneys' fees and costs incurred in enforcing the arbitration award.

18.2   Negligence and Compliance. A Unit Owner and/or tenant of a Unit shall be liable for the expense of any maintenance, repair or replacement made necessary by his negligence or by that of any member of his family or his or their guests, employees, agents or lessees, but only to the extent such expense is not met by the proceeds of insurance actually collected in respect of such negligence by the Association. In the event a Unit Owner, tenant or occupant fails to maintain a Unit or fails to cause such Unit to be maintained, or fails to observe and perform all of the provisions of the Declaration, the By-Laws, the Articles of Incorporation of the Association, applicable rules and regulations, or any other agreement, document or instrument affecting the Condominium Property or administered by the Association, in the manner required, the Association shall have the right to proceed in equity to require performance and/or compliance, to impose any applicable fines, to sue at law for damages, and to charge the Unit Owner for the sums necessary to do whatever work is required to put the Unit Owner or Unit in compliance, provided, however, that nothing contained in this Section 19.2 shall authorize the Association to enter a Unit to enforce compliance. In any proceeding arising because of an alleged failure of a Unit Owner, a tenant or the Association to comply with the requirements of

NOT OFFICIAL COPY

the Act, this Declaration, the exhibits annexed hereto, or the rules and regulations adopted pursuant to said documents, as the same may be amended from time to time, the prevailing party shall be entitled to recover the costs of the proceeding and such reasonable attorneys' fees (including appellate attorneys' fees). A Unit Owner prevailing in an action with the Association, in addition to recovering his reasonable attorneys' fees, may recover additional amounts as determined by the court to be necessary to reimburse the Unit Owner for his share of Assessments levied by the Association to fund its expenses of the litigation.

19. **Termination of Condominium.** The Condominium shall continue until (i) terminated by casualty loss, condemnation or eminent domain, as more particularly provided in this Declaration, or (ii) such time as withdrawal of the Condominium Property from the provisions of the Act is authorized by a vote of Owners owning at least 80% of the applicable interests in the Common Elements and by the Primary Institutional First Mortgagee. In the event such withdrawal is authorized as aforesaid, the Condominium Property shall be subject to an action for partition by any Unit Owner, mortgagee or lienor as if owned in common in which event the net proceeds of the partition sale shall be divided among all Unit Owners in proportion to their respective interests in the Common Elements, provided, however, that no payment shall be made to a Unit Owner until there has first been paid off out of his share of such net proceeds all mortgages and liens on his Unit in the order of their priority. The termination of the Condominium, as aforesaid, shall be evidenced by a certificate of the Association executed by its President and Secretary, certifying as to the basis of the termination and said certificate shall be recorded among the public records of the County.

This Section may not be amended without the consent of the Primary Institutional First Mortgagee and the Developer as long as it owns any Unit.

20. **Additional Rights of Mortgagees and Others.**

20.1 **Availability of Association Documents.** The Association shall have current and updated copies of the following available for inspection by Institutional First Mortgagees during normal business hours or under other reasonable circumstances as determined by the Board: (a) this Declaration; (b) the Articles; (c) the By-Laws; (d) the rules and regulations of the Association; and (e) the books, records and financial statements of the Association.

20.2 **Notices.** Any holder, insurer or guarantor of a mortgage on a Unit shall have, if it first requested in writing, the right to timely written notice of:

(a)  any condemnation or casualty loss affecting a material portion of the Condominium and/or Association Property or the affected mortgaged Unit;

(b)  a sixty (60) day delinquency in the payment of the Assessments on a mortgaged Unit;

(c)  the occurrence of a lapse, cancellation or material modification of any insurance policy or fidelity bond maintained by the Association;

(d)  any proposed action which requires the consent of a specified number of mortgage holders.

20.3 **Additional Rights.** Institutional First Mortgagees shall have the right, upon written request to the Association, to: (a) receive a copy of an audited financial statement of the Association for the immediately preceding fiscal year if such statements were prepared; and (b) receive notices of and attend Association meetings.

21. **Covenant Running With the Realty.** All provisions of this Declaration, the Articles, By-Laws and applicable rules and regulations of the Association, shall, to the extent applicable and unless otherwise expressly herein or therein provided to the contrary, be perpetual and be construed to be covenants running with the Realty and with every part thereof and interest therein, and all of the provisions hereof and thereof shall be binding upon and inure to the benefit of the Developer and subsequent owner(s) of the Realty or any part thereof, or interest therein, and their respective heirs, personal representatives, successors and assigns, but the same are not intended to create nor shall they be construed as creating any rights in or for the benefit of the general public. All present and future Unit Owners, tenants and occupants of Units shall be subject to and shall comply with the provisions of this Declaration, the Articles, By-Laws and applicable rules and regulations, as they may be amended from time to time. The acceptance of a deed or conveyance, or the entering into of a lease, or the entering into occupancy of any Unit, shall constitute an adoption and ratification of the provisions of this Declaration, and the Articles, By-Laws and applicable rules and regulations of the Association, all as they may be amended from time to time, including, but not limited to, a ratification of any appointments of attorneys-in-fact contained herein.

22. **Disclaimer of Warranties.** Except only for those warranties provided in Section 718.203, Florida Statutes (and then only to the extent applicable and not yet expired), to the maximum extent lawful Developer hereby disclaims any and all and each and every express or implied warranties, whether established by statutory, common, case law or otherwise, as to the design, construction, sound and/or odor transmission, existence and/or development of molds, mildew, toxins or fungi, furnishing and equipping of the Condominium Property, including, without limitation, any implied warranties of habitability, fitness for a particular purpose or merchantability, compliance with plans, and all warranties imposed by statute (other than those imposed by Section 718.203, Florida Statutes, and then only to the extent applicable and not yet expired) and all other express and implied warranties of any kind or character. Developer has not given and the Unit Owner has not relied on or bargained for any such warranties. Each Unit Owner, by accepting a deed to a Unit, or other

CFN # 106678130, OR BK 43282 PG 1966, Page 24 of 94

conveyance thereof, shall be deemed to represent and warrant to Developer that in deciding to acquire the Unit, the Unit Owner relied solely on such Unit Owner's independent inspection of the Unit and the Condominium. The Unit Owner has not received nor relied on any warranties and/or representations from Developer of any kind, other than as expressly provided herein.

All Unit Owners, by virtue of their acceptance of title to their respective Units (whether from the Developer or another party) shall be deemed to have automatically waived all of the aforesaid disclaimed warranties and incidental and consequential damages. The foregoing shall also apply to any party claiming by, through or under a Unit Owner, including a tenant thereof.

Further, given the climate and humid conditions in South Florida, molds, mildew, toxins and fungi may exist and/or develop within the Unit and/or the Condominium Property. Each Owner is hereby advised that certain molds, mildew, toxins and/or fungi may be, or if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk. By acquiring title to a Unit, each Owner shall be deemed to have assumed the risks associated with molds, mildew, toxins and/or fungi and to have released the Developer from any and liability resulting from same.

Lastly, each Owner, by acceptance of a deed or other conveyance of a Unit, understands and agrees that there are various methods for calculating the square footage of a Unit, and that depending on the method of calculation, the quoted square footage of the Unit may vary by more than a nominal amount. Additionally, as a result of in the field construction, other permitted changes to the Unit, and settling and shifting of improvements, actual square footage of a Unit may also be affected. By accepting title to a Unit, the applicable Owner(s) shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit, regardless of any variances in the square footage from that which may have been disclosed at any time prior to closing, whether included as part of Developer's promotional materials or otherwise. Without limiting the generality of this Section 22, Developer does not make any representation or warranty as to the actual size, dimensions or square footage of any Unit, and each Owner shall be deemed to have fully waived and released any such warranty and claims for losses or damages resulting from any variances.

23.   Additional Provisions.

23.1   Notices. All notices to the Association required or desired hereunder or under the By-Laws of the Condominium, or to such other address as the Association may hereafter designate from time to time by Association shall be sent by certified mail (return receipt requested) to the Association in care of its office at notice in writing to all Unit Owners. Except as provided specifically in the Act, all notices to any Unit Owner shall be sent by first class mail to the Condominium address of such Unit Owner, or such other address as may have been designated by him from time to time, in writing to the Association. All notices to mortgagees of Units shall be sent by first class mail to their respective addresses, or such other address as may be designated by them from time to time, in writing to the Association. All notices shall be deemed to have been given when mailed in a postage prepaid sealed wrapper, except notices of a change of address, which shall be deemed to have been given when received, or 5 business days after proper mailing, whichever shall first occur.

23.2   Mortgagees. Anything herein to the contrary notwithstanding, the Association shall not be responsible to any mortgagee or lienor of any Unit hereunder, and may assume the Unit is free of any such mortgages or liens, unless written notice of the existence of such mortgage or lien is received by the Association.

23.3   Exhibits. There is hereby incorporated in this Declaration all materials contained in the Exhibits annexed hereto, except that as to such Exhibits, any conflicting provisions set forth therein as to their amendment, modification, enforcement and other matters shall control over those hereof.

23.4   Signature of President and Secretary. Wherever the signature of the President of the Association is required hereunder, the signature of a vice-president may be substituted therefor, and wherever the signature of the Secretary of the Association is required hereunder, the signature of an assistant secretary may be substituted therefor, provided that the same person may not execute any single instrument on behalf of the Association in two separate capacities.

23.5   Governing Law. Should any dispute or litigation arise between any of the parties whose rights or duties are affected or determined by this Declaration, the Exhibits annexed hereto or applicable rules and regulations adopted pursuant to such documents, as the same may be amended from time to time, said dispute or litigation shall be governed by the laws of the State of Florida.

23.6   Severability. The invalidity in whole or in part of any covenant or restriction, or any section, subsection, sentence, paragraph, clause, phrase or word, or other provision of this Declaration, the Exhibits annexed hereto, or applicable rules and regulations adopted pursuant to such documents, as the same may be amended from time to time, shall not affect the validity of the remaining portions thereof which shall remain in full force and effect.

23.7   Waiver. The failure of the Association or any Unit Owner to enforce any covenant, restriction or other provision of the Act, this Declaration, the exhibits annexed hereto, or the rules and regulations adopted pursuant to said documents, as the same may be amended from time to time, shall not constitute a waiver of their right to do so thereafter.

CFN # 106676130, OR B   13282   PG   1967, Page   25 of 94

23.8   Ratification.  Each Unit Owner, by reason of having acquired ownership (whether by purchase, gift, operation of law or otherwise), and each occupant of a Unit, by reason of his occupancy, shall be deemed to have acknowledged and agreed that all of the provisions of this Declaration, and the Articles and By-Laws of the Association, and applicable rules and regulations, are fair and reasonable in all material respects.

23.9   Execution of Documents; Attorney-in-Fact.  Without limiting the generality of other Sections of this Declaration and without such other Sections limiting the generality hereof, each Owner, by reason of the acceptance of a deed to such Owner's Unit, hereby agrees to execute, at the request of the Developer, all documents or consents which may be required by all governmental agencies to allow the Developer and its affiliates to complete the plan of development of the Condominium as such plan may be hereafter amended, and each such Owner further appoints hereby and thereby the Developer as such Owner's agent and attorney-in-fact to execute, on behalf and in the name of such Owners, any and all of such documents or consents.  This Power of attorney is irrevocable and coupled with an interest.  The provisions of this Section may not be amended without the consent of the Developer.

23.10   Gender; Plurality.  Wherever the context so permits, the singular shall include the plural, the plural shall include the singular, and the use of any gender shall be deemed to include all or no genders.

23.11   Captions.  The captions herein and in the Exhibits annexed hereto are inserted only as a matter of convenience and for ease of reference and in no way define or limit the scope of the particular document or any provision thereof.

23.12   Liability.  Notwithstanding anything contained herein or in the Articles of Incorporated, By-laws, any rules or regulations of the Association or any other document governing the Association, except to the extent specifically provided to the contrary herein, neither the Hotel Unit Owner nor the Association for in any manner or character or insurer of the health, safety or welfare of any Owner, occupant or user of any portion of the Condominium and/or Association Property including, without limitation Owners and their guests, invitees, agents, servants, contractors or subcontractors or for any property of any such persons.  Without limiting the generality of the foregoing:

(a)   It is the express intent of the Association Documents that the various provisions thereof which are enforceable by the Association and/or the Hotel Unit Owner and which govern or regulate the uses of the properties have been written, and are to be interpreted and enforced, for the sole purpose of enhancing and maintaining the enjoyment of the properties and the value thereof;

(b)   neither the Hotel Unit Owner nor the Association are empowered, and neither has been created, to act as an entity which enforces or ensures the compliance with the laws of the United States, State of Florida, County and/or any other jurisdiction or the prevention of tortious activities; and

(c)   the provisions of the Association Documents setting forth the uses of assessments and/or which relate to health, safety and/or welfare shall be interpreted and applied only as limitations on the uses of assessment funds and not as creating a duty of the Hotel Unit Owner and/or Association to protect or further the health, safety or welfare of any person(s), even if assessment funds are chosen to be used for any such reason.

Each Owner (by virtue of his acceptance of title to his Unit) and each other person having an interest in or lien upon, or making use of, any portion of the properties (by virtue of accepting such interest or lien or making such use) shall be bound by this provision and shall be deemed to have automatically waived any and all rights, claims, demands and causes of action against the Hotel Unit Owner and/or Association arising from or connected with any matter for which the liability of the Hotel Unit Owner and/or Association has been disclaimed hereby.  As used herein, (i) "Association" shall include within its meaning all of Association's directors, officers, committee and board members, employees, agents, contractors (including management companies), subcontractors, successors and assigns, and (ii) "Hotel Unit Owner" shall include within its meaning all of its members, and its and their directors, officers, shareholders, employees, agents, contractors (including management companies), subcontractors, successors and assigns.  The provisions hereof shall also inure to the benefit of Developer, which shall be fully protected hereby.

23.13   NO REPRESENTATIONS OR WARRANTIES.  NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, HAVE BEEN GIVEN OR MADE BY DEVELOPER, HOTEL OWNER OR ITS OR THEIR AGENTS OR EMPLOYEES IN CONNECTION WITH ANY PORTION OF THE CONDOMINIUM PROPERTY, THE SHARED COMPONENTS, THEIR PHYSICAL CONDITION, ZONING, COMPLIANCE WITH APPLICABLE LAWS, MERCHANTABILITY, HABITABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR IN CONNECTION WITH THE SUBDIVISION, SALE, OPERATION, MAINTENANCE, COST OF MAINTENANCE, TAXES OR REGULATION THEREOF, EXCEPT (A) AS SPECIFICALLY AND EXPRESSLY SET FORTH IN THIS DECLARATION OR IN DOCUMENTS WHICH MAY BE FILED BY DEVELOPER OR HOTEL OWNER FROM TIME TO TIME WITH APPLICABLE REGULATORY AGENCIES, AND (B) AS OTHERWISE REQUIRED BY LAW.  AS TO SUCH WARRANTIES WHICH CANNOT BE DISCLAIMED, AND TO OTHER CLAIMS, IF ANY, WHICH CAN BE MADE AS TO THE AFORESAID MATTERS, ALL INCIDENTAL AND CONSEQUENTIAL DAMAGES ARISING THEREFROM ARE HEREBY DISCLAIMED.  ALL OWNERS, BY VIRTUE OF ACCEPTANCE OF TITLE TO THEIR RESPECTIVE UNITS (WHETHER FROM THE DEVELOPER OR ANOTHER PARTY) SHALL BE DEEMED TO HAVE AUTOMATICALLY WAIVED ALL OF THE AFORESAID DISCLAIMED WARRANTIES AND INCIDENTAL AND CONSEQUENTIAL DAMAGES.

CFN # 106678130, OR B 13282 PG 1968, Page 26 of 94

IN WITNESS WHEREOF, the Developer has caused this Declaration to be duly executed and its corporate seal to be hereunto affixed as of the 30 day of November, 2006.

Witnessed by:

COSTA DORADA ASSOCIATES, LTD., a Florida limited partnership

By:   Costa Dorada Associates, Inc., a Florida corporation

Name: C. ANDREW WILLIAMS

By:
Name:   Jose E. Cabanas
Title:   President

Name: Janet A Larson

(Corporate Seal)

Address: 10520 HW 26 STREET 0201
Miami, Florida 33172

STATE OF FLORIDA ) ss:
COUNTY OF DADE )

The foregoing instrument was acknowledged before me this 30th day of November, 2006 by Jose E. Cabanas, as President of Costa Dorada Associates, Inc., a Florida corporation, General Partner of COSTA DORADA ASSOCIATES, LTD., a Florida limited partnership, on behalf of said company and partnership. He is personally known to me or produced _____ as identification.

Name: Renee Williams

Notary Public, State of Florida
Commission No. _____

Renee Williams
Commission # DD332093
Expires: JUNE 24, 2008
AaronNotary.com

My commission expires:

Renee Williams
Commission # DD332093
Expires: JUNE 24, 2008
AaronNotary.com

Declaration

CFN # 106678130, OR    43282  PG  1969,  Page  27 of 94

## CONSENT OF MORTGAGEE

THIS CONSENT is given as of the 29th day of November, 2006 on behalf of Hypo Real Estate Capital Corporation ("Mortgagee"), being the owner and holder of that certain Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing given by Costa Dorada Associates, Ltd., a Florida limited partnership ("Mortgagor") and recorded on August 19, 2004 in Official Records Book 38053, Pages 565-604, and as amended by that certain Notice of Future Advance and First Amendment to Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated April 15, 2005, recorded May 12, 2005, in Official Records Book 39630, Page, and as amended by that certain Notice of Future Advance and First Amendment to Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated April 18, 2005, recorded May 17, 2005, in Official Records Book 39657, Page 252, and as further amended by that certain Notice of Future Advance and Second Amendment to Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated July 20, 2006, recorded July 25, 2006, in Official Records Book 42457, Page 1388, all in the Public Records of Broward County, Florida. (as amended or modified, the "Mortgage").

WHEREAS, Mortgagor has requested Mortgagee to consent to the recording of the Declaration of Q CLUB RESORT AND RESIDENCES CONDOMINIUM (the "Declaration").

NOW, THEREFORE, Mortgagee consents to the recordation of the Declaration. Mortgagee makes no warranty or any representation of any kind or nature concerning the Declaration, any of its terms or provisions, of the legal sufficiency thereof, and disavows any such warranty or representation as well as any participation in the development of Q CLUB RESORT AND RESIDENCES CONDOMINIUM (the "Condominium"), and does not assume and shall not be responsible for any of the obligations or liabilities of the developer contained in the Declaration or the prospectus, (if any) or other documents issued in connection with the promotion of the Condominium. None of the representations contained in the prospectus, (if any) or other documents shall be deemed to have been made by Mortgagee, nor shall they be construed to create any obligation on Mortgagee to any person relying thereon.   This consent is limited to the purposes and requirements of Section 718.104, Florida Statutes, and does not affect or impair the rights and remedies of Mortgagee as set forth in the Mortgage or in the Declaration.

Made as of the day and year first above written.

Witnessed by:

Name: Thomas Doyle

Name: Kurt Reihersperger

Name: XENIA DYMBROSI SENIOR ASSOCIATE

Name: Jeffrey L. Phelps
Director

HYPO REAL ESTATE CAPITAL CORPORATION, a Delaware corporation

By: Celeste Stevenson
Name: Celeste Stevenson
Title: Director

By: Christopher Peter
Name: Christopher Peter
Title: Director

Address:   622 Third Avenue
New York, New York 10017

CFN # 106678130, OR   43282 PG 1970, Page 28 of 94

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF NEW YORK   )

On the 29th day of November, in the year 2006, before me, the undersigned personally appeared Celeste Stinson and Christopher Peters, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Signature and Office of individual taking acknowledgment

JEFFREY A. LEHMAN
Notary Public, State of New York
No. 02LE6138168
Qualified in New York County
Commission Expires August 13, 2010

THIS IS NOT AN
OFFICIAL COPY

CFN # 106678130, OR   43282  PG  1971,  Page  29 of 94

Exhibit "1"

*Legal Description of the Condominium Property*

All of Block D, of BIRCH OCEAN FRONT SUBDIVISION, according to the
Plat thereof, as recorded in Plat Book 19, Page 26, of the Public Records
of Broward County, Florida.

THIS IS NOT AN OFFICIAL COPY

CFN # 106678130, OR   43282 PG 1972, Page 30 of 94



EXHIBIT 2

CFN # 106678130, OR 43282 PG 1973, Page 31 of 94



CFN # 106678130, OR    43282  PG  1974,  Page  32 of 94



CFN # 106678130, OR   43282  PG  1975,  Page  33 of 94



CFN # 106678130, OR     43282   PG  1976,  Page  34 of 94



CFN # 106678130, OR    43282  PG  1977,  Page  35 of 94



EXHIBIT 2

CFN # 106678130, OR    43202  PG  1978,  Page  36 of 94



EXHIBIT 2

CFN # 106678130, OR   43282 PG 1979, Page 37 of 94



CFN # 106678130, OR   43282 PG 1980, Page 38 of 94



CFN # 106678130, OR     43282  PG  1981,  Page  39 of 94



CFN # 106678130, OR    43282  PG  1982,  Page  40 of 94



EXHIBIT 2

CFN # 106678130, OR    43282  PG  1983,  Page  41 of 94



CFN # 106678130, OR    43282  PG 1984,  Page  42 of 94



CFN # 106678130, OR B   43282   PG  1985,  Page  43 of 94



CFN # 106678130, OR E   43282  PG  1986,  Page  44 of 94



CFN # 106678130, OR BK 43282 PG 1987, Page 45 of 94



EXHIBIT 2

CFN # 106678130, OR I   43282 PG 1988, Page 46 of 94



CFN # 106678130, OR B  43282 PG 1989, Page 47 of 94



EXHIBIT 2

CFN # 106678130, OR F  43282 PG 1990, Page 48 of 94



CFN # 106678130, OR E  43282  PG  1991,  Page  49 of 94



EXHIBIT 2

CFN # 106678130, OR F   43282 PG 1992, Page 50 of 94



EXHIBIT 2

CFN # 106678130, OR F  43282  PG  1993,  Page  51 of 94



EXHIBIT 2

CFN # 106678130, OR ) 43282 PG 1994, Page 52 of 94



EXHIBIT 2

CFN # 106678130, OR F   43282  PG  1995,  Page  53 of 94



EXHIBIT 2

CFN # 106678130, OR F  43282 PG 1996, Page 54 of 94



CFN # 106678130, OR BK 43282 PG 1997, Page 55 of 94



CFN # 106678130, OR I   43282  PG  1998,  Page  56 of 94



CFN # 106678130, OR P   43282   PG  1999,  Page  57 of 94



CFN # 106678130, OR B* 43282 PG 2000, Page 58 of 94



CFN # 106678130, OR E  43282 PG  2001, Page  59 of 94



CFN # 106678130, OR J 43282 PG 2002, Page 60 of 94

Exhibit "3"

Q Club Resort and Residences Condominium

*Percentage Share of Ownership in the Common Elements and Common Surplus*

| Unit Number | Qty | % Ea. Type | Total % By Type |
|---|---|---|---|
| 601, 701, 801, 901, 1001, 1101, 1201, 1401, 1504, 1601, 1701, 1801, 1901, 2001, 2101, 2201, 2301, 2401, 2501, 602, 702, 802, 902, 1002, 1102, 1202, 1402, 1504, 1602, 1702, 1802, 1902, 2002, 2102, 2202, 2302, 2402, 2502 | 38 | 0.1714% | 0.5133% |
| 603, 703, 803, 903, 1003, 1103, 1203, 1403, 1503, 1603, 1703, 1803, 1903, 2003, 2103, 2203, 2303, 2403, 2503, 604, 704, 804, 904, 1004, 1104, 1204, 1404, 1504, 1604, 1704, 1804, 1904, 2004, 2104, 2204, 2304, 2404, 2504, 607, 707, 807, 907, 1007, 1107, 1407, 1607, 1707, 1807, 1907, 2007, 2107, 2207, 2307, 2407, 2507 | | 0.0766% | 1.2635% |
| 606, 706, 806, 906, 1006, 1106, 1206, 1406, 1506, 1606, 1706, 1806, 1906, 2006, 2106, 2206, 2406, 2406, 2506 | | 0.0765% | 1.4553% |
| 605, 705, 805, 905, 1005, 1105, 1205, 1405, 1905, 1605, 1705, 1805, 1905, 2005, 2105, 2205, 2305, 2405, 2505, 608, 708, 808, 906, 1008, 1108, 1208, 1406, 1506, 1608, 1706, 1806, 1906, 2006, 2108, 2208, 2306, 2408, 2506 | 38 | 0.1159% | 4.3704% |
| 608, 708, 808, 908, 1008, 1108, 1208, 1408, 1508, 1608, 1708, 1808, 1908, 2008, 2108, 2208, 2308, 2408, 2508, 610, 710, 810, 910, 1010, 1110, 1210, 1410, 1510, 1610, 1710, 1810, 1910, 2010, 2110, 2210, 2310, 2410, 2510, 2313, 2413 | 40 | 0.0639% | 2.5551% |
| 711, 811, 911, 1011, 1111, 1211, 1411, 1511, 1611, 1711, 1811, 1911, 2011, 2111, 2211, 2311, 2411, 2511, 712, 812, 912, 1012, 1112, 1212, 1412, 1512, 1612, 1712, 1812, 1912, 2012, 2112, 2212, 2312, 2412, 2512, 716, 816, 916, 1016, 1116, 1216, 1416, 1516, 1616, 1716, 1816, 1916, 2016, 2116, 2216 | 51 | 0.0606% | 3.0895% |
| 2314, 2414 | 2 | 0.0503% | 0.1005% |
| 715, 815, 915, 1015, 1115, 1215, 1415, 1515, 1615, 1715, 1815, 1915, 2015, 2115, 2215 | 15 | 0.0590% | 0.8849% |
| 713, 813, 913, 1013, 1113, 1213, 1413, 1513, 1613, 1713, 1813, 1913, 2013, 2113, 2213 | 15 | 0.1195% | 1.7924% |
| 714, 814, 914, 1014, 1114, 1214, 1414, 1514, 1614, 1714, 1814, 1914, 2014, 2114, 2214 | 15 | 0.0863% | 1.2947% |
| 617, 717, 817, 917, 1017, 1117, 1217, 1417, 1617, 1717, 1717, 1817, 1917, 2017, 2117, 2217, 818, 718, 818, 918, 1018, 1118, 1218, 1418, 1518, 1618, 1718, 1818, 1918, 2018, 2118, 2218 | 30 | 0.1344% | 4.0034% |
| 219, 220 | 2 | 0.0659% | 0.1317% |
| 221, 222 | 2 | 0.1037% | 0.2075% |
| 223, 224 | 2 | 0.3498% | 0.6998% |
| 225, 226 | 2 | 0.1528% | 0.3055% |
| 227 | 1 | 0.1557% | 0.1557% |
| 100 | 1 | 0.1730% | 0.1730% |
| 200 | 1 | 0.1574% | 0.1574% |
| 2400 | 1 | 0.2864% | 0.2864% |
| 2500 | 1 | 0.3676% | 0.3676% |
| CU 2 | 1 | 0.2755% | 0.2755% |
| CU 3 | 1 | 0.1646% | 0.1646% |
| CU 4 | 1 | 0.3115% | 0.3115% |
| CU 5 | 1 | 0.2868% | 0.2868% |
| CU 6 | 1 | 0.3653% | 0.3653% |
| CU 7 | 1 | 0.3765% | 0.3765% |
| Hotel Unit | 1 | 85.2740% | 85.2740% |
| Total | 340 | | 100.0000% |

CFN # 106678130, OR E  43282  PG  2003,  Page  61 of 94

Exhibit "4"

BY-LAWS
OF
Q CLUB RESORT AND RESIDENCES CONDOMINIUM ASSOCIATION, INC.

A corporation not for profit organized
under the laws of the State of Florida

1.  **Identity.**  These are the By-Laws of Q CLUB RESORT AND RESIDENCES CONDOMINIUM ASSOCIATION, INC. (the "Association"), a corporation not for profit incorporated under the laws of these of the State of Florida, and organized for the purposes set forth in its Articles of Incorporation.

   1.1  **Fiscal Year.**  The fiscal year of the Association shall be the twelve month period commencing January 1st and terminating December 31st of each year.

   1.2  **Seal.**  The seal of the Association shall bear the name of the corporation, the word "Florida", the words "Corporation Not for Profit", and the year of incorporation.

2.  **Definitions.**  For convenience, these By-Laws shall be referred to as the "By-Laws" and the Articles of Incorporation of the Association as the "Articles".  The other terms used in these By-Laws shall have the same definitions and meanings as those set forth in the Declaration for Q CLUB RESORT AND RESIDENCES CONDOMINIUM, unless herein provided to the contrary, or unless the context otherwise requires.

3.  **Members.**

   3.1  **Annual Meeting.**  The annual members' meeting shall be held on the date, at the place and at the time determined by the Board of Directors from time to time, provided that there shall be an annual meeting every calendar year and, to the extent possible, no later than thirteen (13) months after the last preceding annual meeting.  The purpose of the meeting shall be, except as provided herein to the contrary, to elect Directors, and to transact any other business authorized to be transacted by the members, or as stated in the notice of the meeting sent to Unit Owners in advance thereof.  Unless changed by the Board of Directors, the first annual meeting shall be held in the month of December following the year in which the Declaration is filed.

   3.2  **Special Meetings.**  Special members' meetings shall be held at such places as provided herein for annual meetings, and may be called by the President or by a majority of the Board of Directors of the Association, and must be called by the President or Secretary upon receipt of a written request from a majority of the members of the Association.  The business conducted at a special meeting shall be limited to that stated in the notice of the meeting.  Special meetings may also be called by Unit Owners in the manner provided for in the Act.  Notwithstanding the foregoing: (i) as to special meetings regarding the adoption of the Condominium's estimated operating budget, reference should be made to Section 10.1 of these By-Laws; and (ii) as to special meetings regarding recall of Board members, reference should be made to Section 4.3 of these By-Laws.

   3.3  **Participation by Unit Owners.**  Subject to the following and such further reasonable restrictions as may be adopted from time to time by the Board, Unit Owners shall have the right to speak at the annual and special meetings of the Unit Owners, committee meetings and Board meetings with reference to all designated agenda items.  A Unit Owner does not have the right to speak with respect to items not specifically designated on the agenda, provided, however, that the Board may permit an Unit Owner to speak on such items in its discretion.  Every Unit Owner who desires to speak at a meeting, may do so, provided that the Unit Owner has filed a written request with the Secretary of the Association not less than 24 hours prior to the scheduled time for commencement of the meeting.  Unless waived by the chairman of the meeting (which may be done in the chairman's sole and absolute discretion and without being deemed to constitute a waiver as to any other subsequent speakers), all Unit Owners speaking at a meeting shall be limited to a maximum of three (3) minutes per speaker.  Any Unit Owner may tape record or videotape a meeting, subject to the following and such further reasonable restrictions as may be adopted from time to time by the Board:

      (a)  The only audio and video equipment and devices which Unit Owners are authorized to utilize at any such meeting is equipment which does not produce distracting sound or light emissions;

      (b)  Audio and video equipment shall be assembled and placed in position in advance of the commencement of the meeting.

      (c)  Anyone videotaping or recording a meeting shall not be permitted to move about the meeting room in order to facilitate the recording; and

      (d)  At least 48 hours (or 24 hours with respect to a Board meeting) prior written notice shall be given to the Secretary of the Association by any Unit Owner desiring to make an audio or video taping of the meeting.

3.4   Notice of Meeting; Waiver of Notice.   Notice of a meeting of members (annual or special), stating the time and place and the purpose(s) for which the meeting is called, shall be given by the President or Secretary. A copy of the notice shall be posted at a conspicuous place on the Condominium Property. The notice of an annual or special meeting shall be hand delivered, electronically transmitted or sent by regular mail to each Unit Owner, unless the Unit Owner waives in writing the right to receive notice of the Association by the Unit Owner.  However, if a Unit is owned by more than one person, the Association shall provide notice, for meetings and all other purposes, to that one address initially identified for that purpose by the Developer and thereafter as one or more of the Owners of the Unit shall so advise the Association in writing, or if no address is given or if the Owners disagree, notice shall be sent to the address for the Owner as set forth on the deed of the Unit.  The posting and mailing of the notice for either special or annual meetings, shall be effected not less than fourteen (14) continuous days, nor more than sixty (60) days, prior to the date of the meeting.  The Board shall adopt by rule, and give incorporate an identification of agenda items, shall be effected not less than fourteen (14) continuous days, notice to Unit Owners of, a specific location on the Condominium Property upon which all notices of members' meetings shall be posted.  In lieu of or in addition to the physical posting of notice of any meeting of the Unit Owners on the Condominium Property, the Association may, by reasonable rule, adopt a procedure for conspicuously posting and repeatedly broadcasting the notice and the agenda on a closed-circuit cable television system serving the Association, if any. However, if broadcast notice is used in lieu of a notice posted physically on the Condominium Property, the notice and agenda must be broadcast at least four times every broadcast hour of each day that a posted notice is otherwise required. When broadcast notice is provided, the notice and agenda must be broadcast in a manner and for a length sufficient continuous length of time sales to allow an average reader to observe the notice and read and comprehend the entire content of the notice and the agenda.

Notice of members' meetings may be waived before or after the meeting and the attendance of any member (or person authorized to vote for such member), either in person or by proxy, shall constitute such member's waiver of notice of such meeting and waiver of any and all objections to the place of the meeting, the time of the meeting or the manner in which it has been called or convened except when his or her authorized representative's) attendance is for the express purpose of objecting at the beginning of the meeting to the transaction of business because the meeting is not lawfully called.

An officer of the Association, or the manager or other person providing notice of the meeting shall provide an affidavit or United States Postal Service certificate of mailing, to be included in the official records of the Association, affirming that notices of meetings were posted and mailed or hand delivered in accordance with this Section and Section 718.112(2)(d) of the Act, to each Unit Owner at the appropriate address for such Unit Owner.  No other proof of notice of a meeting shall be required.

3.5   Quorum.   A quorum at members' meetings shall be attained by the presence, either in person or by proxy (limited or general), of persons entitled to cast in excess of 33 1/3% of the votes of members entitled to vote at the subject meeting.

3.6   Voting.

(a)   Number of Votes.   Except as provided in Section 3.11 hereof, in any meeting of members, the Owners of each Residential Unit shall be entitled to cast one (1) vote for each Unit owned, the Hotel Unit Owner shall be entitled to cast fifty (50) votes and each Commercial Unit shall be entitled to three (3) votes, to be cast by each Commercial Unit Owner. The vote of a Unit shall not be divisible.

(b)   Majority Vote.   The acts approved by a majority of the votes present in person or by proxy at a meeting at which a quorum shall have been attained shall be binding upon all Unit Owners for all purposes, except where otherwise provided by law, the Declaration, the Articles or these By-Laws. As used in these By-Laws, the Articles or the Declaration, the terms 'majority of the Unit Owners' and 'majority of the members' shall mean a majority of the votes entitled to be cast by the members and not a majority of the members themselves and shall further mean more than 50% of the then total authorized votes present in person or by proxy and voting at any meeting of the Unit Owners at which a quorum shall have been attained.  Similarly, if some greater percentage of members is required herein or in the Declaration or Articles, it shall mean such greater percentage of the votes of members and not of the members themselves.

(c)   Voting Member.   If a Unit is owned by one person, that person's right to vote shall be established by the roster of members.  If a Unit is owned by more than one person, those persons (including husbands and wives) shall decide among themselves as to who shall cast the vote of the Unit. In the event that those persons cannot so decide, no vote shall be cast. A person casting a vote for a Unit shall be presumed to have the authority to do so unless the President or the Board of Directors is otherwise notified.  If a Unit is owned by a corporation, the person entitled to cast the vote for the Unit shall be designated by a certificate signed by an appropriate officer of the corporation and filed with the Secretary of the Association.  Such person need not be a Unit Owner.  Those certificates shall be valid until revoked or until superseded by a subsequent certificate or until a change in the ownership of the Unit concerned. A certificate designating the person entitled to cast the vote for a Unit may be revoked by any record owner of an undivided interest in the Unit.  If a certificate designating the person entitled to cast the vote for a Unit for which such certificate is required is not on file or has been revoked, the vote attributable to such Unit shall not be considered in determining whether a quorum is present, nor for any other

CFN # 106678130, OR : 43282 PG 2005, Page 63 of 94

purpose, and the total number of authorized votes in the Association shall be reduced accordingly until such certificate is filed.

3.7   Proxies. Votes to be cast at meetings of the Association membership may be cast in person or by proxy. Except as specifically provided herein, Unit Owners may not vote by general proxy, but may vote by limited proxies substantially conforming to the limited proxy form approved by the Division. Limited proxies shall be permitted to the extent permitted by the Act. No proxy, limited or general, shall be used in the election of Board members. General proxies may be used for other matters for which a limited proxy is required and may also be used in voting for nonsubstantive changes to items for which a limited proxy is required and given. A proxy may be made by any person entitled to vote, but shall only be valid for the specific meeting for which originally given and any lawful adjourned meetings thereof. In no event shall any proxy be valid for a period longer than 90 days after the date of the first meeting for which it was given. Every proxy shall be revocable at any time at the pleasure of the person executing it. A proxy must be in writing, signed by the person authorized to cast the vote for the Unit (as above described), name the person(s) voting by proxy and the person authorized to vote for such person(s) and filed with the Secretary before the appointed time of the meeting, or before the time to which the meeting is adjourned. Each proxy shall contain the date, time and place of the meeting for which it is given and, if a limited proxy, shall set forth the matters on which the proxy holder may vote and the manner in which the vote is to be cast. There shall be no limitation on the number of proxies which may be held by any person (including a designee of the Developer). If a proxy expressly provides, any proxy holder may appoint, in writing, a substitute to act in his place, if such provision is not made, substitution is not permitted.

3.8   Adjourned Meetings. If any proposed meeting cannot be organized because a quorum has not been attained, the members who are present, either in person or by proxy, may adjourn the meeting from time to time until a quorum is present provided notice of the newly scheduled meeting is given in the manner required for the giving of notice of a meeting. Except as required (above) proxies given for the adjourned meeting shall be valid for the newly scheduled meeting unless revoked for purposes other than the new date of the meeting.

3.9   Order of Business. If a quorum has been attained, the order of business at annual members' meetings, and, if applicable, at other members' meetings, shall be:

(a)   Collect any ballots not yet cast;

(b)   Call to order by President;

(c)   Appointment by the President of a chairman of the meeting (who need not be a member or a director);

(d)   Appointment of inspectors of election;

(e)   Counting of Ballots for Election of Directors;

(f)   Proof of notice of the meeting or waiver of notice;

(g)   Reading of minutes;

(h)   Reports of officers;

(i)   Reports of committees;

(j)   Unfinished business;

(k)   New business;

(l)   Adjournment.

Such order may be waived in whole or in part by direction of the chairman.

3.10   Minutes of Meeting. The minutes of all meetings of Unit Owners shall be kept in a book available for inspection by Unit Owners or their authorized representatives and Board members at any reasonable time. The Association shall retain these minutes for a period of not less than seven (7) years.

3.11   Action Without A Meeting. Anything to the contrary herein notwithstanding, to the extent lawful, any action required or which may be taken at any annual or special meeting of members, may be taken without a meeting, without prior notice and without a vote if a consent in writing, setting forth the action so taken, shall be signed by the members (or persons authorized to cast the vote of any such members as elsewhere herein set forth) having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting of members at which all members (or authorized persons) entitled to vote thereon were present and voted. In order to be effective, the action must be evidenced by one or more written consents describing the action taken, dated and signed by approving members having the requisite number of votes and entitled to vote on such action, and delivered to the Secretary of the Association, or other authorized agent of the Association. Written consent shall not be effective to take the corporate action referred to in the consent unless signed by members having the requisite number of votes necessary to

CFN # 106678130, OR J    43282   PG   2006,   Page   64  of  94

authorize the action within sixty (60) days of the date of the earliest dated consent and delivered to the Association as aforesaid. Any written consent may be revoked prior to the date the Association receives the required number of consents to authorize the proposed action. A revocation is not effective unless in writing and until received by the Secretary of the Association, or other authorized agent of the Association. Within ten (10) days after obtaining such authorization by written consent, notice must be given to members who have not consented in writing. The notice shall fairly summarize the material features of the authorized action. A consent signed in accordance with the foregoing has the effect of a meeting vote and may be described as such in any document.

4.    Directors.

4.1    Membership. The affairs of the Association shall be governed by a Board of not less than three (3) nor more than nine (9) directors, the exact number to be determined in the first instance in the Articles and, thereafter, except as provided herein, from time to time upon majority vote of the membership. Directors must be natural persons who are 18 years of age or older. Any person who has been convicted of any felony by any court of record in the United States and who has not had his or her right to vote restored pursuant to law in the jurisdiction of his or her residence is not eligible for Board membership (provided, however, that the validity of any Board action is not affected if it is later determined that a member of the Board is ineligible for Board membership due to having been convicted of a felony). Directors may not vote at Board meetings by proxy or by secret ballot.

4.2    Election of Directors. Election of Directors shall be held at the annual members' meeting, except as herein provided to the contrary. Not less than sixty (60) days prior to a scheduled election, the Association shall mail, deliver or electronically transmit to each Unit Owner entitled to vote, a first notice of the date of election. Any Unit Owner or other eligible person desiring to be a candidate for the Board shall give written notice to the Secretary of the Association not less than forty (40) days prior to the scheduled election. Together with the notice of meeting and pursuant to Section 3.4 above, the Association shall then, not less than fourteen (14) days prior to the date of the meeting, mail, deliver or electronically transmit a second notice of the meeting, together with a ballot which shall list all candidates. Upon request of a candidate, the Association shall include an information sheet, no larger than 8-1/2 inches by 11 inches furnished by the candidate, which must be furnished by the candidate to the Association not less than thirty five (35) days before the election, to be included with the mailing of the ballot, with the costs of mailing or delivery and copying to be borne by the Association. The Association is not liable for the contents of the information sheets prepared by the candidates. In order to reduce costs, the Association may print or duplicate the information sheets on both sides of the paper.

The election of directors shall be by written ballot or voting machine. Proxies shall in no event be used in electing the Board at general elections or to fill vacancies caused by resignation or otherwise, provided, however, that limited proxies may be used to fill a vacancy resulting from the recall of a director, in the manner provided by the rules of the Division. Elections shall be decided by a plurality of those ballots and votes cast. There shall be no quorum requirement, however at least 20 percent of the eligible voters must cast a ballot in order to have a valid election of members of the Board. There shall be no cumulative voting.

Notwithstanding the provisions of this Section 4.2, an election is not required unless more candidates file notices of intent to run or are nominated than vacancies exist on the Board.

4.3    Vacancies and Removal.

(a)    Except as to vacancies resulting from removal of Directors by members (as addressed in subsection (b) below), vacancies in the Board of Directors occurring between annual meetings of members shall be filled by a majority vote of the remaining Directors at any Board meeting (even if the remaining Directors constitute less than a quorum), provided that all vacancies in directorships to which Directors were appointed by the Developer pursuant to the provisions of paragraph 4.15 hereof shall be filled by the Developer without the necessity of any meeting.

(b)    Any Director elected by the members (other than the Developer) may be removed by concurrence of a majority of the voting interests of the members at a special meeting of members called for that purpose or by written agreement signed by a majority of all voting interests. The vacancy in the Board of Directors so created shall be filled by the members at a special meeting of the members called for such purpose, or by the Board of Directors, in the case of removal by a written agreement unless said agreement also designates a new Director to take the place of the one removed. If the written agreement calls for the removal of a majority of the Directors, such agreement shall also provide the names of eligible persons who are willing to be candidates for replacement Directors in sufficient numbers to replace all of the removed Directors. The conveyance of all Units owned by a Director in the Condominium (other than appointees of the Developer or Directors who were not Unit Owners) shall constitute the resignation of such Director.

(c)    Anything to the contrary herein notwithstanding, until a majority of the Directors are elected by members other than the Developer of the Condominium, neither the first Directors of the Association, nor any Directors replacing them, nor any Directors named by the Developer, shall be subject to removal by members other than the Developer. The first Directors and Directors replacing them may be removed and replaced by the Developer without the necessity of any meeting.

CFN # 106678130, OR F :43282  PG  2007,  Page  65 of 94

(d)    If a vacancy on the Board of Directors results in the inability to obtain a quorum of directors in accordance with these By-Laws, any Owner may apply to the Circuit Court within whose jurisdiction the Condominium lies for the appointment of a receiver to manage the affairs of the Association. At least thirty (30) days prior to applying to the Circuit Court, the Unit Owner shall mail to the Association and post in a conspicuous place on the Condominium Property a notice describing the intended action and giving the Association an opportunity to fill the vacancy(ies) in accordance with these By-Laws. If, during such time, the Association fails to fill the vacancy(ies), the Unit Owner may proceed with the petition. If a receiver is appointed, the Association shall be responsible for the salary of the receiver, court costs and attorneys' fees. The receiver shall have all powers and duties of a duly constituted Board of Directors, and shall serve until the Association fills the vacancy(ies) on the Board sufficient to constitute a quorum in accordance with these By-Laws.

4.4    **Term.**  Except as provided herein to the contrary, the term of each Director's service shall extend until the next annual meeting of the members and subsequently until his successor is duly elected and has taken office, or until he is removed in the manner elsewhere provided. Notwithstanding the foregoing, any Director designated by the Developer shall serve at the pleasure of the Developer and may be removed and replaced by the Developer at any time.

4.5    **Organizational Meeting.**  The organizational meeting of newly-elected or appointed Directors shall be held within ten (10) days of their election or appointment. The Directors calling the organizational meeting shall give at least three (3) days advance notice thereof, stating the time and place of the meeting.

4.6    **Meetings.**  Meetings of the Board of Directors may be held at such time and place as shall be determined, from time to time, by a majority of the Directors. Meetings of the Board of Directors may be held by telephone conference with those Directors attending by telephone counted toward the quorum requirement, provided that a telephone speaker must be used so that the conversation of those Directors attending by telephone may be heard by the Directors and any Unit Owners attending such meeting in-person. Notice of meetings shall be given to each Director, personally or by mail, telephone or telegraph, and shall be transmitted at least three (3) days prior to the meeting. Meetings of the Board of Directors and any Committee thereof at which a quorum of the members of that Committee are present shall be open to all Unit Owners. Any Unit Owner may tape record or videotape meetings of the Board, in accordance with the rules of the Division. The right to attend such meetings includes the right to speak at such meetings with respect to all designated agenda items. The Association may adopt reasonable rules governing the frequency, duration and manner of Unit Owner statements. Adequate notice of such meetings, which notice shall specifically incorporate an identification of agenda items, shall be posted conspicuously on the Condominium Property at least forty-eight (48) continuous hours preceding the meeting, except in the event of an emergency. An item not included on the notice may be taken up on an emergency basis by at least a majority plus one of the members of the Board. Such emergency action shall be noticed and ratified at the next regular meeting of the Board. Notwithstanding the foregoing, written notice of any meeting of the Board at which nonemergency special assessment, or at which amendment to rules regarding unit use will be proposed, discussed or approved, shall be mailed, delivered or electronically transmitted to all Unit Owners and posted conspicuously on the Condominium property not less than fourteen (14) continuous days prior to the meeting. Evidence of compliance with this fourteen (14) continuous day notice shall be made by an affidavit executed by the Secretary of the Association and filed among the official records of the Association. The Board shall adopt by rule, and give notice to Unit Owners of, a specific location on the Condominium Property upon which all notices of Board and/or Committee meetings shall be posted. In lieu of or in addition to the physical posting of notice of any meeting of the Board on the Condominium Property, the Association may, by reasonable rule, adopt a procedure for conspicuously posting and repeatedly broadcasting the notice and the agenda on a closed-circuit cable television system serving the Association, if any. However, if broadcast notice is used in lieu of a notice posted physically on the Condominium Property, the notice and agenda must be broadcast at least four times every broadcast hour of each day that a posted notice is otherwise required. When broadcast notice is provided, the notice and agenda must be broadcast in a manner and for a sufficient continuous length of time so as to allow an average reader to observe the notice and read and comprehend the entire content of the notice and the agenda. Special meetings of the Directors may be called by the President, and must be called by the President or Secretary at the written request of one-third (1/3) of the Directors or where required by this Act. A Director or member of a Committee of the Board of Directors may submit in writing his/her agreement or disagreement with any action taken at a meeting that such individual did not attend.  This agreement or disagreement may not be used for the purposes of creating a quorum.

4.7    **Waiver of Notice.**  Any Director may waive notice of a meeting before or after the meeting and that waiver shall be deemed equivalent to the due receipt by said Director of notice. Attendance by any Director at a meeting shall constitute a waiver of notice of such meeting, and a waiver of any and all objections to the place of the meeting, to the time of the meeting or the manner in which it has been called or convened, except when a Director states at the beginning of the meeting, or promptly upon arrival at the meeting, any objection to the transaction of affairs because the meeting is not lawfully called or convened.

4.8    **Quorum.**  A quorum at Directors' meetings shall consist of a majority of the entire Board of Directors. The acts approved by a majority of those present at a meeting at which a quorum is present shall constitute the acts of the Board of Directors, except when approval by a greater number of Directors is specifically required by the Declaration, the Articles or these By-Laws.

4.9    **Adjourned Meetings.**  If, at any proposed meeting of the Board of Directors, there is less than a quorum present, the majority of those present may adjourn the meeting from time to time until a quorum is present,

CFN # 106670130, OR    43282  PG  2008,  Page  66 of 94

provided notice of such newly scheduled meeting is given as required hereunder.  At any newly scheduled meeting, any business that might have been transacted at the meeting as originally called may be transacted as long as notice of such business to be conducted at the rescheduled meeting is given, if required (e.g., with respect to budget adoption).

4.10   Joinder in Meeting by Approval of Minutes.  The joinder of a Director in the action of a meeting by signing and concurring in the minutes of that meeting shall constitute the approval of that Director of the business conducted at the meeting, but such joinder shall not be used as a vote for or against any particular action taken and shall not allow the applicable Director to be counted as being present for purposes of quorum.

4.11   Presiding Officer.  The presiding officer at the Directors' meetings shall be the President (who may, however, designate any other Unit Owner to preside).

4.12   Order of Business.  If a quorum has been attained, the order of business at Directors' meetings shall be:

   (a)   Proof of due notice of meeting;

   (b)   Reading and disposal of any unapproved minutes;



   (c)   Reports of officers and committees;

   (d)   Election of officers;

   (e)   Unfinished business;

   (f)   New business;

   (g)   Adjournment.

Such order may be waived in whole or in part by direction of the presiding officer.

4.13   Minutes of Meetings.  The minutes of all meetings of the Board of Directors shall be kept in a book available for inspection by Unit Owners, or their authorized representatives, and Board members at any reasonable time.  The Association shall retain these minutes for a period of not less than seven years.

4.14   Committees.  The Board may by resolution also create Committees and appoint persons to such Committees and vest in such Committees such powers and responsibilities as the Board shall deem advisable.

4.15   Proviso.  Notwithstanding anything to the contrary contained in this Section 4 or otherwise, the Board shall consist of three directors during the period that the Developer is entitled to appoint a majority of the Directors, as hereinafter provided.  The Developer shall have the right to appoint all of the members of the Board of Directors until Unit Owners other than the Developer own fifteen (15%) percent or more of the Units in the Condominium. When Unit Owners other than the Developer own fifteen percent (15%) or more of the Units in the Condominium that will be operated ultimately by the Association, the Unit Owners other than the Developer shall be entitled to elect not less than one-third (1/3) of the members of the Board of Directors.  Upon the election of such director(s), the Developer shall forward to the Division of Florida Land Sales, Condominiums and Mobile Homes the name and mailing address of the director(s) elected.  Unit Owners other than the Developer are entitled to elect not less than a majority of the members of the Board of Directors: (a) three years after fifty (50%) percent of the Units that will be operated ultimately by the Association have been conveyed to purchasers; (b) three months after ninety (90%) percent of the Units that will be operated ultimately by the Association have been conveyed to purchasers; (c) when all of the Units that will be operated ultimately by the Association have been completed, some of them have been conveyed to purchasers, and none of the others are being offered for sale by the Developer in the ordinary course of business; (d) when some of the Units have been conveyed to purchasers, and none of the others are being constructed or offered for sale by the Developer in the ordinary course of business; or (e) seven (7) years after recordation of the Declaration, whichever occurs first.  The Developer is entitled (but not obligated) to elect at least one (1) member of the Board of Directors as long as the Developer holds for sale in the ordinary course of business any of the Units that will be operated ultimately by the Association.

The Developer may transfer control of the Association to Unit Owners other than the Developer prior to such dates in its sole discretion by causing enough of its appointed Directors to resign, whereupon it shall be the affirmative obligation of Unit Owners other than the Developer to elect Directors and assume control of the Association. Provided at least sixty (60) days' notice of Developer's decision to cause its appointees to resign is given to Unit Owners, neither the Developer, nor such appointees, shall be liable in any manner in connection with such resignations even if the Unit Owners other than the Developer refuse or fail to assume control.

Within seventy-five (75) days after the Unit Owners other than the Developer are entitled to elect a member or members of the Board of Directors, or sooner if the Developer has elected to accelerate such event as aforesaid, the Association shall call, and give not less than sixty (60) days' notice of an election for the member or members of the Board of Directors.  The notice may be given by any Unit Owner if the Association fails to do so.

CFN # 106678130, OR    43282   PG  2009,  Page  67 of 94

At the time the Unit Owners other than the Developer elect a majority of the members of the Board of Directors of the Association, the Developer shall relinquish control of the Association and such Unit Owners shall accept control. At that time (except as to subparagraph (g), which may be ninety (90) days thereafter) Developer shall deliver to the Association, at Developer's expense, all property of the Unit Owners and of the Association held or controlled by the Developer, including, but not limited to, the following items, if applicable to the Condominium:

(a)   The original or a photocopy of the recorded Declaration of Condominium, and all amendments thereto. If a photocopy is provided, the Developer must certify by affidavit that it is a complete copy of the actual recorded Declaration.

(b)   A certified copy of the Articles of Incorporation of the Association.

(c)   A copy of the By-Laws of the Association.

(d)   The minute book, including all minutes, and other books and records of the Association.

(e)   Any rules and regulations which have been adopted.

(f)   Resignations of resigning officers and Board members who were appointed by the Developer.

(g)   The financial records, including financial statements of the association, and source documents from the incorporation of the Association through the date of the turnover. The records shall be audited for the period from the incorporation of the Association or from the period covered by the last audit, if applicable, by an independent certified public accountant. All financial statements shall be prepared in accordance with generally accepted accounting principles and shall be audited in accordance with generally accepted auditing standards as prescribed by the Florida Board of Accountancy. The accountant performing the audit shall examine to the extent, necessary supporting documents and records, including the cash disbursements and related paid invoices to determine if expenditures were for Association purposes, and billings, cash receipts and related records to determine that the Developer was charged and paid the proper amounts of Assessments.

(h)   Association funds or the control thereof.

(i)   All tangible personal property that is the property of the Association or is or was represented by the Developer to be part of the Common Elements or is ostensibly part of the Common Elements, and an inventory of such property.

(j)   A copy of the plans and specifications utilized in the construction or remodeling of improvements and the supplying of equipment, and for the construction and installation of all mechanical components serving the Improvements and the Condominium Property, with a certificate, in affidavit form, of an officer of the Developer or an architect or engineer authorized to practice in Florida, that such plans and specifications represent, to the best of their knowledge and belief, the actual plans and specifications utilized in the construction and improvement of the Condominium Property and the construction and installation of the mechanical components serving the Improvements and the Condominium Property.

(k)   A list of the names and addresses of all contractors, subcontractors and suppliers, of which Developer had knowledge at any time in the development of the Condominium, utilized in the construction or remodeling of the improvements and the landscaping of the Condominium and/or Association Property.

(l)   Insurance policies.

(m)   Copies of any Certificates of Occupancy which may have been issued for the Condominium Property.

(n)   Any other permits issued by governmental bodies applicable to the Condominium Property in force or issued within one (1) year prior to the date the Unit Owners take control of the Association.

(o)   All written warranties of contractors, subcontractors, suppliers and manufacturers, if any, that are still effective.

(p)   A roster of Unit Owners and their addresses and telephone numbers, if known, as shown on the Developer's records.

(q)   Leases of the Common Elements and other leases to which the Association is a party, if applicable.

(r)   Employment contracts or service contracts in which the Association is one of the contracting parties, or service contracts in which the Association or Unit Owners have an obligation or responsibility, directly or indirectly, to pay some or all of the fee or charge of the person or persons performing the service.

CFN # 106678130, OR   43282   PG   2010,   Page   68 of 94

    (s)    All other contracts to which the Association is a party.

5.    <u>Authority of the Board.</u>

  5.1    <u>Powers and Duties.</u>  The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may take all acts, through the proper officers of the Association, in executing such powers, except such acts which by law, the Declaration, the Articles or these By-Laws may not be delegated to the Board of Directors by the Unit Owners. Such powers and duties of the Board of Directors shall include, without limitation (except as limited elsewhere herein), the following:

    (a)    Operating and maintaining all Common Elements and the Association Property.

    (b)    Determining the expenses required for the operation of the Association and the Common Elements of the Condominium.

    (c)    Employing and dismissing the personnel necessary for the maintenance and operation of the Common Elements and the Association Property.

    (d)    Adopting and amending rules and regulations concerning the details of the operation and use of the Common Elements and Association Property, subject to a right of the Unit Owners to overrule the Board as provided in Section \_ hereof.

    (e)    Maintaining bank accounts on behalf of the Association and designating the signatories required therefor.

    (f)    Purchasing, leasing or otherwise acquiring title to, or interest in, property in the name of the Association, or its designee, for the use and benefit of its members. The power to acquire personal property shall be exercised by the Board and the power to acquire real property shall be exercised as described herein and in the Declaration.

    (g)    Purchasing, leasing or otherwise acquiring Units or other property, including, without limitation, Units at foreclosure or other judicial sales, all in the name of the Association, or its designee.

    (h)    Selling, leasing, mortgaging or otherwise dealing with Units acquired, and subleasing Units leased, by the Association, or its designee.

    (i)    Organizing corporations and appointing persons to act as designees of the Association in acquiring title to or leasing Units or other property.

    (j)    Obtaining and reviewing insurance for the Common Elements and Association Property.

    (k)    Making repairs, additions and improvements to, or alterations of, Common Elements and Association Property, and repairs to and restoration of Common Elements and Association Property, in accordance with the provisions of the Declaration after damage or destruction by fire or other casualty, or as a result of condemnation or eminent domain proceedings or otherwise.

    (l)    Enforcing obligations of the Unit Owners, allocating profits and expenses and taking such other actions as shall be deemed necessary and proper for the sound management of the Condominium.

    (m)    Levying fines against appropriate Unit Owners for violations of the rules and regulations established by the Association to govern the conduct of such Unit Owners. No fine shall be levied except after giving reasonable notice and opportunity for a hearing to the affected Unit Owner and, if applicable, his tenant, licensee or invitee. The hearing must be held before a committee of other Unit Owners. If the committee does not agree with the fine, the fine may not be levied. No fine may exceed $100.00 per violation, however, a fine may be levied on the basis of each day of a continuing violation with a single notice and opportunity for hearing, provided however, that no such fine shall in the aggregate exceed $1,000.00. No fine shall become a lien upon a Unit.

    (n)    Purchasing or leasing Units for use by resident superintendents and other similar persons or for the general use and enjoyment of the Unit Owners.

    (o)    Borrowing money on behalf of the Association or the Condominium when required in connection with the operation, care, upkeep and maintenance of Common Elements (if the need for the funds is unanticipated) or the acquisition of real property, and granting mortgages on and/or security interests in Association owned property; provided, however, that the consent of the Owners of at least two-thirds (2/3rds) of the Units represented at a meeting at which a quorum has been attained in accordance with the provisions of these By-Laws shall be required for the borrowing of any sum which would cause the total outstanding indebtedness of the Association to exceed $10,000.00. If any sum borrowed by the Board of Directors on behalf of the Condominium pursuant to the authority contained in this subparagraph 5.1(o) is not repaid by the Association, a Unit Owner who pays to the creditor such portion thereof as his interest in his Common Elements bears to the interest of all the Unit Owners in the Common Elements shall be entitled to obtain from the creditor a release of any judgment or other lien which said creditor shall have filed or shall have the right to file against, or which will effect, such Owner's Unit. Notwithstanding the foregoing, the restrictions

THIS IS NOT AN OFFICIAL COPY

CFN # 106678130, OR     43282   PG   2011,   Page   69 of 94

on borrowing contained in this subparagraph 5.1(o) shall not apply if such indebtedness is entered into for the purpose of financing insurance premiums, which action may be undertaken solely by the Board of Directors, without requiring a vote of the Unit Owners.

(p)    Subject to the provisions of Section 5.2 below, contracting for the management and maintenance of the Common Elements and Association Property and authorizing a management agent (who may be an affiliate of the Developer) to assist the Association in carrying out its powers and duties by performing such functions as the submission of proposals, collection of Assessments, preparation of records, enforcement of rules and maintenance, repair, and replacement of the Common Elements and Association Property with such funds as shall be made available by the Association for such purposes. The Association and its officers shall, however, retain at all times the powers and duties granted by the Declaration, the Articles, these By-Laws and the Act, including, but not limited to, the making of Assessments, promulgation of rules and execution of contracts on behalf of the Association.

(q)    At its discretion, but within the parameters of the Act, authorizing Unit Owners or other persons to use portions of the Common Elements or Association Property for private parties and gatherings and imposing reasonable charges for such private use.

(r)    Executing all documents or consents, on behalf of all Unit Owners (and their mortgagees), required by all governmental and/or quasi-governmental agencies in connection with land use and development matters (including, without limitation, plats, waivers of plat, unities of title, covenants in lieu thereof, etc.), and in that regard, each Owner, by acceptance of the deed to such Owner's Unit, and each mortgagee of a Unit Owner by acceptance of a lien on said Unit, appoints and designates the President of the Association as each Owner's agent and attorney-in-fact to execute any and all such documents or consents.

(s)    The duty and obligation to comply with any requirements of any Federal, State or local rule, regulation, ordinance, code, project or agreement, relating to the installation, maintenance, repair, restoration, renourishing and/or replacing of the beach/dune system, any seawall, and any crosswalk/boardwalk to and from the beach now or hereafter located upon or adjacent to (even if beyond the legal boundaries of) the Condominium Property.

(t)    Exercising (i) all powers specifically set forth in the Declaration, the Articles, these By-Laws and in the Act, (ii) all powers incidental thereto, and (iii) all other powers of a Florida corporation not for profit.

(u)    Contracting with and creating or joining in the creation of special taxing districts, joint councils and the like.

5.2    **Contracts.** Any contract which is not to be fully performed within one (1) year from the making thereof, for the purchase, lease or renting of materials or equipment to be used by the Association in accomplishing its purposes, and all contracts for the provision of services, shall be in writing. Where a contract for purchase, lease or renting materials or equipment, or for the provision of services, requires payment by the Association on behalf of the Condominium in the aggregate exceeding $5,000.00, the Association shall obtain competitive bids for the materials, equipment or services. Nothing contained herein shall be construed to require the Association to accept the lowest bid. Notwithstanding the foregoing, contracts with employees of the Association and contracts for attorney, accountant, architect, community association manager, engineering and landscape architect services shall not be subject to the provisions hereof. Further, nothing contained herein is intended to limit the ability of the Association to obtain needed products and services in an emergency, nor shall the provisions hereof apply if the business entity with which the Association desires to contract is the only source of supply within the County.

6.    **Officers.**

6.1    **Executive Officers.** The executive officers of the Association shall be a President, a Vice-President, a Treasurer and a Secretary (none of whom need be Directors), all of whom shall be elected by the Board of Directors and who may be peremptorily removed at any meeting by concurrence of a majority of all of the Directors. A person may hold more than one office, except that the President may not also be the Secretary. No person shall sign an instrument or perform an act in the capacity of more than one office. The Board of Directors from time to time shall elect such other officers and designate their powers and duties as the Board shall deem necessary or appropriate to manage the affairs of the Association. Officers, other than designees of the Developer, must be Unit Owners (or authorized representatives of corporate/partnership/trust Unit Owner).

6.2    **President.** The President shall be the chief executive officer of the Association. He shall have all of the powers and duties that are usually vested in the office of president of an association.

6.3    **Vice-President.** The Vice-President shall exercise the powers and perform the duties of the President in the absence or disability of the President. He also shall assist the President and exercise such other powers and perform such other duties as are incident to the office of the vice president of an association and as may be required by the Directors or the President.

CFN # 106678130, OR ?   43282  PG  2012,  Page  70 of 94

6.4   **Secretary.** The Secretary shall keep the minutes of all proceedings of the Directors and the members. The Secretary shall attend to the giving of all notices to the members and Directors and other notices required by law. The Secretary shall have custody of the seal of the Association and shall affix it to instruments requiring the seal when duly signed. The Secretary shall keep the records of the Association, except those of the Treasurer, and shall perform all other duties incident to the office of the secretary of an association and as may be required by the Directors or the President.

6.5   **Treasurer.** The Treasurer shall have custody of all property of the Association, including funds, securities and evidences of indebtedness. The Treasurer shall keep books of account for the Association in accordance with good accounting practices, which, together with substantiating papers, shall be made available to the Board of Directors for examination at reasonable times. The Treasurer shall submit a treasurer's report to the Board of Directors at reasonable intervals and shall perform all other duties incident to the office of treasurer and as may be required by the Directors or the President. All monies and other valuable effects shall be kept for the benefit of the Association in such depositories as may be designated by a majority of the Board of Directors.

6.6   **Developer Appointees.** No officer appointed by the Developer may be removed except as provided in Section 4.15 hereof and by law.

7.   **Fiduciary Duty.** The officers and directors of the Association, as well as any manager employed by the Association, have a fiduciary relationship to the Unit Owners. No officer, director or manager shall solicit, offer to accept, or accept any thing of value for which consideration has not been provided for his own benefit or that of his immediate family, from any person providing or proposing to provide goods or services to the Association. Any such officer, director or manager who knowingly so solicits, offers to accept or accepts any thing of value or service of value shall, in addition to all other rights and remedies of the Association and Unit Owners, be subject to a civil penalty in accordance with the Act. Notwithstanding the foregoing, this paragraph shall not prohibit an officer, director or manager from accepting services or items received in connection with trade fairs or education programs.

8.   **Compensation.** Neither Directors nor officers shall receive compensation for their services as such, but this provision shall not preclude the Board of Directors from employing a Director or officer as an employee of the Association, nor preclude contracting with a Director or officer for the management of the Condominium or for any other service to be supplied by such Director or officer. Directors and officers shall be compensated for all actual and proper out of pocket expenses relating to the proper discharge of their respective duties.

9.   **Resignations.** Any Director or officer may resign his post at any time by written resignation, delivered to the President or Secretary, which shall take effect upon its receipt unless a later date is specified in the resignation, in which event the resignation shall be effective from such date unless withdrawn. The acceptance of a resignation shall not be required to make it effective. The conveyance of all Units owned by any Director or officer (other than appointees of the Developer or officers who were not Unit Owners) shall constitute a written resignation of such Director or officer.

10.   **Fiscal Management.** The provisions for fiscal management of the Association set forth in the Declaration and Articles shall be supplemented by the following provisions:

CFN # 106678130, OR   43282   PG   2013,   Page   71 of 94

10.1   Budget.

(a)   Adoption by Board; Items. The Board of Directors shall from time to time, and at least annually, prepare a budget for all Condominiums governed and operated by the Association (which shall detail all accounts and items of expense and contain at least all items set forth in Section 718.504(21) of the Act, if applicable), determine the amount of Assessments payable by the Unit Owners to meet the expenses of such Condominium(s) and allocate and assess such expenses among the Unit Owners in accordance with the provisions of the Declaration. In addition, if the Association maintains limited common elements with the cost to be shared only by those entitled to use the limited common elements, the budget or a schedule attached thereto shall show amounts budgeted therefor. In addition to annual operating expenses, the budget shall include reserve accounts for capital expenditures and deferred maintenance (to the extent required by law). These accounts shall include, but not be limited to, roof replacement, building painting and pavement resurfacing regardless of the amount of deferred maintenance expense or replacement cost, and for any other item for which the deferred maintenance expense or replacement cost exceeds $10,000.00. The amount of reserves shall be computed by means of a formula which is based upon the estimated remaining useful life and the estimated replacement cost of each reserve item. The Association may adjust replacement and reserve assessments annually to take into account any changes in estimates or extension of the useful life of a reserve item caused by deferred maintenance. Reserves shall not be required if the members of the Association have, by a majority vote at a duly called meeting of members, determined for a specific fiscal year to provide no reserves or reserves less adequate than required hereby. Prior to transfer of control of the Association to Unit Owners other than the Developer, the Developer may vote to waive reserves or reduce the funding of reserves for the first two (2) fiscal years of operation of the Association, beginning with the fiscal year in which the Declaration is recorded, after which time and until transfer of control of the Association to Unit Owners other than the Developer, reserves may only be waived or reduced upon the vote of a majority of all non-Developer voting interests voting in person or by limited proxy at a duly called meeting of the Association. Following transfer of control of the Association to Unit Owners other than the Developer, the Developer may vote its voting interest to waive or reduce the funding of reserves. If a meeting of Unit Owners has been called to determine to provide no reserves or reserves less adequate than required, and such result is not attained or a quorum is not attained, the reserves, as included in the budget, shall go into effect. Reserve funds and any interest accruing thereon shall remain in the reserve account or accounts, and shall be used only for authorized reserve expenditures, unless their use for any other purposes is approved in advance by a majority vote at a duly called meeting of the Association. Prior to transfer of control of the Association to Unit Owners other than the Developer, the Association shall not vote to use reserves for purposes other than that for which they were intended without the approval of a majority of all non-Developer voting interests, voting in person or by limited proxy at a duly called meeting of the Association.

The adoption of a budget for the Condominium shall comply with the requirements hereinafter set forth:

(i)   Notice of Meeting. A copy of the proposed budget of Common Expenses shall be hand delivered, mailed or electronically transmitted to each Unit Owner (at the address last furnished to the Association) not less than fourteen (14) days prior to the meeting of the Board of Directors at which the budget will be considered, together with a notice of that meeting indicating the time and place of such meeting. An officer or manager of the Association, or other person providing notice of such meeting, shall execute an affidavit evidencing compliance with such notice requirement and such affidavit shall be filed among the official records of the Association.

(ii)   Special Membership Meeting. If the Board of Directors adopts in any fiscal year an annual budget which requires assessments against Unit Owners which exceed one hundred fifteen percent (115%) of such Assessments for the preceding fiscal year, the Board of Directors shall conduct a special meeting of the Unit Owners to consider a substitute budget if the Board of Directors receives, within twenty-one (21) days following the adoption of the annual budget, a written request for a special meeting from at least ten percent (10%) of all voting interests. In such instance, the special meeting shall be conducted within sixty (60) days following the adoption of the annual budget. At least fourteen (14) days prior to such special meeting, the Board of Directors shall hand deliver to each Unit Owner, or mail to each Unit Owner at the address last furnished to the Association, a notice of the meeting. An officer or manager of the Association, or other person providing notice of such meeting, shall execute an affidavit evidencing compliance with this notice requirement and such affidavit shall be filed among the official records of the Association. A substitute budget is adopted if approved by a majority of all voting interests. If there is not a quorum at the special meeting or a substitute budget is not adopted, the annual budget previously adopted by the Board of Directors shall take effect as scheduled.

(iii)   Determination of Budget Amount. Any determination of whether assessments exceed one hundred fifteen percent (115%) of assessments for the preceding fiscal year shall exclude any authorized provision for reasonable reserves for repair or replacement of the Condominium Property, anticipated expenses of the Association which the Board of Directors does not expect to be incurred on a regular or annual basis, or assessments for betterments to the Condominium Property.

(iv)   Proviso. As long as the Developer is in control of the Board of Directors of the Association, the Board shall not impose Assessments for a year greater than one hundred fifteen percent (115%) of the prior fiscal year's Assessments, as herein defined, without the approval of a majority of all voting interests.

(b) **Adoption by Membership.** In the event that the Board of Directors shall be unable to adopt a budget for a fiscal year in accordance with the requirements of Subsection 10.1(a) above, the Board of Directors may call a special meeting of Unit Owners for the purpose of considering and adopting such budget, which meeting shall be called and held in the manner provided for such special meetings in said subsection, or propose a budget in writing to the members, and if such budget is adopted by the members, upon ratification by a majority of the Board of Directors, it shall become the budget for such year.

10.2 **Assessments.** Assessments against Unit Owners for their share of the items of the budget shall be made for the applicable fiscal year annually at least twenty (20) days preceding the year for which the Assessments are made. Such Assessments shall be due in equal installments, payable in advance on the first day of each month (or each quarter at the election of the Board) of the year for which the Assessments are made. If annual Assessments are not made as required, Assessments shall be presumed to have been made in the amount of the last prior Assessments, and monthly (or quarterly) installments on such Assessments shall be due upon each installment payment date until changed by amended Assessments. In the event the annual Assessments prove to be insufficient, the budget and Assessments may be amended at any time by the Board of Directors, subject to the provisions of Section 10.1 hereof, if applicable. Unpaid Assessments for the remaining portion of the fiscal year for which amended Assessments are made shall be payable in as many equal installments as there are full months (or quarters) of the fiscal year left as of the date of such amended Assessments, each such monthly (or quarterly) installment to be paid on the first day of the month (or quarter). If only a partial month (or quarter) remains, the amended Assessments shall be paid with the next regular installment in the following year, unless otherwise directed by the Board in its resolution.

10.3 **Special Assessments and Assessments for Capital Improvements.** Special Assessments and Capital Improvement Assessments (as defined in the Declaration) shall be levied as provided in the Declaration and shall be paid in such manner as the Board of Directors of the Association may require in the notice of such Assessments. The funds collected pursuant to a Special Assessment shall be used only for the specific purpose or purposes set forth in the notice of adoption of same. However, upon completion of such specific purpose or purposes, any excess funds will be considered Common Surplus, and may, at the discretion of the Board, either be returned to the Unit Owners or applied as a credit towards future assessments.

10.4 **Depository.** The depository of the Association shall be such bank or banks in the State of Florida, which bank or banks must be insured by the FDIC, as shall be designated from time to time by the Directors and in which the monies of the Association shall be deposited. Withdrawal of monies from these accounts shall be made only by checks signed by such person or persons as are authorized by the Directors. All sums collected by the Association from Assessments or otherwise may be commingled in a single fund or divided into more than one fund, as determined by a majority of the Board of Directors. In addition, a separate reserve account should be established for the Association in such a depository for monies specifically designated as reserves for capital expenditures and/or deferred maintenance. Reserve and operating funds of the Association shall not be commingled unless combined for investment purposes, provided that the funds so commingled shall be accounted for separately and the combined account balance of such commingled funds may not, at any time, be less than the amount identified as reserve funds in the combined account.

10.5 **Acceleration of Installments Upon Default.** If a Unit Owner shall be in default in the payment of an installment upon his Assessments, the Board of Directors or its agent may accelerate the balance of the current budget years' Assessments upon thirty (30) days' prior written notice to the Unit Owner and the filing of a claim of lien, and the then unpaid balance of the current budget years' Assessments shall be due upon the date stated in the notice, but not less than five (5) days after delivery of the notice to the Unit Owner, or not less than ten (10) days after the mailing of such notice to him by certified mail, whichever shall first occur.

10.6 **Fidelity Insurance or Fidelity Bonds.** The Association shall obtain and maintain adequate insurance or fidelity bonding of all persons who control or disburse Association funds, which shall include, without limitation, those individuals authorized to sign Association checks and the president, secretary and treasurer of the Association. The insurance policy or fidelity bond shall be in such amount as shall be determined by a majority of the Board, but must be sufficient to cover the maximum funds that will be in the custody of the Association or its management agent at any one time. The premiums on such bonds and/or insurance shall be paid by the Association as a Common Expense.

10.7 **Accounting Records and Reports.** The Association shall maintain accounting records in the State, according to accounting practices normally used by similar associations. The records shall be open to inspection by Unit Owners or their authorized representatives at reasonable times and written summaries of them shall be supplied at least annually. The records shall include, but not be limited to, (a) a record of all receipts and expenditures, and (b) an account for each Unit designating the name and current mailing address of the Unit Owner, the amount of Assessments, the dates and amounts in which the Assessments come due, the amount paid upon the account and the dates so paid, and the balance due. Written summaries of the records described in clause (a) above, in the form and manner specified below, shall be supplied to each Unit Owner annually.

THIS IS NOT AN OFFICIAL COPY

CFN # 106678130, OR  43282  PG 2015, Page 73 of 94

Within ninety (90) days following the end of the fiscal year, the Association shall prepare and complete, or contract for the preparation and completion of a financial report for the preceding fiscal year (the "Financial Report"). Within twenty-one (21) days after the final Financial Report is compiled by the Association, or received from a third party, but not later than one hundred twenty (120) days following the end of the fiscal year, the Board shall mail, or furnish by personal delivery, a copy of the Financial Report to each Unit Owner, or a notice that a copy of the Financial Report will be mailed or hand delivered to the Unit Owner, without charge, upon receipt of a written request from the Unit Owner.

The Financial Report shall be prepared in accordance with the rules adopted by the Division. The type of Financial Report to be prepared shall, unless modified in the manner set forth below, be based upon the Association's total annual revenues, as follows:

(a)    REPORT OF CASH RECEIPTS AND EXPENDITURES -- if the Association's revenues are less than $100,000.00 or if the Association operates less than fifty (50) Units (regardless of revenue) (or, if determined by the Board, the Association may prepare any of the reports described in subsections (b), (c) or (d) below in lieu of the report described in this section (a)).

(b)    COMPILED FINANCIAL STATEMENTS -- if the Association's revenues are equal to or greater than $100,000.00, but less than $200,000.00 (or, if determined by the Board, the Association may prepare any of the reports described in subsections (c) or (d) below in lieu of the report described in this section (b)).

(c)    REVIEWED FINANCIAL STATEMENTS -- if the Association's revenues are equal to or greater than $200,000.00, but less than $400,000.00 (or, if determined by the Board, the Association may prepare the report described in subsection (d) below in lieu of the report described in this section (c)).

(d)    AUDITED FINANCIAL STATEMENTS -- if the Association's revenues are equal to or exceed $400,000.00.

A report of cash receipts and expenditures must disclose the amount of receipts by accounts and receipt classifications and the amount of expenses by accounts and expense classifications, including, but not limited to, the following, as applicable: costs for security, professional and management fees and expenses, taxes, costs for recreation facilities, expenses for refuse collection and utility services, expenses for lawn care, costs for building maintenance and repair, insurance costs, administration and salary expenses, and reserves accumulated and expended for capital expenditures, deferred maintenance, and any other category for which the association maintains reserves.

If approved by a majority of the voting interests present at a properly called meeting of the Association, the Association may prepare or cause to be prepared: (i) a report of cash receipts and expenditures in lieu of a compiled, reviewed, or audited financial statement; (ii) a report of cash receipts and expenditures or a compiled financial statement in lieu of a reviewed or audited financial statement; or (iii) a report of cash receipts and expenditures, a compiled financial statement or a reviewed financial statement in lieu of an audited financial statement. Such meeting and approval must occur prior to the end of the fiscal year and is effective only for the fiscal year in which the vote is taken. Prior to the time that control of the Association has been turned over to Unit Owners other than the Developer, all Unit Owners, including the Developer, may vote on issues related to the preparation of financial reports for the first two (2) fiscal years of the Association's operation. Thereafter, until control of the Association has been turned over to Unit Owners other than the Developer, all Unit Owners except for the Developer may vote on such issues.

10.8    Application of Payment. All payments made by a Unit Owner shall be applied as provided in these By-Laws and in the Declaration or as otherwise determined by the Board.

10.9    Notice of Meetings. Notice of any meeting where Assessments against Unit Owners are to be considered for any reason shall specifically contain a statement that Assessments will be considered and the nature of any such Assessments.

11.    Roster of Unit Owners. Each Unit Owner shall file with the Association a copy of the deed or other document showing his ownership. The Association shall maintain such information. The Association may rely upon the accuracy of such information for all purposes until notified in writing of changes therein as provided above. Only Unit Owners of record on the date notice of any meeting requiring their vote is given shall be entitled to notice of and to vote at such meeting, unless prior to such meeting other Owners shall produce adequate evidence, as provided above, of their interest and shall waive in writing notice of such meeting.

12.    Parliamentary Rules. Except when specifically or impliedly waived by the chairman of a meeting (either of members or directors), Robert's Rules of Order (latest edition) shall govern the conduct of the Association meetings when not in conflict with this Act, the Declaration, the Articles or these By-Laws; provided, however, that a strict or technical reading of said Robert's Rules shall not be made so as to frustrate the will of the persons properly participating in said meeting.

13.    Amendments. Except as may be provided in the Declaration to the contrary, these By-Laws may be amended in the following manner:

13.1    Notice. Notice of the subject matter of a proposed amendment shall be included in the notice of a meeting at which a proposed amendment is to be considered.

CFN # 106678130, OR ˈ 43282 PG 2016, Page 74 of 94

13.2   <u>Adoption</u>. A resolution for the adoption of a proposed amendment may be proposed either by a majority of the Board of Directors or by not less than one-third (1/3) of the members of the Association. Directors and members not present in person or by proxy at the meeting considering the amendment may express their approval in writing, provided that such approval is delivered to the Secretary at or prior to the meeting. The approval must be:

    (a)   by not less than a majority of the votes of all members of the Association represented at a meeting at which a quorum has been attained and by not less than 66-2/3% of the entire Board of Directors; or

    (b)   after control of the Association has been turned over to Unit Owners other than the Developer, by not less than 80% of the votes of the members of the Association represented at a meeting at which a quorum has been attained.

13.3   <u>Proviso</u>. No amendment may be adopted which would eliminate, modify, prejudice, abridge or otherwise adversely affect any rights, benefits, privileges or priorities granted or reserved to the Developer or mortgagees of Units without the consent of said Developer and mortgagees in each instance. No amendment shall be made that is in conflict with the Articles or Declaration. No amendment to this Section shall be valid.

13.4   <u>Execution and Recording</u>. A copy of each amendment shall be attached to a certificate certifying that the amendment was duly adopted as an amendment of these By-Laws, which certificate shall be executed by the President or Vice-President and attested by the Secretary or Assistant Secretary of the Association with the formalities of a deed, or by the Developer alone if the amendment has been adopted consistent with the provisions of the Declaration allowing such action by the Developer. The amendment shall be effective when the certificate and copy of the amendment is recorded in the Public Records of the County with an identification on the first page of the amendment of the Official Records Book and Page of said Public Records where the Declaration is recorded.

14.   <u>Rules and Regulations</u>. The Board of Directors may, from time to time, adopt and thereafter, modify, amend or add to such rules and regulations, except that subsequent to the date control of the Board is turned over by the Developer to Unit Owners other than the Developer, Owners of a majority of the Units may overrule the Board with respect to any such modifications, amendments or additions. Copies of such modified, amended or additional rules and regulations shall be furnished by the Board of Directors to each affected Unit Owner not less than thirty (30) days prior to the effective date thereof. At no time may any rule or regulation be adopted which would prejudice the rights reserved to the Developer.

15.   <u>Official Records</u>. From the inception of the Association, the Association shall maintain for the condominium, a copy of each of the following, where applicable, which shall constitute the official records of the Association:

    (a)   The plans, permits, warranties, and other items provided by the Developer pursuant to Section 718.301(4) of the Act;

    (b)   A photocopy of the recorded Declaration of Condominium and all amendments thereto;

    (c)   A photocopy of the recorded By-Laws of the Association and all amendments thereto;

    (d)   A certified copy of the Articles of Incorporation of the Association or other documents creating the Association and all amendments thereto;

    (e)   A copy of the current Rules and Regulations of the Association;

    (f)   A book or books containing the minutes of all meetings of the Association, of the Board of Directors, and of Unit Owners, which minutes shall be retained for a period of not less than 7 years.

    (g)   A current roster of all Unit Owners, their mailing addresses, Unit identifications, voting certifications, and if known, telephone numbers. The Association shall also maintain the electronic mailing addresses and the numbers designated by Unit Owners for receiving notices sent by electronic transmission of those Unit Owners consenting to receive notice by electronic transmission. The electronic mailing addresses and numbers provided by Unit Owners to receive notice by electronic transmission shall be removed from Association records when consent to receive notice by electronic transmission is revoked. However, the Association shall not be liable for an erroneous disclosure of the electronic mail address or the number for receiving electronic transmission of notices.

    (h)   All current insurance policies of the Association and of all Condominiums operated by the Association;

    (i)   A current copy of any management agreement, lease, or other contract to which the Association is a party or under which the Association or the Unit Owners have an obligation or responsibility;

    (j)   Bills of Sale or transfer for all property owned by the Association;

    (k)   Accounting records for the Association and the accounting records for the Condominium. All accounting records shall be maintained for a period of not less than 7 years. The accounting records shall include, but not be limited to:

CFN # 106678130, OR    43282   PG   2017,   Page   75 of 94

(i)    Accurate, itemized, and detailed records for all receipts and expenditures.

(ii)    A current account and a monthly, bimonthly, or quarterly statement of the account for each Unit designating the name of the Unit Owner, the due date and amount of each Assessment, the amount paid upon the account, and the balance due.

(iii)    All audits, reviews, accounting statements, and financial reports of the Association or Condominium.

(iv)    All contracts for work to be performed.  Bids for work to be performed shall also be considered official records and shall be maintained for a period of 1 year;

(l)    Ballots, sign-in sheets, voting proxies and all other papers relating to elections which shall be maintained for a period of 1 year from the date of the meeting to which the document relates.

(m)    All rental records where the Association is acting as agent for the rental of Units.

(n)    A copy of the current Question and Answer Sheet, in the form promulgated by the Division, which shall be updated annually.

(o)    All other records of the Association not specifically listed above which are related to the operation of the Association.

The official records of the Association shall be maintained in the County in which the Condominium is located, or if in another county then within twenty-five (25) miles of the Condominium.  The official records of the Association shall be open to inspection by any Association member or the authorized representative of such member and shall be made available to a Unit Owner within five (5) working days after receipt of a written request by the board or its designee.  This right to inspect the records includes the right to make or obtain copies, at a reasonable expense, if any, of the Unit Owner.  The Association may adopt reasonable rules regarding the time, location, notice and manner of record inspections and copying.  The failure of an Association to provide official records to a Unit Owner or his authorized representative within ten (10) working days after receipt of a written request therefor shall create a rebuttable presumption that the Association willfully failed to comply with this paragraph. Failure to permit inspection of the Association records as provided herein entitles any person prevailing in an enforcement action to recover reasonable attorneys' fees from the person in control of the records who, directly or indirectly, knowingly denies access to the records for inspection.  The Association shall maintain on the Condominium Property an adequate number of copies of the Declaration, Articles, By-Laws and rules, and all amendments to the foregoing, as well as the Question and Answer Sheet and year-end financial information required by the Act, to ensure their availability to Unit Owners and prospective purchasers.   The Association may charge its actual costs for preparing and furnishing these documents to those persons requesting same. Notwithstanding the provisions of this Section 15, the following records shall not be accessible to Unit Owners:

(i)    Any record protected by the lawyer-client privilege as described in Section 90.502, Florida Statutes, and any record protected by the work-product privilege including any record prepared by an Association attorney or prepared at the attorney's express direction, which reflects a mental impression, conclusion, litigation strategy, or legal theory of the attorney or the Association, and which was prepared exclusively for civil or criminal litigation or for adversarial administrative proceedings, or which was prepared in anticipation of imminent civil or criminal litigation or imminent adversarial administrative proceedings until the conclusion of the litigation or adversarial administrative proceedings.

(ii)    Information obtained by an Association in connection with the approval of the lease, sale or other transfer of a Unit.

(iii)    Medical records of Unit Owners.

16.    **Certificate of Compliance.**  A certificate of compliance from a licensed electrical contractor or electrician may be accepted by the Association's Board as evidence of compliance of the Units to the applicable condominium fire and life safety code.

17.    **Provision of Information to Purchasers or Lienholders.**  The Association or its authorized agent shall not be required to provide a prospective purchaser or lienholder with information about the Condominium or the Association other than information or documents required by the Act to be made available or disclosed. The Association or its authorized agent shall be entitled to charge a reasonable fee to the prospective purchaser, lienholder, or the current Unit Owner for its time in providing good faith responses to requests for information by or on behalf of a prospective purchaser or lienholder, other than that required by law, provided that such fee shall not exceed $150.00 plus the reasonable cost of photocopying and any attorney's fees incurred by the Association in connection with the Association's response.

18.    **Electronic Transmission.**  For purposes hereof, "electronic transmission" means any form of communication, not directly involving the physical transmission or transfer of paper, which creates a record that may be retained, retrieved, and reviewed by a recipient thereof and which may be directly reproduced in a comprehensible and legible paper form by such recipient through an automated process. Examples of electronic transmission include, but are not limited to, telegrams, facsimile transmissions of images, and text that is sent via electronic mail between computers. Notwithstanding the provision for electronic transmission of notices by the Association, same may be only be sent to Unit Owners that consent to receipt of Association notices by electronic transmission (and only for long as such

CFN # 106678130, OR F  43282  PG  2018,  Page  76 of 94

consent remains in effect).  Further, in no event may electronic transmission be used as a method of giving notice of a meeting called in whole or in part regarding the recall of a Director.

19.   Construction.  Wherever the context so permits, the singular shall include the plural, the plural shall include, the singular, and the use of any gender shall be deemed to include all genders.

20.   Captions.  The captions herein are inserted only as a matter of convenience and for reference, and in no way define or limit the scope of these By-Laws or the intent of any provision hereof.

The foregoing was adopted as the By-Laws of Q CLUB RESORT AND RESIDENCES CONDOMINIUM ASSOCIATION, INC., a corporation not for profit under the laws of the State of Florida, as of the ___ day of November, 2006.

Approved:

Jose E. Cabanas, President

Edward A. Cabanas, Secretary

THIS IS NOT AN OFFICIAL COPY

CFN # 106678130, OR F  43282  PG  2019,  Page  77 of 94

Exhibit "5"



December 8, 2006

FLORIDA DEPARTMENT OF STATE
Division of Corporations

Q CLUB RESORT AND RESIDENCES CONDOMINIUM ASSOCIATION, I
505 NORTH FORT LAUDERDALE BEACH BOULEVAR
FORT LAUDERDALE, FL  33304

The Articles of Incorporation for Q CLUB RESORT AND RESIDENCES CONDOMINIUM ASSOCIATION, INC. were filed on December 7, 2006, and assigned document number N06000012546.  Please refer to this number whenever corresponding with this office.

This document was electronically received and filed under FAX audit number H06000290579.

A corporation annual report/uniform business report will be due this office between January 1 and May 1 of the year following the calendar year of the file/effective date.  A Federal Employer Identification (FEI) number will be required before this report can be filed.  Please apply NOW with the Internal Revenue Service by calling 1-800-829-3676 and requesting form SS-4 or by going to their website at www.irs.ustreas.gov.

Please be aware if the corporate address changes, it is the responsibility of the corporation to notify this office.

Should you have any questions regarding corporations, please contact this office at the address given below.

Sincerely,
Ruby Dunlap
Regulatory Specialist
New Filings Section
Division of Corporations

Letter Number: 106A00070287

CFN # 106678130, OR : 43282 PG 2020, Page 78 of 94

H06000290579 3



ARTICLES OF INCORPORATION
FOR
Q CLUB RESORT AND RESIDENCES CONDOMINIUM
ASSOCIATION, INC.

The undersigned incorporator, for the purpose of forming a corporation not for profit pursuant to the laws of the State of Florida, hereby adopts the following Articles of Incorporation:

### ARTICLE 1
### NAME

The name of the corporation shall be **Q CLUB RESORT AND RESIDENCES CONDOMINIUM ASSOCIATION, INC.** For convenience, the corporation shall be referred to in this instrument as the "Association", these Articles of Incorporation as the "Articles", and the By-Laws of the Association as the "By-Laws".

### ARTICLE 2
### OFFICE

The principal office and mailing address of the Association shall be at 505 North Fort Lauderdale Beach Boulevard, Fort Lauderdale, Florida 33304, or at such other place as may be subsequently designated by the Board of Directors. All books and records of the Association shall be kept at its principal office or at such other place as may be permitted by the Act.

### ARTICLE 3
### PURPOSE

The purpose for which the Association is organized is to provide an entity pursuant to the Florida Condominium Act as it exists on the date hereof (the "Act") for the operation of that certain condominium located in Broward County, Florida, and known as **Q CLUB RESORT AND RESIDENCES CONDOMINIUM** (the "Condominium").

CFN # 106678130, OR    43282  PG  2021,  Page  79 of 94

H06000290579 3

## ARTICLE 4
### DEFINITIONS

The terms used in these Articles shall have the same definitions and meanings as those set forth in the Declaration of the Condominium to be recorded in the Public Records of Broward County, Florida, unless herein provided to the contrary, or unless the context otherwise requires.

## ARTICLE 5
### POWERS

The powers of the Association shall include and be governed by the following:

5.1   <u>General</u>. The Association shall have all of the common-law and statutory powers of a corporation not for profit under the Laws of Florida, except as expressly limited or restricted by the terms of these Articles, the Declaration, the By-Laws or the Act.

5.2   <u>Enumeration</u>. The Association shall have all of the powers and duties set forth in the Act, except as limited by these Articles, the By-Laws and the Declaration (to the extent that they are not in conflict with the Act), and all of the powers and duties reasonably necessary to operate the Condominium pursuant to the Declaration and as more particularly described in the By-Laws, as they may be amended from time to time, including, but not limited to, the following:

(a)   To make and collect Assessments and other charges against members as Unit Owners (whether or not such sums are due and payable to the Association), and to use the proceeds thereof in the exercise of its powers and duties.

(b)   To buy, accept, own, operate, lease, sell, trade and mortgage both real and personal property in accordance with the provisions of the Declaration.

(c)   To maintain, repair, replace, reconstruct, add to and operate the Common Elements and/or Association Property, and other property acquired or leased by the Association.

(d)   To purchase insurance upon the Common Elements and Association Property and insurance for the protection of the Association, its officers, directors and Unit Owners.

Articles

CFN # 106678130, OR   43282   PG   2022,   Page   80 of 94

H06000290579 3

(e)   To make and amend reasonable rules and regulations for the maintenance, conservation and use of the Common Elements and Association Property and for the health, comfort, safety and welfare of the Unit Owners.

(f)   To approve or disapprove the leasing, transfer ownership and possession of Units as may be provided by the Declaration.

(g)   To enforce by legal means the provisions of the Act, the Declaration, these Articles, the By-Laws, and the rules and regulations for the use of the Common Elements and Association Property.

(h)   To contract for the management and maintenance of the Common Elements and/or Association Property and to authorize a management agent (which may be an affiliate of the Developer) to assist the Association in carrying out its powers and duties by performing such functions as the submission of proposals, collection of Assessments, preparation of records, enforcement of rules and maintenance, repair and replacement of the Common Elements and Association Property with such funds as shall be made available by the Association for such purposes.   The Association and its officers shall, however, retain at all times the powers and duties granted by the Condominium Act, including, but not limited to, the making of Assessments, promulgation of rules and execution of contracts on behalf of the Association.

(i)   To employ personnel to perform the services required for the proper operation of the Common Elements and the Association Property.

(j)   To execute all documents or consents, on behalf of all Unit Owners (and their mortgagees), required by all governmental and/or quasi-governmental agencies in connection with land use and development matters (including, without limitation, plats, waivers of plat, unities of title, covenants in lieu thereof, etc.), and in that regard, each Owner, by acceptance of the deed to such Owner's Unit, appoints and designates the Board of Directors of the Association as such Owner's agent and attorney-in-fact to execute, any and all such documents or consents.

H06000290579 3

CFN # 106678130, OR   43282   PG   2023,   Page   81 of 94

H06000290579 3

5.3   **Association Property.** All funds and the title to all properties acquired by the Association and their proceeds shall be held for the benefit and use of the members in accordance with the provisions of the Declaration, these Articles and the By-Laws.

**Distribution of Income; Dissolution.** The Association shall not pay a dividend to its members and shall make no distribution of income to its members, directors or officers, and upon dissolution, all assets of the Association shall be transferred only to another non-profit corporation or a public agency or as otherwise authorized by the Florida Not For Profit Corporation Act (Chapter 617, Florida Statutes).

5.5   **Limitation.** The powers of the Association shall be subject to and shall be exercised in accordance with the provisions hereof and of the Declaration, the By-Laws and the Act, provided that in the event of conflict, the provisions of the Act shall control over those of the Declaration and By-Laws.

## ARTICLE 6
## MEMBERS

6.1   **Membership.** The members of the Association shall consist of all of the record title owners of Units in the Condominium from time to time, and after termination of the Condominium, shall also consist of those who were members at the time of such termination, and their successors and assigns.

6.2   **Assignment.** The share of a member in the funds and assets of the Association cannot be assigned, hypothecated or transferred in any manner except as an appurtenance to the Unit for which that share is held.

6.3   **Voting.** On all matters upon which the membership shall be entitled to vote, there shall be only one vote for each Residential Unit. The Hotel Unit shall be entitled to cast fifty (50) votes and the Commercial Unit shall be entitled to cast three (3) votes. All votes shall be exercised or cast in the manner provided by the Declaration and By-Laws. Any person or entity owning more than one Unit shall be entitled to cast the aggregate number of votes attributable to all Units owned.

CFN # 106678130, OR B  43282  PG  2024,  Page  82 of 94

H06000290579 3

6.4   Meetings.   The By-Laws shall provide for an annual meeting of members, and may make provision for regular and special meetings of members other than the annual meeting.



## ARTICLE 7
## TERM OR EXISTENCE

The Association shall have perpetual existence.

## ARTICLE 8
## INCORPORATOR

The name and address of the Incorporator of this Corporation is:

NAME

Jose E. Cabanas

ADDRESS

10520 N.W. 26th Street,
Suite C-201
Miami, Florida 33172

## ARTICLE 9
## OFFICERS

The affairs of the Association shall be administered by the officers holding the offices designated in the By-Laws. The officers shall be elected by the Board of Directors of the Association at its first meeting following the annual meeting of the members of the Association and shall serve at the pleasure of the Board of Directors. The By-Laws may provide for the removal from office of officers, for filling vacancies and for the duties and qualifications of the officers. The names and addresses of the officers who shall serve until their successors are designated by the Board of Directors are as follows:

President:

Jose E. Cabanas

10520 N.W. 26th Street
Suite, C-201
Miami, Florida 33172

Articles
-5-

H06000290579 3

CFN # 106678130, OR F 43282 PG 2025, Page 83 of 94

H06000290579 3

THIS IS NOT AN OFFICIAL COPY

Vice President:

Sergio A. Bagliery

8788 S.W. 8th Street
Miami, Florida 33174

Secretary/Treasurer:

Edward E. Cabanas

10520 N.W. 26th Street,
Suite, C-201
Miami, Florida 33172

## ARTICLE 10
## DIRECTORS

10.1 <u>Number and Qualification</u>. The property, business and affairs of the Association shall be managed by a board consisting of the number of directors determined in the manner provided by the By-Laws, but which shall consist of not less than three (3) directors. Directors need not be members of the Association.

10.2 <u>Duties and Powers</u>. All of the duties and powers of the Association existing under the Act, the Declaration, these Articles and the By-Laws shall be exercised exclusively by the Board of Directors, its agents, contractors or employees, subject only to approval by Unit Owners when such approval is specifically required.

10.3 <u>Election; Removal</u>. Directors of the Association shall be elected at the annual meeting of the members in the manner determined by and subject to the qualifications set forth in the By-Laws. Directors may be removed and vacancies on the Board of Directors shall be filled in the manner provided by the By-Laws.

10.4 <u>Term of Developer's Directors</u>. The Developer of the Condominium shall appoint the members of the first Board of Directors and their replacements who shall hold office for the periods described in the By-Laws.

Articles

H06000290579 3

CFN # 106678130, OR F  43282  PG  2026,  Page  84 of 94

H06000290579 3

10.5  First Directors.  The names and addresses of the members of the first Board of Directors who shall hold office until their successors are elected and have taken office, as provided in the Bylaws, are as follows:

| NAME | ADDRESS |
| --- | --- |
| Sergio A. Bagnosy | 8788 S.W. 8th Street, Miami, Florida 33174 |
| Joseph F. Cabanas | 10520 N.W. 26th Street, Suite, C-201 Miami, Florida 33172 |
| Maria C. Cabanas | 10520 N.W. 26th Street, Suite, C-201 Miami, Florida 33172 |

10.6  Standards.  A Director shall discharge his duties as a director, including any duties as a member of a Committee: in good faith; with the care an ordinary prudent person in a like position would exercise under similar circumstances; and in a manner reasonably believed to be in the best interests of the Association.  Unless a Director has knowledge concerning a matter in question that makes reliance unwarranted, a Director, in discharging his duties, may rely on information, opinions, reports or statements, including financial statements and other data, if prepared or presented by: one or more officers or employees of the Association whom the Director reasonably believes to be reasonable and competent in the manners presented; legal counsel, public accountants or other persons as to matters the Director reasonably believes are within the persons' professional or expert competence; or a Committee of which the Director is not a member if the Director reasonably believes the Committee merits confidence.  A Director is not liable for any action taken as a director, or any failure to take action, if he performed the duties of his office in compliance with the foregoing standards.

H06000290579 3

CFN # 106678130, OR B.   13282   PG   2027,   Page   85 of 94

H06000290579 3

## ARTICLE 11
### INDEMNIFICATION

11.1    Indemnitees.  The Association shall indemnify any person who was or is a party to any proceeding (other than an action by, or in the right of, the Association) by reason of the fact that he is or was a director, officer, employee or agent (each, an "Indemnitee") of the Association, against liability incurred in connection with such proceeding, including any appeal thereof, if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Association and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.  The termination of any proceeding by judgment, order, settlement, or conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in, or not opposed to, the best interests of the Association or, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

11.2    Indemnification.  The Association shall indemnify any person, who was or is a party to any proceeding by or in the right of the Association to procure a judgment in its favor by reason of the fact that he is or was a director, officer, employee, or agent of the Association against expenses and amounts paid in settlement not exceeding, in the judgment of the board of directors, the estimated expense of litigating the proceeding to conclusion, actually and reasonably incurred in connection with the defense or settlement of such proceeding, including any appeal thereof.  Such indemnification shall be authorized if such person acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Association, except that no indemnification shall be made under this subsection in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable unless, and only to the extent that, the court in which such proceeding was brought, or any other court of competent jurisdiction, shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

CFN # 106678130, OR 1   43282 PG 2028, Page 86 of 94

H06000290579 3

11.3   Indemnification for Expenses.  To the extent that a director, officer, employee, or agent of the Association has been successful on the merits or otherwise, in defense of any proceeding referred to in subsection 11.1 or 11.2, or in defense of any claim, issue, or matter therein, he shall be indemnified against expenses actually and reasonably incurred by him in connection therewith.

11.4   Determination of Applicability.   Any indemnification under subsection 11.1 or subsection 11.2, unless pursuant to a determination by a court, shall be made by the Association only as authorized in the specific case upon a determination that indemnification of the director, officer, employee, or agent is proper under the circumstances because he has met the applicable standard of conduct set forth in subsection 11.1 or subsection 11.2.  Such determination shall be made:

(a)   By the board of directors by a majority vote of a quorum consisting of directors who were not parties to such proceeding;

(b)   If such a quorum is not obtainable or, even if obtainable, by majority vote of a Committee duly designated by the Board of Directors (in which directors who are parties may participate) consisting solely of two or more Directors not at the time parties to the proceeding;

(c)   By independent legal counsel:

1.   selected by the Board of Directors prescribed in paragraph 11.4(a) or the committee prescribed in paragraph 11.4(b); or

CFN # 106678130, OR I   43282  PG  2029,  Page  87 of 94

H06000290579 3

2.   if a quorum of the Directors cannot be obtained for paragraph 11.4(a) and the Committee cannot be designated under paragraph 11.4(b), selected by majority vote of the full Board of Directors (in which Directors who are parties may participate); or

(d)   By a majority of the voting interests of the members of the Association who were not parties to such proceeding.

11.5   <u>Determination Regarding Expenses</u>.  Evaluation of the reasonableness of expenses and authorization of indemnification shall be made in the same manner as the determination that indemnification is permissible. However, if the determination of permissibility is made by independent legal counsel, persons specified by paragraph 11.4(c) shall evaluate the reasonableness of expenses and may authorize indemnification.

11.6   <u>Advancing Expenses</u>.  Expenses incurred by an officer or director in defending a civil or criminal proceeding may be paid by the Association in advance of the final disposition of such proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if he is ultimately found not to be entitled to indemnification by the Association pursuant to this section. Expenses incurred by other employees and agents may be paid in advance upon such terms or conditions that the Board of Directors deems appropriate.

11.7   <u>Exclusivity; Exclusions</u>.  The indemnification and advancement of expenses provided pursuant to this section are not exclusive, and the Association may make any other or further indemnification or advancement of expenses of any of its directors, officers, employees, or agents, under any bylaw, agreement, vote of shareholders or disinterested directors, or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office. However, indemnification or advancement of expenses shall not be made to or on behalf of any director, officer, employee, or agent if a judgment or other final adjudication establishes that his actions, or omissions to act, were material to the cause of action so adjudicated and constitute:

(e)   A violation of the criminal law, unless the director, officer, employee, or agent had reasonable cause to believe his conduct

H06000290579 3

CFN # 106678130, OR I   43282   PG   2031,   Page   89 of 94

H06000290579 3

expenses, or both, in view of all the relevant circumstances, regardless of whether such person met the standard of conduct set forth in subsection N.ll, subsection 11.2, or subsection 11.7, unless (a) a court of competent jurisdiction determines, after all available appeals have been exhausted or not pursued by the proposed indemnitee, that he did not act in good faith or acted in a manner he reasonably believed to be not in, or opposed to, the best interest of the Association, and, with respect to any criminal action or proceeding, that he had reasonable cause to believe his conduct was unlawful, and (b) such court further specifically determines that indemnification should be denied. The termination of any proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith or did act in a manner which he reasonably believed to be not in, or opposed to, the best interest of the Association, and, with respect to any criminal action or proceeding, that he had reasonable cause to believe that his conduct was unlawful.

11.10   Definitions. For purposes of this Article 11, the term "expenses" shall be deemed to include attorneys' fees, including those for any appeals; the term "liability" shall be deemed to include obligations to pay a judgment, settlement, penalty, fine, and expenses actually and reasonably incurred with respect to a proceeding; the term "proceeding" shall be deemed to include any threatened, pending, or completed action, suit, or other type of proceeding, whether civil, criminal, administrative or investigative, and whether formal or informal; and the term "agent" shall be deemed to include a volunteer; the term "serving at the request of the Association" shall be deemed to include any service as a director, officer, employee or agent of the Association that imposes duties on such persons.

11.11   Amendment.  Anything to the contrary herein notwithstanding, no amendment to the provisions of this Article 11 shall be applicable as to any party eligible for indemnification hereunder who has not given his prior written consent to such amendment.

H06000290579 3

CFN # 106678130, OR B  43282  PG  2032,  Page  90 of 94

H06000290579 3

## ARTICLE 12
### BY-LAWS

The first By-Laws of the Association shall be adopted by the Board of Directors and may be altered, amended or rescinded in the manner provided in the By-Laws and the Declaration.

## ARTICLE 13
### AMENDMENTS

Amendments to these Articles shall be proposed and adopted in the following manner:

13.1    _Notice._  Notice of a proposed amendment shall be included in the notice of any meeting at which the proposed amendment is to be considered and shall be otherwise given in the time and manner provided in Chapter 617, Florida Statutes. Such notice shall contain the proposed amendment or a summary of the changes to be affected thereby.

13.2    _Adoption._  Amendments shall be proposed and adopted in the manner provided in Chapter 617, Florida Statutes and in the Act (the latter to control over the former to the extent provided for in the Act).

13.3    _Limitation._  No amendment shall make any changes in the qualifications for membership, nor in the voting rights or property rights of members, nor any changes in Sections 5.3, 5.4 or 5.5, without the approval in writing of all members and the joinder of all record owners of mortgages upon Units. No amendment shall be made that is in conflict with the Act, the Declaration or the By-Laws, nor shall any amendment make any changes which would in any way affect any of the rights, privileges, powers or options herein provided in favor of or reserved to the Developer and/or Institutional First Mortgagees, unless the Developer and/or the Institutional First Mortgagees, as applicable, shall join in the execution of the amendment. No amendment to this paragraph 13.3 shall be effective.

13.4    _Developer Amendments._  To the extent lawful, the Developer may amend these Articles consistent with the provisions of the Declaration allowing certain amendments to be effected by the Developer alone.

Articles

H06000290579 3

CFN # 106676130, OR 1   43282   PG   2033,   Page   91 of 94

H06000290579 3

13.5   Recording.   A copy of each amendment shall be filed with the Secretary of State, pursuant to the provisions of applicable Florida law, and a copy certified by the Secretary of State shall be recorded in the public records of Broward County, Florida with an identification on the first page thereof of the book and page of said public records where the Declaration was recorded which contains, as an exhibit, the initial recording of these Articles.

## ARTICLE 14
### INITIAL REGISTERED OFFICE:
### ADDRESS AND NAME OF REGISTERED AGENT

The initial registered office of this corporation shall be at C/O Cabanas & Associates, P.A., 10520 N.W. 26th Street, Suite C-201, Miami, Florida 33172, with the privilege of having its office and branch offices at other places within or without the State of Florida.   The initial registered agent at that address shall be Jose E. Cabanas.

IN WITNESS WHEREOF, the Incorporator has affixed his signature the day and year set forth below.

Jose E. Cabanas, Incorporator

H06000290579 3

CFN # 106678130, OR ; 43282 PG 2034, Page 92 of 94

H06000290579 3

CERTIFICATE DESIGNATING PLACE OF BUSINESS OR DOMICILE
FOR THE SERVICE OF PROCESS WITHIN THIS STATE,
NAMING AGENT UPON WHOM PROCESS MAY BE SERVED

In compliance with the laws of Florida, the following is submitted:

First -- That desiring to organize under the laws of the State of Florida with

its principal office, as indicated in the foregoing articles of incorporation, in the

County of Broward, State of Florida, the Association named in the said articles has

named Jose E. Cabanas, located at C/O Cabanas & Associates, P.A., 10520 N.W.

26th Street, Suite C-201, Miami, Florida 33172, as its statutory registered agent.

Having been named the statutory agent of said Association at the place

designated in this certificate, I am familiar with the obligations of that position, and

hereby accept the same and agree to act in this capacity, and agree to comply with

the provisions of Florida law relative to keeping the registered office open.

Jose E. Cabanas, Registered Agent

DATED this __30__ day of
November, 2006.

H06000290579 3

CFN # 106678130, OR     43282 PG 2035,  Page 93 of 94

Exhibit "6"

Q Club Resort and Residences Condominium

Condominium Association's Estimated Operating Budget - Guaranteed Assessments

| Unit Number | Qty | Unit Mo. Fee w/Res. | Unit Annual Fee w/Res. |
|---|---|---|---|
| 601, 701, 801, 901, 1001, 1101, 1201, 1401, 1504, 1601, 1701, 1801, 1901, 2001, 2101, 2201, 2301, 2401, 2601, 2602, 702, 802, 902, 1082, 1102, 1202, 1402, 1504, 1602, 1702, 1802, 1902, 2002, 2102, 2202, 2302, 2402, 2502 | 38 | $ 28.96 | $ 305.71 |
| 603, 703, 803, 903, 1003, 1103, 1203, 1403, 1503, 1603, 1703, 1803, 1903, 2003, 2103, 2203, 2303, 2403, 2503, 604, 704, 804, 904, 1004, 1104, 1204, 1404, 1504, 1604, 1704, 1804, 1904, 2004, 2104, 2204, 2304, 2404, 1205, 605, 707, 707, 807, 907, 1007, 1407, 1207, 1407, 1607, 1707, 1807, 1907, 2007, 2107, 2207, 2307, 2407, 2507 | 57 | $ 14.56 | $ 151.28 |
| 609, 709, 809, 909, 1009, 1109, 1209, 1409, 1509, 1609, 1709, 1809, 1909, 2009, 2109, 2209, 2309, 2509 | 18 | $ 12.52 | $ 150.27 |
| 605, 705, 805, 905, 1005, 1105, 1205, 1405, 1505, 1605, 1705, 1805, 1905, 2005, 2105, 2205, 2305, 2405, 2505, 606, 706, 806, 906, 1006, 1106, 1206, 1406, 1506, 1606, 1706, 1806, 1906, 2006, 2106, 2206, 2506, 2406, 2506 | 38 | $ 18.33 | $ 225.92 |
| 608, 708, 808, 908, 1008, 1108, 1208, 1408, 1508, 1608, 1708, 1808, 1908, 2008, 2108, 2208, 2308, 2408, 2508, 610, 710, 810, 910, 1010, 1110, 1210, 1410, 1510, 1610, 1710, 1810, 1910, 2010, 2110, 2210, 2310, 2410, 2510, 2313, 2413 | 40 | $ 10.45 | $ 125.48 |
| 711, 811, 911, 1011, 1111, 1211, 1411, 1511, 1611, 1711, 1811, 1911, 2011, 2111, 2211, 2311, 2411, 2511, 712, 812, 912, 1012, 1112, 1212, 1412, 1512, 1612, 1712, 1812, 1912, 2012, 2112, 2212, 2312, 2412, 2512, 718, 818, 918, 1018, 1118, 1218, 1418, 1515, 1518, 1716, 1816, 1916, 2018, 2116, 2216 | 51 | $ 9.92 | $ 119.00 |
| 2314, 2414 | 2 | $ 8.23 | $ 98.76 |
| 715, 815, 915, 1015, 1115, 1215, 1415, 1515, 1616, 1715, 1815, 1916, 2015, 2115, 2215 | 16 | $ 9.69 | $ 115.83 |
| 713, 813, 913, 1013, 1113, 1213, 1413, 1513, 1613, 1713, 1813, 1913, 2013, 2113, 2213 | 15 | $ 19.56 | $ 234.73 |
| 714, 814, 914, 1014, 1114, 1214, 1414, 1514, 1614, 1714, 1814, 1914, 2014, 2114, 2214 | 15 | $ 14.13 | $ 169.54 |
| 617, 717, 817, 917, 1017, 1117, 1217, 1417, 1517, 1617, 1717, 1817, 1917, 2017, 2117, 2217, 618, 718, 818, 918, 1018, 1118, 1218, 1418, 1518, 1618, 1018, 1718, 1818, 1918, 2018, 2118, 2218 | 30 | $ 22.17 | $ 266.07 |
| 219, 220 | 2 | $ 10.78 | $ 129.40 |
| 221, 222 | 2 | $ 21.89 | $ 262.71 |
| 223, 224 | 2 | $ 57.26 | $ 687.13 |
| 225, 226 | 2 | $ 25.01 | $ 300.06 |
| 227 | 1 | $ 25.48 | $ 305.80 |
| 100 | 1 | $ 28.33 | $ 339.93 |
| 200 | 1 | $ 25.76 | $ 309.15 |
| 2400 | 1 | $ 46.89 | $ 562.53 |
| 2500 | 1 | $ 60.18 | $ 722.10 |
| CU 2 | 1 | $ 45.09 | $ 541.09 |
| CU 3 | 1 | $ 26.95 | $ 323.42 |
| CU 4 | 1 | $ 50.99 | $ 611.87 |
| CU 5 | 1 | $ 46.98 | $ 563.47 |
| CU 6 | 1 | $ 59.90 | $ 717.83 |
| CU 7 | 1 | $ 45.26 | $ 543.23 |
| Hotel Unit | 1 | $ 10,685.13 | $ 128,221.58 |
| Total | 340 | | |

CFN # 106678130, OR    43282  PG 2036, Page  94 of 94

Exhibit "7"

Q Club Resort and Residences Condominium

*Non-Hotel Units Allocated Share of Shared Costs*

| Unit Number | Qty | % Ea. Type | Total % By Type |
|---|---|---|---|
| 601, 701, 801, 901, 1001, 1101, 1201, 1401, 1501, 1601, 1701, 1801, 1901, 2001, 2101, 2201, 2301, 2401, 2501, 602, 702, 802, 902, 1002, 1102, 1202, 1402, 1504, 1902, 1702, 1802, 1902, 2002, 2102, 2202, 2302, 2402, 2502 | 38 | 0.4936% | 18.7571% |
| 603, 703, 803, 903, 1903, 1103, 1203, 1403, 1503, 1603, 1703, 1903, 1903, 2003, 2103, 2203, 2303, 2403, 2503, 604, 704, 804, 904, 1004, 1104, 1204, 1304, 1504, 1604, 1704, 1904, 1904, 2004, 2104, 2204, 2304, 2404, 2504, 607, 707, 807, 907, 1007, 1107, 1207, 1407, 1507, 1607, 1707, 1907, 1907, 2007, 2107, 2207, 2307, 2407, 2507 | 57 | 0.2215% | 12.6242% |
| 609, 709, 809, 909, 1009, 1409, 1209, 1409, 1509, 1609, 1709, 1809, 1909, 2009, 2109, 2209, 2309, 2409, 2509 | 19 | 0.2299% | 4.3678% |
| 605, 705, 805, 905, 1005, 1105, 1205, 1405, 1505, 1605, 1705, 1805, 1905, 2005, 2105, 2205, 2305, 2405, 2505, 606, 706, 806, 906, 1006, 1106, 1206, 1406, 1506, 1606, 1706, 1806, 1906, 2006, 2106, 2206, 2306, 2406, 2506 | 38 | 0.3312% | 12.5853% |
| 608, 708, 808, 908, 1008, 1108, 1208, 1408, 1508, 1608, 1708, 1808, 1908, 2008, 2108, 2208, 2308, 2408, 2500, 610, 710, 810, 910, 1010, 1110, 1210, 1410, 1510, 1610, 1710, 1810, 1910, 2010, 2110, 2210, 2310, 2410, 2510, 2313, 2413 | 40 | 0.1839% | 7.3560% |
| 711, 811, 911, 1011, 1111, 1211, 1411, 1511, 1611, 1711, 1811, 1911, 2011, 2111, 2211, 2311, 2411, 2511, 712, 812, 912, 1012, 1112, 1212, 1412, 1512, 1612, 1712, 1812, 1912, 2012, 2112, 2212, 2312, 2412, 2512, 716, 816, 916, 1016, 1116, 1216, 1416, 1516, 1616, 1716, 1816, 1916, 2016, 2116, 2216 | 51 | 0.1744% | 8.8968% |
| 2314, 2414 | 2 | 0.1448% | 0.2896% |
| 715, 815, 915, 1015, 1115, 1215, 1415, 1515, 1915, 1715, 1815, 1915, 2015, 2115, 2215 | 15 | 0.1698% | 2.5470% |
| 713, 813, 913, 1013, 1113, 1213, 1413, 1513, 1613, 1713, 1813, 1913, 2013, 2113, 2213 | 15 | 0.3441% | 5.1817% |
| 714, 814, 914, 1014, 1114, 1214, 1414, 1514, 1614, 1714, 1814, 1914, 2014, 2114, 2214 | 15 | 0.2465% | 3.7282% |
| 617, 717, 817, 917, 1017, 1117, 1217, 1417, 1517, 1617, 1717, 1817, 1917, 2017, 2117, 2217, 618, 718, 918, 918, 1018, 1118, 1218, 1418, 1518, 1618, 1718, 1818, 1918, 2018, 2118, 2218 | 30 | 0.3900% | 11.7014% |
| 218, 220 | 2 | 0.1897% | 0.3794% |
| 221, 222 | 2 | 0.3851% | 0.7702% |
| 223, 224 | 2 | 1.0073% | 2.0146% |
| 222, 226 | 2 | 0.4399% | 0.8798% |
| 227 | 1 | 0.4483% | 0.4483% |
| 100 | 1 | 0.4983% | 0.4983% |
| 200 | 1 | 0.4532% | 0.4532% |
| 2400 | 1 | 0.8248% | 0.8248% |
| 2500 | 1 | 1.0586% | 1.0586% |
| CU 2 | 1 | 0.7632% | 0.7532% |
| CU 3 | 1 | 0.4741% | 0.4741% |
| CU 4 | 1 | 0.8970% | 0.8970% |
| CU 5 | 1 | 0.8260% | 0.8260% |
| CU 6 | 1 | 1.0526% | 1.0526% |
| CU 7 | 1 | 0.7965% | 0.7965% |
| Total | 336 | | 100.0000% |

THIS IS NOT AN OFFICIAL COPY



**FORT LAUDERDALE
BEACH RESORT**

September 19, 2012

Michael and Patricia Bruens
1281 SW 20th Avenue
Boca Raton, FL 33486

RE: 1604

Dear Michael and Patricia Bruens, –

Please find the attached revised Rules and Regulations for Unit Access for Resort Program Non-Members. As per Rules and Regulations document please remit payment for the 90 days initial prepayment of the Resort Access Fee and the Hotel Related Service Fees in the amount of $13,500.00.

Please be advised payment is due within 10 days of written notice of Rules and Regulations.

Payment should be made out to the Hilton Fort Lauderdale Beach Resort and sent to:

> Hilton Fort Lauderdale Beach Resort
> Attn: Condo Accounting
> 505 North Fort Lauderdale Beach Resort
> Fort Lauderdale, FL. 33304

If you have any questions about the account or the amount that is due, please contact me by email at Janell.Uhl@hilton.com.

Sincerely,

Janell Uhl
Accounting Manager

**Exhibit 2**

# Q CLUB HOTEL, LLC

## Rules and Regulations for Unit Access for Resort Program Non-Members

Pursuant to Section 16.10 of the Q Club Resort and Residences Condominium Declaration, please be advised that the Hotel Unit Owner (Hotel) has adopted the following rules and regulations regarding access control and check-in, check-out, and other matters which are applicable to Resort Program Non-Members and their Permitted Occupants.

Resort Program Non-Members refers to Unit Owners who are not in the Resort Program described in the Hilton Fort Lauderdale Resort Owner Orientation Guide, a copy of which is available upon request from the Owner Relations Manager at the Hilton Fort Lauderdale Beach Resort.

Permitted Occupant refers to all persons, guests and invitees of a Resort Program Non-Member, including a Unit Owner, that have been authorized, by written notice to the Hotel, to occupy the Unit of a Resort Program Non-Member solely for transient purposes, provided that the Resort Program Non-Member and his/her Permitted Occupants are at all times in compliance with the terms hereof and the Hotel's other or ancillary rules, regulations and procedures for hotel check-in, check-out and use of hotel services.

No guest (including unit owners) of the Hotel shall be provided with lodging for more than sixty (60) days during November 15th to April 15th of each year, and no more than a total of one hundred and twenty (120) days in any calendar year.

A. It is mandatory for all Hotel guests, Unit Owners, Resort Program Non-Members and Permitted Occupants of the Hilton Fort Lauderdale Beach Resort to check-in and check-out with the hotel front desk located in the lobby of the Hilton Fort Lauderdale Beach Resort.

B. The Hotel will provide housekeeping service to Resort Program Non-Members unless they elect a no-service option at the time of making their reservation. Housekeeping service includes room cleaning, towel and linen replacement, dishware and flatware replacement. The Hotel will provide housekeeping service to Permitted Occupant(s) for a fee. The daily housekeeping service rates currently in effect are as follows:

| Room types: | Daily Rate: |
| --- | --- |
| Three bedroom suite | $350 |
| Two bedroom suite | $180 |
| One bedroom suite | $130 |
| Studio/Junior suite | $110 |

*Applicable taxes will be added to above daily rates. Rates are subject to change at any time without advance notice.*

C.   The Hotel will provide deep cleaning room services to Resort Program Non-Members and Permitted Occupants for a fee. The deep cleaning service rates currently in effect are as follows:

| Room types: | Rate: |
| --- | --- |
| Three bedroom suite | $1,150 |
| Two bedroom suite | $950 |
| One bedroom suite | $750 |
| Studio/Junior suite | $550 |

*Applicable taxes will be added to above daily rates. Rates are subject to change at any time without advance notice.*

D.   All reservations for use of a Unit of a Resort Program Non-Member must be made in writing or by email to OR_FLLFS@hilton.com. Any person whose name does not appear on the reservation at time of arrival will not be granted access to any unit for any reason. The Unit Owner shall at all times keep the Hotel and the Owner Relations Manager informed, in advance of arrival, of the Permitted Occupant(s) who will occupy the Unit solely for transient purposes. The Unit Owner shall also inform the Hotel, in advance, of the duration of the transient stay of such Permitted Occupant(s). All inquiries may be directed to the Owner Relations Manager at the Hilton Fort Lauderdale Beach Resort.

E.   If a Resort Program Non-Member has designated any Permitted Occupant(s), (other than the Unit Owner), then the Resort Program Non-Member (the Unit Owner) shall pay to the Hotel a Resort Access Fee for and in consideration of the Hotel granting to the Permitted Occupant(s) (other than the Unit Owner), access to the hotel concierge, the hotel front desk for the purpose of check-in and check-out, issuing and retrieving keys to the Unit of the Resort Program Non-Member, and for the granting of such other or ancillary hotel, guest and resort services in connection therewith as the Hotel may determine from time to time.

F.   If a Resort Program Non-Member has designated any Permitted Occupant(s), (other than the Unit Owner), then the Resort Program Non-Member (the Unit Owner) shall pay to the Hotel a Hotel Related Service Fee for and in consideration of the Hotel providing to the Permitted Occupant(s) (other than the Unit Owner), hotel and/or transient rental services, including, but not limited to, solicitation and/or provision of personal services (i.e., massage, personal training, dry cleaning, etc.) and/or food and beverage service, and for the granting of such other or ancillary hotel, guest and resort services in connection therewith as the Hotel may determine from time to time.

G.   The Resort Access Fee shall be equal to $75.00 for every day that the Unit is occupied by a Permitted Occupant (other than the Unit Owner),. The Hotel Related Service Fee shall be equal to $75.00 for every day that the Unit is occupied by a Permitted Occupant(s) (other than the Unit Owner). The Unit of a Resort Program Non-Member shall be deemed occupied for a "day" for a) each twenty-four hour period (or portion thereof) that the Unit is occupied; or b) any night the Unit is occupied, at Hotel's election, but in no event shall a Unit be deemed occupied more than once in any "day" by the same person, guest, or invitee. For purposes of example, if a guest arrives at 10 PM and departs at 11 AM the following day, this shall be deemed only one "day" of transient occupancy by such guest.

H.   The Unit Owner shall prepay an amount equal to the amount of the Resort Access Fee and the Hotel Related Service Fee, for ninety days' (90) of occupancy (the Initial Prepayment), which Initial Prepayment shall be non-refundable, earned upon receipt, but creditable against the payment of the Resort Access Fee and the Hotel Related Service Fee for the first ninety (90) days' of occupancy by a Permitted Occupant(s) (other than the Unit Owner). The payment of the Initial Prepayment shall be a precondition to the permitted or continued use of the Unit (or any part of the Shared Components or Condominium Property) by any Permitted Occupant(s) (other than the Unit Owner), or access to any hotel or resort services provided by Hotel to any Permitted Occupant(s) (other than the Unit Owner). The Unit Owner shall not receive a refund of any portion of the Prepayment if the Unit is not occupied for any period of time during such one year period from the date of payment thereof and the Initial Prepayment shall not "rollover" to any succeeding one (1) year period from the date of payment thereof.

I.   The Resort Program Non-Member shall make subsequent and additional Prepayments (Additional Prepayments) of the Resort Access Fee and the Hotel Related Service Fee, after the Initial Prepayment amounts have been utilized to cover a sixty (60) day occupancy period by a Permitted Occupant(s) (other than the Unit Owner). Such Additional Prepayments of the Resort Access Fee and the Hotel Related Service Fee shall be for an additional ninety (90) day occupancy period by any Permitted Occupant(s) of the Unit of a Resort Program Non-Member. In the event that the Additional Prepayments of the Resort Access Fee and the Hotel Related Service Fee are not made and tendered within ten (10) days after written notice by the Hotel to the Resort Program Non-Member, then any Permitted Occupant(s) (excepting the Unit Owner) shall not be granted access to the Unit of a Resort Program Non-Member for any reason until such time as the Additional Prepayments have been actually collected by the Hotel. The payment of the Additional Prepayments referenced herein shall be a precondition to the permitted or continued use of the Unit (or any part of the Shared Components or Condominium Property) by any Permitted Occupant(s) (other than the Unit Owner), or access to any hotel or resort services provided by Hotel to any Permitted Occupant(s) (other than the Unit Owner).

J.   The Resort Access Fee and/or the Hotel Related Service Fee may be increased by the Hotel by an amount to be determined by the Hotel in its sole and absolute discretion, provided however, that notice of the increase, if any, shall be provided to the Resort Program Non-Member. After the increase, if any, then the increased Resort Access Fee and/or Hotel Related Service Fee shall then be in effect for the next ensuing one year period.

K.   The Hotel Unit Owner may establish such other rules, regulations, and other procedural requirements or standards for collection and payment of the Resort Access Fee and/or the Hotel Related Service Fee from Resort Program Non-Members, including but not limited to deducting and collecting the Resort Access Fee and/or the Hotel Related Service Fee or any Additional Prepayments in connection therewith as an element or component of the Resort Program Non-Member's Shared Costs in accordance with the terms and provisions of the Condominium Declaration.

L.   In the event that a Unit Owner shall discontinue being a Resort Program Non-Member then these Rules and Regulations for Unit Access for Resort Program Non-Members shall no longer apply to such Unit owner.

M.     All Resort Program Non-Members shall deliver to the Owner Relations Manager at the Hilton Fort Lauderdale Beach Resort an acknowledgement of receipt of these rules as a precondition to the permitted use of the Unit (or any part of the Shared Components or Condominium Property) by any Permitted Occupant(s) or access to any hotel or resort services provided by Hotel to any Permitted Occupant(s).

# Q CLUB HOTEL, LLC

ACKNOWLEDGMENT RECEIPT

OF

<u>RULES AND REGULATIONS FOR UNIT ACCESS FOR RESORT PROGRAM NON-MEMBERS</u>

I, _____, the undersigned, do hereby acknowledge having received a copy of the Rules and Regulations for Unit Access for Resort Program Non-Members from the Q Club Hotel, LLC. or the Owner Relations Manager at the Hilton Fort Lauderdale Beach Resort, on the date designated below.

_____          Dated:_____, _____

Unit Owner Signature:

Unit Owner Printed Name: _____

Unit Number: _____